**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| TUPPERWARE BRANDS CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 24-12156 (___) |
| Debtors. | ) |
| | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF**
**BRIAN J. FOX, CHIEF RESTRUCTURING**
**OFFICER OF TUPPERWARE BRANDS CORPORATION,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Brian J. Fox, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer of Tupperware Brands Corporation (the "Company", and together with the other above-captioned debtors and debtors in possession, the "Debtors," and collectively with their non-debtor affiliates, "Tupperware").

**Introduction**

2.     Tupperware is a leading global brand for food storage and other kitchen and beverage solutions and an iconic American company.  Founded in 1946 and headquartered in Orlando, Florida, Tupperware currently employs a global workforce of over 5,450 employees in 41 countries and partners with a world-wide sales force of over 465,000 independent sales consultants who sell the Debtors' products on a freelance basis (the "Sales Force" comprised of the "Independent Consultants") into nearly 70 countries.  For the fiscal year 2023, Tupperware's revenue was approximately $1.1 billion.  Tupperware's common stock is publicly traded on the New York Stock Exchange.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Tupperware.  The location of the Debtors' service address in these chapter 11 cases is: 14901 S Orange Blossom Trail, Orlando, FL 32837.

3.    Tupperware has approximately $811.8 million of funded debt obligations, consisting primarily of a single, first lien credit facility.  The Debtors—which consist of nine U.S. entities and one Swiss entity—are the obligors on the facility.  The Debtors also have dozens of non-debtor foreign operating subsidiaries, in countries all over the world, that are not obligors on the funded debt.  With the exception of an $8 million bridge loan entered into last month, the Debtors have no funded debt other than the first-lien debt borrowed under the Credit Agreement. Until recently, the term loan facility was held by ten lenders consisting entirely of incumbent commercial banks, led by Wells Fargo, the administrative agent and a significant lender.

4.    For decades, Tupperware's direct selling business model thrived, offering individuals across the globe—predominantly women—an opportunity to build their own businesses and develop valuable leadership and financial management skills, while also cementing the Tupperware brand in the hearts and homes of consumers.  In recent years, however, the historical strengths of a widespread direct selling model began to turn into weaknesses. The Company's focus on its direct sales model ultimately came at the cost of developing an omnichannel strategy, or even modern e-commerce infrastructure to support its Sales Force.  These issues, and others described in greater detail herein, resulted in the Company issuing a "going concern" warning in a connection with its third quarter FY2022 earnings release.  This news prompted headlines that "the party was over" for Tupperware, exacerbating Sales Force deterioration.

5.    This operational deterioration began to put significant stress on the Company's capital structure by the end of 2022 turning into the new year.  In November 2022, the Company retained A&M.  The Company subsequently retained Moelis to provide financial advisory services in connection with its balance sheet, including, but not limited to the marketing and sale of all or

substantially all of its assets and potential refinancing, restructuring and/or recapitalization transactions, and Kirkland & Ellis as legal counsel.  The Company entered into restructuring discussions with Wells Fargo, who retained McGuire Woods as counsel and RPA as financial advisor, and the other term lenders.  In consultation with the lenders, in April 2023, the Company determined to launch a marketing process in parallel to negotiations with its lenders regarding a standalone restructuring.

6.      The marketing process generated significant interest from numerous parties. After executing NDAs with 36 parties, the Debtors received 8 indications of interest at valuations that, while well inside the principal amount of the term loan, were significant.  Ultimately, however, after multiple rounds of negotiation with a number of these interested bidders over several months, the marketing process did not produce any offers that were sufficiently attractive to the term lenders.  Accordingly, on August 2, 2023, the Company and its lenders executed a Debt Restructuring Agreement that reallocated and restructured the Company's secured debt to give the Company liquidity and breathing room to execute a turnaround.

7.      In connection with the Debt Restructuring Agreement, the Company created a restructuring committee of the Board of Directors (the "Transformation Committee") and retained several turnaround veterans to help manage liquidity, evaluate the business, and develop structural and strategic initiatives to address key weaknesses and renew turnaround efforts.  The Debtors also appointed a new Chief Executive Officer who helped recruit an accomplished management team to lead the business.

8.      But liquidity issues quickly resurfaced, exacerbating the Company's operational challenges and perpetuating the overhang of negative publicity.  In February 2024, the Debtors missed an interest payment on the term loan, requiring additional disclosures regarding the

Company's financial position.  On February 13, 2024, the Debtors and certain of their lenders entered into a Forbearance Agreement containing milestones for a second marketing process and, as a contingency, chapter 11 preparations.

9.      Guided by the Transformation Committee, the Company sought any and all proposals ranging from out-of-court recapitalization structures, to asset sales, to whole-company transactions.  Again, the Company received multiple indications of interest at significant valuations.  Through the Spring of 2024, the Transformation Committee, the executive leadership team, and the Company's advisors carefully evaluated proposals and negotiated with interested counterparties to identify a comprehensive solution for the Company.  This second process resulted in a transaction proposal that—after extensive development and negotiation—fell through on the eve of execution going into the July 4, 2024, holiday weekend.

10.      Facing ever more urgent liquidity needs and continued operational stress, the Company restarted marketing efforts for a third time after the July 4 weekend.  This third round of marketing required an extension of the Forbearance Agreement, and in connection therewith, the Debtors lifted certain restrictions on trading the term loans, which were contained in the Credit Agreement and certain confidentiality agreements.  Thereafter, in July 2024, a majority by principal amount of the Debtors' first-lien debt traded to three new holders:  Stonehill, Alden, and a BAML trading desk.  The three new lenders formed an ad hoc group (the "Ad Hoc Group") and retained Dechert as counsel.  Another lender, Wexford, also bought a portion of the debt. The Debtors understand that these new lenders purchased the debt between three and six cents on the dollar.  The implied value of this purchase—between $15 million and $30 million in the aggregate for a majority of the $800 million debt—is well below the value of various indications of interest the Company has received in its marketing processes to date.

11.     The Company entered into discussions with the Ad Hoc Group regarding a going-concern transaction in which the Ad Hoc Group would acquire the Tupperware brand name, select assets in the United States, and select foreign subsidiaries.  Weeks of in-depth diligence meetings occurred among principals and advisors regarding the Company's business and structure and the proposed go-forward business model.

12.     In August, to fund their diligence process, the Ad Hoc Group provided an $8 million bridge loan secured by certain of the Debtors' inventory, giving the Debtors access to approximately $6 million of proceeds (taking into account a 25% OID).  The Ad Hoc Group, as majority lenders, directed that the inventory be released from the collateral securing the existing term loan to serve as collateral for the bridge loan.  The Ad Hoc Group excluded Wexford from the bridge loan, and Wexford subsequently filed a lawsuit against two members of the Ad Hoc Group in connection with the bridge loan, which remains pending.  The Debtors have encouraged the Ad Hoc Group to engage constructively with Wexford, notwithstanding the pending suit, but understand that to-date, the Ad Hoc Group has hesitated to do so.

13.     From the outset, the Debtors proposed that any sale to the Ad Hoc Group would be implemented through a chapter 11 proceeding and funded by a debtor-in-possession financing facility provided by the Ad Hoc Group.  The Company submitted a form of a section 363 sale asset purchase agreement to the Ad Hoc Group and a proposed DIP budget.  The Ad Hoc Group indicated that a DIP term sheet and proposed DIP order would be forthcoming.

14.     Instead, on August 30, 2024, the Ad Hoc Group informed the Company that it was strongly considering implementing its proposed acquisition through an out-of-court strict foreclosure on a subset of the Company's assets, including the Tupperware brand name. The Company informed the Ad Hoc Group that it was not supportive of this approach for numerous

reasons, including that it did not provide notice and an opportunity to be heard to the Company's stakeholders in an open forum.  Weeks of discussion regarding these competing implementation mechanisms ensued, culminating in a letter from the Ad Hoc Group to the Tupperware board of directors on September 11, 2024, attached hereto as **Exhibit A**, and a letter from the Company to the Ad Hoc Group in response on September 14, 2024, attached here to as **Exhibit B**.  The Ad Hoc Group sent a responsive letter on September 16, 2024, which is attached hereto as **Exhibit C**.  Ultimately, after significant deliberation, the board of directors determined that, given the number of constituents and parties in interest involved, it could not support a strict foreclosure.

15.     Accordingly, the Debtors have commenced these chapter 11 cases to utilize their limited cash on hand to fund an approximately 30-day bidding process.  Substantially concurrently herewith, the Debtors intend to file an emergency bidding procedures motion, seeking the Court's approval of that timeline.  The motion will be accompanied by a declaration (the "Steinberg Declaration") from Adam Steinberg, of Moelis, attesting to the 17 months of marketing that have already occurred, which supports proceeding expeditiously with a 30-day, final phase of the marketing process.  The bidding procedures motion proposes that all bids must be in cash.  Given the level of interest in the marketing process to date, the Debtors believe that an all-cash auction will foster a competitive bidding environment.

16.     The Debtors have also filed a proposed consensual cash collateral motion and a customary suite of first-day pleadings to support a 30-day bidding process.  As of the Petition Date, the Debtors have approximately $7.4 million of cash, which they expect will be sufficient to fund this expedited process.  The Debtors understand that the Ad Hoc Group intends to object to the use of cash collateral and file a motion to convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, to dismiss the chapter 11 cases, or for relief from the automatic stay to

execute their foreclosure strategy. The Debtors intend to oppose the Ad Hoc Group's efforts to shut down the business and foreclose on the Company. Instead, the Debtors will seek to use the chapter 11 process to preserve this iconic American company as a going concern, to the benefit of all of the Debtors' stakeholders, including the thousands of employees, consumers, vendors, and others that depend on a value-maximizing outcome here.

### Background and Qualifications

17.    I am a Managing Director at Alvarez & Marsal, North America, LLC ("A&M"). I was appointed Chief Restructuring Officer of Tupperware on May 4, 2023. For over a year, my team and I have worked closely with the Debtors to oversee their current restructuring initiatives. As such, I am familiar with the Debtors' operations, business affairs, financial performance, and restructuring efforts.

18.    I have more than thirty years of experience advising on corporate finance and restructuring transactions. Some of those engagements include the representation of debtors in company restructurings such as GenesisCare Inc., Loyalty Ventures Inc., GTT Communications, Inc., Dean Foods, Inc., The Rockport Company, Performance Sports Group, Totes/Isotoner and GulfMark, Inc., Caesars Entertainment Operating Company, and Momentive Performance Materials. I have also served as chief restructuring officer and interim chief financial officer for companies, including debtors-in-possession in chapter 11 cases. In each of these situations, I have led the review and development of cash flow forecasts and strategic and operating plans, the evaluation of capital structure alternatives, and the negotiation and implementation of restructuring transactions.

19.    A&M is a global business advisory firm that, together with its affiliates, employs over 10,000 professionals in 83 offices worldwide. Prior to the date hereof (the "Petition Date"),

A&M was engaged by the Debtors to help manage their liquidity, identify strategic options to enhance liquidity and profitability, and assist with the development of a business plan and preparing for these chapter 11 cases.

20.     As Chief Restructuring Officer of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and interested parties in understanding why the Debtors filed these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in the motions filed along with the petitions (collectively, the "First Day Motions").  The facts set forth in each First Day Motion are incorporated herein by reference.  I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to smoothly transition into chapter 11 and to continue ordinary course operations postpetition.

21.     Except where otherwise noted, the statements set forth in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and third-party advisors.  I am above eighteen years of age and I am competent to testify.  If called upon to testify, I could and would testify competently to the facts set forth herein.

*       *       *       *       *

22.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections.  The *first* section provides background information on the Company's corporate history.  The *second* section provides an overview of the Company's

current operations. The *third* section offers detailed information on the Debtors' prepetition capital structure. The *fourth* section describes the circumstances leading to the filing of these chapter 11 cases. The *fifth* section summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

<u>Section 1:  Corporate History</u>

I.      **The Founder of Fresh and the Life of the Party:  Earl Silas Tupper & Brownie Wise.**

A.      **The Invention of Tupperware.**

23.      Tupperware's story begins with Earl Tupper, a farmer's son with a penchant for inventing and an interest in advertising. Ever resourceful, Tupper aspired to achieve fame and riches as an inventor. He found inspiration in everyday challenges, constantly looking for ways to improve day-to-day life.

24.      In 1938, Tupper started a plastics company, the Earl S. Tupper Company (also known as Tupper Plastics). Tupper Plastics found its legs during World War II, producing gas masks and other wartime supplies. The post-war transition period marked a pivotal juncture for Tupper Plastics and the entire plastics industry. At the time, plastics were not widely used in consumer goods, so plastic manufacturers had significant surplus production capacity once hostilities ceased. Plastics were made of polyethylene, which was black, brittle, slimy, and smelled bad, making it difficult to work with and even more difficult to market to consumers who, unlike soldiers, had a choice in what they used. Tupper tinkered until he created a durable, clean, and translucent plastic.

25.      This new plastic, while a major innovation, was only half of the equation—the other half was the "Tupper seal." Inspired by the airtight seal commonly found on paint cans at that time (which could keep paint from drying out for years), Tupper created an air-tight, leak-proof

lid that could be sealed by pressing it to "burp" out the air (leading to the moniker "burping" seal). Tupper utilized this seal in a bowl—the Wonder Bowl—which became the cornerstone of Tupperware (and is still sold worldwide, now called the Wonderlier® Bowl). In 1946, Tupper debuted the Wonder Bowl and thirteen other companion products.

26.     Tupper's food storage products were an invention made for the moment. Consumerism was on the rise, and Americans were particularly looking for practical purchases that would improve their day-to-day lives (refrigerators being one of the most-purchased items of the time). Tupperware offered an attractive, affordable product—soon available in bright colors named after fruits and gemstones—that was highly functional for reducing food waste, which was a major financial drain for growing families in the post-war era.

27.     Tupper's products were available in hardware and department stores, and he even opened a store front on 5th Avenue. While unimaginable now, the Wonder Bowl was too high tech for consumers, who were used to using tin foil, glass jars, or ceramic containers. Tupper marketed his plastic alternatives heavily, including distributing catalogues and giving products away with cigarettes, with little success until a single mother from Detroit changed everything.

**B.      The Start of the Tupperware Party.**

28.     Brownie Wise was a divorcée and single mother living in Detroit when a friend who had come across Tupperware in a hardware store introduced her to the product in 1947. It took her three days to figure out how to use the Tupper seal, but once she got the hang of it, she immediately saw the potential.

29.     At the time, Wise worked for Stanley Home Products, which had recently launched a new sales model that involved home-based sales demonstrations. Wise, who had previously worked at an advertising agency, had a knack for marketing. Putting her own spin on things, Wise

envisioned a new business model based around parties ("Polly-T" parties, after the new plastic utilized in Tupperware products).  Wise received Tupper's permission to sell Tupperware, recruited a few friends to work with her, and embarked on her new business venture.

30.    At a Polly-T party (now known as a "Tupperware Party") a host would pair with a well-dressed Tupperware dealer, who would give a product demonstration and sell products to any interested guests.  The parties were fun and interactive events.  Famously, Wise would fill a Wonder Bowl with water (or even grape juice), show the group how to "burp" the lid, and then toss the bowl to an attendee.  The women, who were used to containers that would shatter and spill, marveled that not a single drop escaped through the Tupper seal.  Wise and her team quickly outsold retail stores and Tupper's other independent distributors.  In 1951, Tupper pulled his products from stores and hired Wise to serve as his head of marketing and vice president of the Company, a position unheard of for a woman at the time.

31.    Wise's approach—like Tupper's product—was perfect for the moment.  Women, who had held jobs during the war, were back at home and, in many cases, longing for more.  Wise encouraged these women to believe in themselves and dream big, and to represent both themselves and the Company's products with confidence.  At the same time, consumers were looking to spend, but not opulently, and homemaking was a priority as the post-war baby boom began.  Tupperware Parties offered the perfect opportunity to socialize and earn supplemental income, all from the comfort of one's home, without threatening the established family order.

32.    Famous for saying, "If we build the people, they'll build the business," Wise not only empowered women; she also incentivized them.  Wise introduced the concept of "Jubilees," which were lavish annual celebrations designed to reward top sellers with recognition, entertainment, and prizes.  These events were unprecedented at the time and fostered a strong sense

of community and loyalty among the sales force.  Wise's approach turned the Company into an

empire, and in 1954, she became the first woman to be featured on the cover of *Business Week*.

## II.     Mergers, Acquisitions, and Expansion.

33.     Between 1958 and 1996, the Company was the subject of several major

transactions, including (a) a 1958 sale to Rexall Drug Company (later renamed to Dart Industries,

Inc., "Dart"); (b) a 1980 merger with Kraft, Inc. ("Kraft") (one of the largest U.S. mergers in

history at that time), forming Dart & Kraft, Inc ("Dart & Kraft"); (c) a 1986 de-merging from

Kraft; and (d) a 1996 spin off from its post-Dart & Kraft parent company (Premark International,

Inc.), resulting in the Tupperware Corporation.  In this period, the Company also significantly

expanded its operational footprint, establishing a presence in dozens of new countries on multiple

continents.

34.     Moving into the 2000s, the Company diversified into beauty and personal care

brands by acquiring companies like BeautiControl (a beauty company specializing in spa

treatments) and direct-selling brands like Avroy Shlain, Fuller Cosmetics, NaturCare, Nutrimetics,

and Nuvo from the Sara Lee Corporation.  The brand continued to accumulate accolades, including

being named one of Fortune Magazine's "World's Most Admired Companies" in 2008.  By 2015,

Tupperware brands were sold in over 80 countries, the Sales Force consisted of approximately

3.1 million Independent Consultants, an estimated 90% of American homes owned at least one

Tupperware product, and the Company held over 10,000 product patents.

35.     Gradually, however, Tupperware began finding itself "late to the party" when it

came to modern consumers.  Consumers primarily purchase homewares either in stores

(approximately 76%) or online (approximately 20%), where Tupperware's products were

historically not available.  While Tupperware maintains a website, even today that website only

includes 13% of Tupperware's products, and the 87% that are missing include some of Tupperware's most beloved products.  The Company has also struggled to make its products consistently available online and for the Sales Force, and the technology supporting the Sales Force is a step behind that of the Company's competitors, resulting in further frustrations and Sales Force deterioration.

36.     As described in greater detail below, the Company developed a revitalization plan for the business in the face of these challenges—including a focus on sales channel modernization—but started from behind, particularly stressed under the weight of the Company's existing capital structure.

<u>**Section 2: Current Operations**</u>

**I.     Operations Overview.**

37.     Notwithstanding its challenges, Tupperware remains a leader in the global food storage market and one of the most trusted brands in America.[2]  The Company employs 5,450 employees across 41 countries and has a Sales Force of over 465,000 active Independent Consultants worldwide who sell to consumers in 70 countries.

38.     The Company designs, manufactures, and distributes its own products in addition to offering branding opportunities to third parties.  To support its global network, the Company operates nine manufacturing plants (contracting with three others) and forty-six distribution centers around the globe, as depicted on the following map.

---

[2]     *Wow!  Tupperware Popped Up on Newsweek's Most Trustworthy Companies in America*, Apr. 16, 2024, https://www.prnewswire.com/news-releases/wow-tupperware-popped-up-on-newsweeks-most-trustworthy-companies-in-america-302118566.html.



*Tupperware has 9 plants, 3 contract plants, and 46 distribution centers around the globe to serve customers across 70 countries.*

## II.    Sales Channels.

39.    As described below, the Company currently executes sales through a variety of different methods, with the most prevalent being direct sales through the Sales Force.

### A.    The Company's Direct Sales Channels.

40.    Today, the Company still primarily uses a direct-selling business model to distribute and market its products through personal connections and product demonstrations, with direct sales accounting for nearly 90% of the Company's sales in 2023.   The engine of the direct-sales model is the Sales Force which consists of approximately 465,000 Independent Consultants.   The Independent Consultants who comprise the Sales Force voluntarily partner with the Company to sell its products in exchange for sales-based commissions and incentives. The exact commissions paid to an Independent Consultant depend upon the Independent Consultant's role and the market in which the Independent Consultant operates.

41.    Generally, in the United States (where most of the Debtors' Sales Force operates) Independent Consultants receive at least 25% of their sales profits as a base commission.

The Debtors' Sales Force has four leadership levels: (a) managers, (b) directors, (c) organizational leaders, and (d) business leaders.  As Independent Consultants advance to higher leadership levels within the Sales Force, they earn incremental commissions based on the sales of their team members.  These incremental commissions range from 2–8.5% of the relevant sales, depending upon the Independent Consultant's leadership level.  Independent Consultants who become "organizational leaders" are eligible for additional incremental commissions based on the sales attributable to their team members that achieve the level of "director."

42.     In addition to the commissions, the Debtors have offered a variety of incentives to Independent Consultants to encourage them to partner with the Debtors and to drive increased Sales Force sales.  For example, each step up within the Independent Consultant leadership hierarchy results in a one-time step-up bonus worth between $150 and $3,000.  Additionally, the Debtors offer recognition to members of the Sales Force based on their monthly unit sales, which recognition is accompanied by a cash payment based on the sales threshold achieved (*e.g.*, $3,000 in monthly sales results in a $60 cash payment).  Certain Sales Force incentive programs offer more valuable incentives (including rewards such as discounts or subsidies on car or travel purchases), dependent upon achievement of consistent sales outcomes to ensure alignment with Company performance goals.

43.     In recent years, Tupperware's operational challenges have strained the Sales Force, resulting in the departure of a significant number of Independent Consultants.  In the face of these challenges, Tupperware has provided its Sales Force with digital tools to connect with consumers through social media and personalized web pages, offered digital training and virtual meetings for Sales Force development, and maintained direct sales websites for Independent Consultants in several countries (including the United States).

B.     **The Company's Other Distribution Channels.**

44.     In stark contrast to the early days of the Company, nearly everyone now knows what Tupperware is, but fewer people know where to find it.  To remedy this and renew interest in the brand, the Company has expanded its online and retail presence in recent years, and, indeed, these efforts have been a critical component of the Company's turnaround efforts.

45.     ***Amazon***.  In June of 2022, Tupperware opened a digital storefront on Amazon.com, which offered thirty different Tupperware products.  "Tupperware" is a frequently searched term on Amazon (with approximately 500,000 searches a month), but one of the Company's current challenges is that the search results for "Tupperware" presently return results for other brands, undercutting the Company's strategic purpose for selling on Amazon.  A key pillar of the turnaround plan is to increase the Company's focus on marketing and advertising to capture this existing demand and to generate further sales.

46.     ***Target***.  In October 2022, Tupperware successfully launched in Target stores (and on Target.com).  The launch—which was limited to classic food storage containers—exceeded expectations and paves the way for future strategic retail expansion.

47.     ***International Store Fronts***.  In certain markets, most predominantly in China, Sales Force members operate independent retail stores and studios.  These physical locations provide an entrepreneurial opportunity for independent owners to connect with consumers to demonstrate and sell products while also creating visibility and reinforcing Tupperware's iconic image with consumers.

48.     ***Pop-Up Stores***.  Pop-up stores promote brand awareness without the risks and burdens of a permanent retail footprint.  In March 2024, the Company launched one of its most ambitious "pop ups," a limited-time experience in New York City, featuring social-media worthy

bright colors and clean lines to offer an inviting, modern space for live demonstrations of classic products.

49.     ***Macy's***.   In June 2024, Tupperware launched in Macy's stores, with in-store "Tupperware Parties" hosted by Independent Consultants to mark the launch.

50.     In total, the Company has approximately 155 retail customers around the world, and now has multi-channel activity in 27 of its markets.

### III.   The Product—Current Offerings.

51.     Tupperware products are a masterful blend of form and function.  Recognized the world over for both functionality and style, Tupperware products satisfy the practical demands of the customer as well as the design standards of some of the world's most important design centers and art museums.  Tupperware's current product lines are each described in turn below.

52.     ***Kitchen Tools***.  Tupperware food preparation offerings include the Chop 'N Prep Chef (a manual food processor that allows the user to chop vegetables, fruits, and nuts quickly and efficiently), the Mandoline Slicer (a versatile kitchen tool that helps in uniformly slicing and grating fruits and vegetables), mixing bowls (which come with airtight lids and are useful for mixing ingredients, marinating, and even storing leftovers), and kitchen staples like cutting boards, knives, spatulas, and ladles.

53.     ***Cookware & Bakeware***.  Tupperware's cookware and bakeware offerings include silicone molds and baking sheets, metal stove-top cookware, and even oven-safe plastic cookware, which provides a lighter option for chefs who may struggle with heavier alternatives. Tupperware's cook- and bakeware is expertly designed and includes innovations that give it an edge over rival products.  For example, Tupperware's silicone bake sheets are pre-marked to help perfectly portion baked goods and also feature rims to minimize messes.

54.    *Serveware*.  Tupperware's serveware offerings include serving trays, bowls, and pitchers that are designed to be both functional and attractive for table presentation.  Additional serving solution offerings include microwave reheatable products that are designed to go from the refrigerator to the microwave, making it easy to reheat and serve food.

55.    *Food Storage*.  Food storage is Tupperware's core offering.  Products in the Food Storage category include Modular Mates (airtight containers that come in various shapes and sizes, designed to optimize space in the pantry or refrigerator, which are ideal for storing dry goods like cereals, flour, sugar, and pasta), FridgeSmart Containers (containers specifically designed to keep fruits and vegetables fresh for longer periods that feature venting systems to regulate airflow, which helps in maintaining the right environment for different types of produce), and Freezer Mates (containers designed to withstand low temperatures, making them perfect for freezing food).

56.    *On-the-Go*.  Tupperware offers an array of products focused on mobile storage solutions, including lunch boxes containing multiple compartments and insulated bags to keep food at the desired temperature and water bottles featuring Tupperware's leak-proof seal.

57.    *Kids and Toys*.  Tupperware offers toys and specialty products for its younger customers—TupperKids®.  In the "kids and toys" category, caregivers can find, among other things, school-oriented storage solutions for their young, and the young (or young at heart) can purchase branded products featuring their favorite characters.

58.    Nearly every Tupperware product sold is backed by a warranty as a testament to the Company's confidence in its product quality and its dedication to customer satisfaction. The applicability of a given warranty (or warranties) depends on the specific good purchased.

- *Limited Lifetime Warranty*.  Tupperware provides a Limited Lifetime Warranty for most of its products.  Products that are not covered by the Limited Lifetime Warranty are noted with an exception in the applicable catalog, product literature, or product description.  For products subject to

the Limited Lifetime Warranty, the Company warrants that the product will not chip, crack, break, peel or warp, under normal, non-commercial uses, for the lifetime of the product.

- ***Time-Based Quality Warranty***. For items that do not fall under the Limited Lifetime Warranty, the Company will generally warrant that the subject product is free of manufacturing defects for either 30 days or one year from the date of purchase under normal, non-commercial uses, depending upon the particular product purchased.

- ***The Premium Product Warranty***. Select products enumerated in the Premium Product Warranty—generally in the cookware or kitchen tool category—are subject to the Premium Product Warranty. For such products, the Company warrants that the subject product is free from defects in material or workmanship for the lifetime of the product when used under normal, non-commercial use, subject to enumerated exclusions (which vary by product).

- In limited circumstances, no product warranty is offered and a product is sold as-is.

59.    In the event of a product's failure to meet the applicable warranty, the Company will either replace the affected product with a like or similar product or contribute toward future purchases of Tupperware-brand products via a merchandise credit. The Company's warranties provide peace of mind to consumers, allowing them to feel confident about their purchase.

**Section 3:  Tupperware's Organizational Structure and Prepetition Capital Structure**

60.    A comprehensive organizational chart depicting the Company's entire corporate structure is attached hereto as **Exhibit D**. Each Debtor is a direct or indirect wholly-owned subsidiary of Debtor Tupperware Brands Corporation. In order to minimize business disruption,

Tupperware's foreign operating subsidiaries (other than Debtor Tupperware Products AG ("TPAG")) did not commence chapter 11 cases.[3]

61.    The Debtors have approximately $811.8 million (inclusive of approximately €196 million in borrowings denominated in Euros) in total funded debt obligations. The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid cash interest and fees:

| Debt Instrument | Maturity | Outstanding Amount (Approx.) |
|---|---|---|
| Revolving Credit Facility | July 31, 2025 | $7.0 million ($15.3 million letters of credit)[4] |
| USD Term A Loan Facility | July 31, 2025 | $399.9 million |
| USD Term C Loan Facility | July 31, 2027 | $177.5 million |
| EUR Term D Loan Facility | July 31, 2027 | €196 million |
| Bridge Facility | September 30, 2024 | $8 million[5] |
| **Total Funded Debt:** | **$811.8 million (inclusive of €196 million)** | |

## I.    The Credit Agreement.

62.    Certain of the Debtors are party to that certain credit agreement dated as of November 23, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"),[6] by and among Tupperware Brands Corporation (the "Parent

---

[3]    As described further herein, in conjunction with the Debtors' chapter 11 cases, TPAG is also commencing a parallel moratorium proceeding in Switzerland.

[4]    Figure reflects outstanding letters of credit, which reduce availability of the Revolving Credit Facility but do not crystalize as liabilities unless drawn.

[5]    Excluding $1.8 million of unamortized issuance costs.

[6]    To date, as discussed *infra*, Section 4, the Credit Agreement has been amended or otherwise affected by that certain First Amendment to Credit Agreement dated as of August 1, 2022, that certain Second Amendment to Credit Agreement dated as of December 21, 2022, that certain Third Amendment to Credit Agreement dated as of February 22, 2023, that certain Fourth Amendment to Credit Agreement and Limited Waiver of Borrowing Conditions dated as of May 5, 2023, that certain Debt Restructuring Agreement dated as of August 2, 2023, that certain Fifth Amendment to Credit Agreement dated as of October 5, 2023, that certain Sixth Amendment to Credit Agreement dated as of December 22, 2023, that certain Forbearance Agreement, dated as of February 14, 2024 (as amended by the First Amendment to Forbearance Agreement, the Second Amendment to Forbearance Agreement, and the Third Amendment to Forbearance Agreement, the "Forbearance Agreement"), that certain

Borrower"), TPAG (the "Swiss Borrower" and together with the Parent Borrower, the "Borrowers"), the lenders from time to time party thereto, and Wells Fargo Bank, National Association, as administrative agent (the "Credit Agreement Administrative Agent").  The Credit Agreement provides four credit facilities (the "Credit Facilities"):  (a) a global tranche revolving credit facility (the "Revolving Credit Facility"); (b) term A loans denominated in U.S. dollars (the "USD Term A Loan Facility"); (c) term C loans denominated in U.S. dollars (the "USD Term C Loan Facility"); and (d) term D loans denominated in euros (the "EUR Term D Loan Facility").

63.     The obligations of the Debtors under the Credit Agreement are secured by first priority liens (subject to (a) the Bridge Facility Liens (as defined below) on the Bridge Collateral (as defined below) and (b) certain other permitted liens) on substantially all of the assets of the Debtors (other than TPAG, which has only provided limited cash collateral in connection with, and as collateral security for certain obligations outstanding under, the Credit Agreement), subject to exclusions for, among other things, certain Excluded Assets (as defined in the Credit Agreement) (the "Credit Agreement Collateral").  The Credit Agreement Collateral is pledged pursuant to, among other things, (1) that certain Master Collateral Agreement dated as of November 23, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Master Collateral Agreement"), among the Parent Borrower, Dart, the other subsidiary grantors party thereto, and the Credit Agreement Administrative Agent, (2) that certain Security Agreement dated as of November 23, 2021 by and

---

Amendment to Forbearance Agreement, dated as of June 3, 2024 (the "First Amendment to Forbearance Agreement"), that certain Second Amendment to Forbearance Agreement, dated as of July 12, 2024 (the "Second Amendment to Forbearance Agreement"), and that certain Seventh Amendment to Credit Agreement and Third Amendment to Forbearance Agreement, dated as of August 12, 2024 (the "Third Amendment to Forbearance Agreement").

between Dart and the Credit Agreement Administrative Agent, and (3) certain intellectual property security agreements by and among the Debtors party thereto and the Credit Agreement Administrative Agent.

### A.    The Revolving Credit Facility.

64.    The Revolving Credit Facility provides for aggregate revolving credit commitments of $22.3 million, inclusive of any letters of credit issued thereunder.[7]  As of the date hereof, the Parent Borrower has drawn $7.0 million on the Revolving Credit Facility and has been issued letters of credit in the aggregate amount of approximately $15.3 million such that the Debtors do not have any availability under the Revolving Credit Facility.

65.    As of the date hereof, (a) borrowings outstanding under the Revolving Credit Facility accrue interest at a per annum rate equal to either (i) Adjusted Term SOFR, the Adjusted Eurocurrency Rate or Daily Simple SONIA plus 7.00% per annum or (ii) the Base Rate plus 6.00% per annum (plus, in each case and to the extent applicable, the 2.00% per annum default interest rate) (the "2025 Maturity Interest Rate"), and (b) letters of credit outstanding under the Revolving Credit Facility accrue each of a participation fee at a rate per annum equal to the Applicable Margin for Term SOFR Loans and a fronting fee at a rate of 0.250% per annum. The unfunded commitments under the Revolving Credit Facility accrue a commitment fee at a rate of 0.925% per annum.  The Revolving Credit Facility matures on July 31, 2025.

### B.    The USD Term A Loan Facility.

66.    The USD Term A Loan Facility provides the Parent Borrower with a $399.9 million term loan (the "USD Term A Loans").  As of the date hereof, the USD Term A Loan Facility accrues interest at a per annum rate equal to the 2025 Maturity Interest Rate.  The USD Term A

---

[7]    The figure described herein reflects the commitments as limited by the Forbearance Agreement.

Loan Facility matures on July 31, 2025. The USD Term A Loans amortize in an amount equal to (i) $1.75 million on the last day of each calendar quarter during the calendar year 2024, and (ii) $3.5 million on the last day of the calendar quarters ending March 31, 2025 and June 30, 2025, respectively. As of the date hereof, the Parent Borrower owes an aggregate principal amount of approximately $399.9 million on the USD Term A Loan Facility.

### C.    The USD Term C Loan Facility.

67.     The USD Term C Loan Facility provides the Parent Borrower with a $177.5 million term loan (the "USD Term C Loans"). As of the date hereof, the USD Term C Loan Facility accrues interest at a per annum rate equal to 14.00%, to be paid in kind and thus capitalized on and increasing the principal balance of the USD Term C Loans each quarter. The USD Term C Loan Facility matures on July 31, 2027. The USD Term C Loans amortize in an amount equal to $1.75 million on the last day of the calendar quarter ending December 31, 2025, on the last day of each calendar quarter during the calendar year 2026, and on the last day of the calendar quarters ending March 31, 2027 and June 30, 2027, respectively. As of the date hereof, the Parent Borrower owes an aggregate principal amount of approximately $177.5 million under the USD Term C Loan Facility.

### D.    The EUR Term D Loan Facility.

68.     The EUR Term D Loan Facility provides the Swiss Borrower with an approximately €196 million term loan (the "EUR Term D Loans"). As of the date hereof, the EUR Term D Loan Facility accrues interest at a per annum rate equal to 14.00%, to be paid in kind and thus capitalized on and increasing the principal balance of the EUR Term D Loans each quarter. The EUR Term D Loan Facility matures on July 31, 2027. The EUR Term D Loans amortize in an amount equal to €1,581,993 on the last day of the calendar quarter ending December 31, 2025,

on the last day of each calendar quarter during the calendar year 2026, and on the last day of the calendar quarters ending March 31, 2027 and June 30, 2027, respectively.  As of the date hereof, the Swiss Borrower owes an aggregate principal amount of approximately €196 million under the EUR Term D Loan Facility.

69.     The Swiss Borrower is only liable for its own borrowings under the Credit Agreement.  It is neither a guarantor nor jointly nor severally liable in respect of other borrowings made to the Parent Borrower pursuant to the Credit Agreement.  However, there is a limited cash pledge of certain of the Swiss Borrower's bank accounts.[8]

## II.     The Bridge Facility.

70.     On August 12, 2024, the Company and the guarantors under the Credit Agreement, as guarantors, entered into the Bridge Loan Credit Agreement with the Ad Hoc Group, pursuant to which the Ad Hoc Group provided $8 million principal amount in emergency funding (half of which came in the form of a delayed draw term loan funded on August 26, 2024, following the Company's borrowing request) (the "Bridge Facility") to bridge the Debtors to the commencement of these chapter 11 cases.  The Bridge Facility principal amount was funded with a 25.00% original issue discount, netting approximately $6 million of proceeds.  The Bridge Facility currently accrues interest at a per annum rate equal to 14.00% and matures on September 30, 2024.  As of the date hereof, the Company owes an aggregate principal amount of approximately $8 million on account of the Bridge Facility.  Obligations of the Company under the Bridge Facility are secured by first priority liens (the "Bridge Facility Liens"), subject to certain permitted liens, on certain inventory owned by Debtor Tupperware U.S., Inc. and any books and records or proceeds related thereto (the "Bridge Collateral").

---

[8]     Such account is maintained with JPMorgan Chase Bank in the United Kingdom.

### III.    Common Stock.

71.    Shares of Tupperware Brands Corporation's Common Stock, $0.01 par value (the "Common Stock"), trade on the New York Stock Exchange under the symbol "TUP."  As of the date hereof, 46,572,276 shares of Common Stock were issued and outstanding.

### Section 4:  The Events Leading To These Chapter 11 Filings

### I.    Operational Challenges.

72.    As described herein, Tupperware enjoyed decades of growth propelled by pioneering product development and its direct selling business model, which was innovative for the time.  Over the years, however, this growth slowed as fewer new market opportunities presented.  Particularly in the last few years, the Company has faced several key challenges that put pressure on the business, causing revenue to decline more than 16% YoY in two consecutive years in 2022 and 2023.

73.    Since 2020, the Company has actively worked to identify these challenges and take steps to overcome them, but liquidity constraints—exacerbated by rising interest rates—have limited the Company's ability to respond as comprehensively as the circumstances warrant.

74.    ***Shifts in Consumer Behavior***.  Consumer shopping habits evolved with the advent of online shopping and increased retail convenience.  In the industry, only 4% of homeware sales come from direct selling, but the Company derives nearly 90% of its sales through this channel. The Company has made efforts to adapt its business model to the current landscape and diversify its go-to-market approach, and has seen positive initial results, but significant work remains to be done.

75.    ***Anti-Plastic Sentiment***.  The Company was founded around a solution to reduce food waste and has a longstanding commitment to sustainability, but recent years have been marked by a general resurgence in hesitancy regarding plastics (especially plastics containing

BPAs).  These developments have presented headwinds for the Company, which has had to closely monitor customer sentiment, combat misconceptions about its products, and, at times, reconfigure its product offerings.  The Company continues to pioneer in sustainability efforts and, since 2019, has offered "ECO+" products made of circular polymers, which are made through a process of using mixed single-use plastic waste that was destined for disposal, breaking it down to its molecular level and recreating it into a high-quality food grade plastic.  The Company is expanding its ECO+ product line and has been testing new innovations in the sustainability space like bio-based material as part of its No Time to Waste commitment.

76.     ***Marketing Deficiencies***.  The Company has a robust and innovative product portfolio, but historically had very limited coordinated, formal marketing (particularly online), instead relying on Independent Consultants to market the Company's products.  Indicative of this issue, the Company's total digital advertising spend was historically less than 1%.  By introducing more streamlined marketing campaigns, the Company can better leverage the power of its brand. The Company is under way on establishing new internal functions to improve its marketing approach.

77.     ***Underdeveloped Infrastructure***.  The Company is a global brand with a presence in 70 countries.  In establishing its global reach, however, the Company did not build global infrastructure and has operated in a decentralized manner, resulting in complexity and inefficiencies (and, at times, inconsistent product availability).  The Company is similarly exploring ways to address these operational infrastructure issues.

## II.     The Initial Turnaround Plan.

78.     In early 2020, the Company retained a new executive leadership team and developed whole-business initiatives to put Tupperware back on the right track (as modified, the "Turnaround Plan").  The initial Turnaround Plan consisted of three driving focal points:

- ***Operational Rightsizing for Improved Profitability***.   The Company implemented product and supply chain re-engineering measures and adjusted overhead expenditures, resulting in lower cost of goods sold and SG&A expenditures.

- ***Accelerated Non-Core Business Divestitures***.  The Company embarked on a comprehensive evaluation of its brand portfolio, which resulted in significant divestitures, including the sale of all of the beauty brands acquired in the early 2000s and 2010s—such as Avroy Shlain, House of Fuller, Nutrimetics, and Nuvo—and of certain non-core real estate, including manufacturing facilities in Hemingway, North Carolina and in Indonesia.

- ***Business Model Re-evaluation***.  The Company focused on improving its core direct sales business through introduction of data-driven marketing, communications, and recruitment methods and the roll-out of new digital tools for sellers.  Concurrently, the Company also renewed focus on development of alternative channels and nontraditional business opportunities.

79.     The Turnaround Plan also contemplated a general shift from a distributor-push model to a consumer-pull model to address the needs of modern consumers, an omnichannel evolution, and expansion into new product categories to bring more innovative solutions to the market.  Liquidity constraints and the disruption of the COVID-19 pandemic, however, interrupted implementation of the Turnaround Plan and also skewed perception of its progress.

80.     The initial Turnaround Plan at first appeared very successful, and the Company enjoyed multiple quarters of double-digit EBITDA growth over the course of 2020 and 2021. In November 2021, the Company was able to enter into the Credit Agreement, refinancing its then-existing capital structure though a $480 million revolving credit facility and a $400 million term loan facility provided by certain prepetition bank lenders under the Credit Agreement (the "Prepetition Bank Lenders").  The effect of the refinancing was to provide the Company with access to $100 million of incremental liquidity in the aggregate to further pursue the Turnaround Plan.

III.     **Prior Restructuring Efforts and Engagement of Restructuring Professionals.**

81.     Entry into the Credit Agreement was intended to put the Company on a path towards sustainable future growth, but early gains turned out to be temporary and were replaced with longer-term challenges.  The initial pandemic sales bump slowed, and macroeconomic cost drivers flared, including inflation, the strengthening of the dollar relative to most other currencies, and sustained global supply chain disruptions.  Additionally, the Company made several changes to Sales Force compensation models that unintentionally made remaining with the Company less attractive for high performers and resulted in Sales Force attrition, compounding challenges with the direct selling model.  As a consequence of these and other factors, sales and profitability metrics declined rapidly—leading to a revenue drop of over 16% YoY—in 2022 and 2023.  While execution on the initial Turnaround Plan stalled, the Company began to buckle under what had become an unsustainable capital structure.

A.     **The First, Second, and Third Amendments to the Credit Agreement.**

82.     With the support of the Prepetition Bank Lenders, certain of the Debtors entered into several amendments to the Credit Agreement in an attempt to obtain greater financial flexibility.  On August 1, 2022, the Debtors party thereto entered into the first amendment to the Credit Agreement.  Among other terms and conditions, this first amendment allowed for temporary relief from certain financial covenants, *e.g.*, permitting a temporary higher maximum consolidated net leverage ratio, in exchange for changes to other provisions, such as increased restrictions on permitted debt capacity during the temporary relief period.  The first amendment to the Credit Agreement was not enough for the Company to course-correct, and on November 2, 2022, in connection with its third quarter FY2022 earnings release, the Company issued a "going concern" warning.

83.     On December 21, 2022, and February 22, 2023, the Debtors party thereto entered into second and third amendments, respectively, to the Credit Agreement which provided similar, additional covenant waivers or modifications at the cost of further restrictions.  These amendments included certain material changes to the Credit Agreement such as: (a) shortening the maturity date from November 23, 2026 to November 23, 2025, (b) reducing then-existing Mexican Tranche Revolving Commitments and Singaporean Tranche Revolving Commitments to $0 and removing Administradora Dart, S. de R.L. de C.V. (a Mexican entity) and Tupperware Brands Asia Pacific Pte. Ltd. (a Singaporean entity), respectively, as subsidiary borrowers thereunder, and (c) reducing the commitments under the Revolving Credit Facility from $450 million to $220 million and converting $200 million of outstanding Global Tranche Revolving Loans into a separate term loan that reduced the overall commitments under the Revolving Credit Facility.  Even with the additional covenant relief provided through these amendments, the Company continued to struggle to implement the Turnaround Plan, mitigate its "going concern" condition, and achieve targeted results.

**B.      Retention of Restructuring Professionals and the Fourth Amendment to the Credit Agreement.**

84.     In November 2022, the Company engaged A&M, as financial advisor, and subsequently engaged in early 2023 Kirkland & Ellis LLP ("Kirkland"), as legal counsel, and Moelis & Company LLC ("Moelis"), as investment banker, to advise on its capital structure, the "going concern" warning, liquidity improvement, and potential financing and restructuring alternatives.

85.     On May 5, 2023, the Debtors party thereto entered into a fourth amendment to the Credit Agreement, permitting incremental borrowing to pay past-due interest, adding increased

reporting and information sharing requirements, and requiring that the Company appoint me as Chief Restructuring Officer.

### C.    The 2023 Marketing Process.

86.    As discussed in the Steinberg Declaration, Moelis commenced a formal marketing process in April 2023 on behalf of the Debtors to locate a third-party investment to fund the Company's turnaround.  This marketing process ran in parallel to negotiations with the Prepetition Bank Lenders regarding a standalone restructuring or other strategic alternatives.

87.    This process involved Moelis making contact with eighty-six potential financial or strategic investors, either through outbound solicitations or inbound inquiries.  The Company subsequently executed nondisclosure agreements ("NDAs") with thirty-six parties, who were then granted access to the Debtors' virtual data room.  Of the parties that executed NDAs, eight submitted indications of interest (each, an "IOI").

88.    The marketing process generated significant interest from numerous parties, but the Prepetition Bank Lenders ultimately determined that none of the proposals received through the process were sufficiently attractive, and the Company refocused its efforts on effectuating a standalone restructuring with the Prepetition Bank Lenders.

### D.    The Debt Restructuring Agreement.

89.    As a result, on August 2, 2023, following extensive negotiations with the Prepetition Bank Lenders, the Debtors entered into that certain Debt Restructuring Agreement, by and among Tupperware Brands Corporation, as parent borrower, TPAG, as Swiss subsidiary borrower, the subsidiary guarantors party thereto, Wells Fargo Bank, National Association, as administrative agent, and the Lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time, the "Debt Restructuring Agreement"), which effected additional amendments to the Credit Agreement and waived certain events of default thereunder.

90.     The Debt Restructuring Agreement substantially reorganized the Company's capital structure, leading to the Credit Agreement capital structure outlined above—*i.e.*, the Global Tranche Revolving Commitments, the USD Term A Loans, the USD Term C Loans, and the EUR Term D Loans—and providing for, among other things, the reduction or reallocation of approximately $150 million of cash interest and fees, a maturity extension, reduction of amortization payments, and restructuring of revolving borrowing capacity in an effort to provide the Company with additional liquidity runway.

91.     As a condition to providing the Company with this significant additional flexibility and relief, the Debt Restructuring Agreement required that the Company implement a new governance framework to enhance execution and redevelopment of the Turnaround Plan. The Debt Restructuring Agreement also required that the Company comprehensively explore transformational restructuring alternatives.  Specifically, the Debt Restructuring Agreement required that the Chief Restructuring Officer prepare a redesigned Turnaround Plan with a renewed focus on improved financial performance and disposition of certain assets.

**E.      DRA-Related Leadership Changes.**

92.     The Debt Restructuring Agreement required that the Company place a director on the Board with experience in restructuring and turnaround matters.  On August 24, 2023, the Board appointed Mr. Paul Aronzon as an independent director.  Simultaneously with the appointment of Mr. Aronzon, the Company also established a special committee with delegated authority to investigate, analyze, evaluate, negotiate, and, if appropriate, approve and execute strategic transactions available to the Company, including with respect to the Turnaround Plan.  The original members of the Transformation Committee were Mr. Aronzon and Mr. Richard Riley.

93.     On October 17, 2023, the Company announced the appointment of Ms. Laurie Ann Goldman as President, Chief Executive Officer, and a director of the Board, and the appointment

of three additional directors, Ms. Lori Bush, Mr. Paul Keglevic, and Mr. William Transier.  Upon their appointment to the Board, Mr. Keglevic and Mr. Transier were also appointed to the Transformation Committee.

**F.     The Fifth and Sixth Amendments to the Credit Agreement.**

94.     While the Debt Restructuring Agreement helped the Debtors manage their liabilities and offered an opportunity to develop and implement the Turnaround Plan, the Debtors' substantial obligations under the Credit Agreement continued to pressure liquidity and operational flexibility.  On October 5, 2023 and December 22, 2023, the Debtors party thereto entered into the fifth and sixth amendments to the Credit Agreement, respectively, to obtain relief from certain financial reporting requirements and from milestones related to the Turnaround Plan.

**G.     The Forbearance Agreement.**

95.     In early February 2024, while engaged in discussions with the Prepetition Bank Lenders, the Debtors missed an interest payment due under the Credit Agreement.  Consequently, on February 13, 2024, the Debtors entered into the initial Forbearance Agreement with certain of the Prepetition Bank Lenders and the Credit Agreement Administrative Agent, who agreed to forbear from exercising rights and remedies on account of the defaults specified therein until June 30, 2024, subject to the Debtors' compliance with the terms of the Forbearance Agreement, including milestones for a second marketing process and, as a contingency, chapter 11 preparations.

**H.     The 2024 Marketing Process.**

96.     Substantially concurrently with entry into the Forbearance Agreement, the Company, with the assistance of Moelis, launched a second formal, third-party marketing process in February 2024 to reevaluate market interest and solicit any and all proposals from potentially interested parties, ranging from out-of-court recapitalization structures, to asset sales, to

whole-company transactions.  In March 2024, Moelis also circulated a detailed confidential information presentation containing an updated strategic business plan to potential investors.

97.     This time, Moelis discussed various potential transactions with approximately eighty-four potential financial or strategic investors—with experience in the consumer goods sector, operational turnarounds, and/or distressed situations.  Approximately twenty-eight of those parties executed NDAs.  Of the parties that executed NDAs, seven (the "Interested Parties") engaged in additional discussions regarding potential transactions.  Moelis requested that each Interested Party submit a non-binding IOI by April 5, 2024.

98.     On April 5, 2024, Moelis, acting on behalf of Tupperware, received five non-binding IOIs, (i) three of which proposed acquiring the entirety of the Company via an equity acquisition and (ii) two of which contemplated a "brand management" solution.  After thoroughly evaluating each non-binding IOI, the Company and its advisors requested binding IOIs from four of the Interested Parties by May 15, 2024.

99.     Only one party (the "Leading Bidder") met the deadline and presented an offer (the "Leading Bid") that encompassed a whole-company solution.  The Leading Bidder had already conducted extensive diligence (substantially more than any other bidder), including numerous calls with Tupperware's management, diligence sessions at eight different Tupperware facilities, and one in-person management meeting.  After the May deadline passed, one "whole-company bidder" expressed its willingness to acquire only certain regions of the business, and one "brand-management bidder" reiterated its interest in a brand-centered transaction yet declined the Company's request to present a comprehensive solution.  Under the circumstances, the Company and its advisors concluded that the Leading Bid was the best available option to

right-size Tupperware's overlevered balance sheet and position it for long-term, sustainable growth.

100.    Again, as set forth in greater detail in the Steinberg Declaration, the marketing process generated significant interest from numerous parties.  Through the Spring of 2024, the Company and its advisors carefully evaluated proposals and negotiated with interested counterparties to identify a comprehensive solution for the Company.  This second process resulted in a transaction proposal from the Leading Bidder that—after extensive development and negotiation—fell through on the eve of execution going into the July 4, 2024, holiday weekend.

101.    Separately, that same day, the Company and its advisors were approached by a potential debtor-in-possession lender (the "Potential DIP Lender") who proposed to fund the Debtors' chapter 11 cases and provide a credit bid to serve as a stalking horse for a chapter 11 process (the "DIP Credit Bid Proposal").  In parallel with discussions with the Potential DIP Lender, Moelis commenced a third round of outreach.

I.      **The Forbearance Agreement Amendments.**

102.    On June 3, 2024, the Debtors, the Credit Agreement Administrative Agent and certain of the Prepetition Bank Lenders entered into the first Amendment to Forbearance Agreement (the "First Forbearance Amendment") to, among other things, extend the milestone for entry into a definitive agreement.  In exchange, the First Forbearance Amendment reduced the permitted Aggregate Global Tranche Revolving Credit Exposure (as defined in the Credit Agreement) to the then-current Aggregate Global Tranche Revolving Credit Exposure level (*i.e.*, froze the revolver).  To ensure that the Debtors continued to have liquidity without further draws on the Revolving Credit Facility, the First Forbearance Amendment also adjusted certain repayment requirements.

103.    After entry into the First Forbearance Amendment, the Credit Agreement Administrative Agent, acting in its sole discretion, approved several additional extensions of certain of milestones and the termination date, ultimately postponing them until July 14, 2024. On July 12, 2024, the Debtors, the Credit Agreement Administrative Agent and certain of the Prepetition Bank Lenders entered into the Second Amendment to Forbearance Agreement (the "Second Forbearance Amendment"), which extended the Forbearance Agreement until August 15, 2024.  In connection with entry into the Second Forbearance Agreement, the Debtors lifted certain restrictions on trading the term loans, which were contained in the Credit Agreement and certain confidentiality agreements.

**J.    Arrival of the Ad Hoc Group: the Bridge Facility, the Third Forbearance Amendment, and the Seventh Credit Agreement Amendment.**

104.    By mid July, the Debtors had determined that the DIP Credit Bid Proposal presented the best available solution to their mounting liquidity concerns and progressed with negotiations accordingly.  After several promising weeks of negotiations with the Potential DIP Lender, however, a majority by principal amount of the Debtors' prepetition debt suddenly traded to the Ad Hoc Group and Wexford in a series of transactions.  Such a substantial trade of the Debtors' prepetition debt introduced uncertainty regarding execution on the DIP Credit Bid Proposal, and negotiations with the Potential DIP Lender stalled.

105.    On July 30, 2024, the Ad Hoc Group confirmed that it was not interested in a third party providing a priming DIP facility and provided the Debtors with a non-binding term sheet regarding a bridge facility to allow time for discussions.  On August 12, 2024, the Ad Hoc Group provided an $8 million bridge loan (half of which came in the form of a delayed draw term loan that was funded on August 26, 2024), netting approximately $6 million of proceeds taking into account a 25% OID.  The Bridge Facility was secured by certain of the Debtors' inventory, which

the Ad Hoc Group, as majority lenders, directed be released from the collateral securing the existing facilities under the Credit Agreement to serve as collateral for the bridge loan. The Ad Hoc Group did not allow the other lenders to participate in the bridge loan, and one lender, Wexford subsequently filed a lawsuit against two members of the Ad Hoc Group in connection with the bridge loan, which lawsuit remains pending. *See KIA II LLC v. Alden Global Capital LLC and Stonehill Institutional Partners, L.P.*, Index No. 654395 (N.Y. Sup. Ct. Aug. 26, 2024). Since entering into the Bridge Facility, the Debtors have encouraged the Ad Hoc Group to engage constructively with Wexford, notwithstanding the lawsuit, though the Debtors understand that to-date the Ad Hoc Group has hesitated to do so. In connection with entry into the Bridge Facility, the Forbearance Termination Date was extended to September 30, 2024 to coincide with the maturity date of the Bridge Facility.

106.    In parallel with negotiation of the Bridge Facility, the Debtors entered into discussions with the Ad Hoc Group regarding a going-concern transaction in which the Ad Hoc Group would acquire the Tupperware brand name, select assets in the US, and select foreign subsidiaries. Weeks of in-depth diligence meetings occurred among principals and advisors regarding the Company's business and structure and the proposed go-forward business model.

**K.    Commencement of the Chapter 11 Cases.**

107.    The Debtors and their advisors worked with various stakeholders, including the Ad Hoc Group, to forge a clear path forward for the Debtors' storied business and to maximize value for all stakeholders. Following weeks of discussions regarding a potential chapter 11 filing to implement a transaction, on August 30, 2024, the Ad Hoc Group informed the Debtors that it was instead strongly considering implementing its proposed acquisition through an out-of-court strict foreclosure on a subset of the Debtors' assets, including the Tupperware brand name. After significant deliberation, the board of directors determined that, given the number of constituents

and parties in interest involved, it could not support a strict foreclosure.  Accordingly, the Debtors have commenced these chapter 11 cases to utilize their limited cash on hand to fund an approximately 30-day bidding process to preserve their business as a going concern and foster a competitive bidding environment for their assets.

108.    In conjunction with the filing of these chapter 11 cases, I understand that TPAG will commence a parallel moratorium proceeding in Switzerland (the "Swiss Proceeding").  I understand that the Swiss Proceeding will supplement TPAG's chapter 11 filing in this Court and is necessary pursuant to the laws governing TPAG as a Swiss entity.  The Debtors have engaged local counsel in Switzerland to facilitate the Swiss Proceeding while the Debtors conduct these chapter 11 cases.  The Debtors' advisors expect to coordinate closely with Swiss counsel in order to ensure that both these chapter 11 cases and the Swiss Proceeding proceed with the paramount goal of value maximization for all stakeholders.

## Section 5:  Evidentiary Support for First Day Motions

109.    Contemporaneously herewith, the Debtors filed a number of First Day Motions and are seeking orders granting various forms of relief intended to stabilize the Company's business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run Tupperware's business, ensure the continuation of Tupperware's cash management systems, and allow for other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to give Tupperware an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

110.    The First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant

part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

111. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing the Debtors' chapter 11 strategy. A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit E**.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 17, 2024

*By: /s/ Brian J. Fox*
Name:  Brian J. Fox
Title:  Chief Restructuring Officer of Tupperware Brands Corporation on behalf of itself and each of its Debtor affiliates

## Exhibit A

**September 11, 2024**
**Letter from the Ad Hoc Group**



Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ALLAN BRILLIANT**

Allan.Brilliant@Dechert.com
+1 212 698 3600 Direct
+1 212 698 0612 Fax

September 9, 2024

**VIA EMAIL**

The Board of Directors of Tupperware Brands Corporation (the "Board")
14901 South Orange Blossom Trail
Orlando, Fl 32837
c/o Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Attn: Spencer Winters

Dear members of the Board:

I write on behalf of an ad hoc group of lenders (the "Ad Hoc Group") to Tupperware Brands Corporation and certain of its subsidiaries (collectively, the "Company") under that certain Credit Agreement dated as of November 23, 2021 (as amended, restated, supplemented, or otherwise modified prior to the date hereof, the "Revolving/Term Loan Credit Agreement") and that certain Bridge Loan Credit Agreement dated as of August 12, 2024 (as amended or otherwise modified from time to time, the "Bridge Loan Credit Agreement"). The members of the Ad Hoc Group comprise the "Required Lenders" under the Revolving/Term Loan Credit Agreement, and all of the "Lenders" under the Bridge Loan Credit Agreement.

The Company is in default under the Revolving/Term Loan Credit Agreement. The Lenders under the Revolving/Term Loan Credit Agreement and Bridge Loan Credit Agreement have valid, perfected liens on substantially all of the Company's assets. The Company, through its highly experienced investment banker, Moelis & Company, has conducted a years-long marketing process in an attempt to sell its assets and businesses. The highest bid it received was for less than 20% of the debt outstanding under the Revolving/Term Loan Credit Agreement, and that bid failed to close. Thus, the overwhelming and irrefutable evidence is that the value of the collateral does not come close to approaching the outstanding amount of secured debt.

Over the last few weeks, the Ad Hoc Group has dedicated considerable time and effort to determining whether and how the Company (or a portion thereof) can reorganize and operate as a profitable going concern. Through its collaborative work with the Company's senior management and advisors, the Ad Hoc Group has identified a path forward for transforming and optimizing the Company's operations. The Ad Hoc Group believes that the best way to implement the transaction is through a partial strict foreclosure under the Uniform Commercial Code, pursuant to which certain collateral would be transferred to the lenders in exchange for



The Board of Directors of
Tupperware Brands Corporation
(the "Board")
September 9, 2024
Page 2

debt in an amount greater than the value of the collateral.  That process can ensure the continuation of the Company's operations under its iconic brand, maintain customers for many of its vendors, and preserve numerous jobs and the livelihoods of many of the Company's independent sales representatives, while at the same time maximizing recovery to Company's senior secured lenders.

Attempting to implement this strategy through a chapter 11 bankruptcy would put the Company's ability to reorganize its operations and the revitalize its brand at significant risk.  Given the Company's precarious situation, a chapter 11 will increase the cost of implementation and provide a forum for out-of-the money creditors to potentially delay or derail the transaction. Because a chapter 11 will not provide a stay or any protection for the Company's non-debtor foreign subsidiaries, the filing of a chapter 11 puts those subsidiaries at risk that their own creditors take aggressive actions, which could endanger the contemplated transaction before it has a chance to close.

A partial strict foreclosure can be implemented on a schedule developed by the Company and the lenders in a manner that avoids those costs, delays and risks to the non-debtor foreign subsidiaries' operations.  The partial strict foreclosure could close before being publicly disclosed, allowing the Company to effectively control the messaging to its customers, vendors, employees, and independent sales representatives.  The Ad Hoc Group believes this path would save considerable restructuring costs, which savings could be invested in the reorganized Company.

On Friday, August 30, 2024, members of the Ad Hoc Group discussed this alternative with members of senior management.  On the same date, Dechert LLP ("Dechert"), as counsel to the Ad Hoc Group, discussed the strict foreclosure path with Kirkland & Ellis LLP ("Kirkland"), as counsel to the Company.

On Tuesday, September 3, 2024, however, Kirkland informed Dechert that (i) the Board would not consent to a strict foreclosure, (ii) the main concern was that a strict foreclosure could expose officers and directors to shareholder suits, and (iii) without a bankruptcy, the officers and directors could not obtain releases shielding them from liability on such suits.  Through numerous discussions between principals and advisors since then, the Ad Hoc Group has sought to convince the Company that a strict foreclosure is the better path for all involved.  The Ad Hoc Group also expressed a willingness to assist with financing, on terms acceptable to it, a post-strict foreclosure chapter 11 case to liquidate remaining assets, wind down the remaining businesses, and confirm a chapter 11 plan that could provide for director and officer releases.  To date, the Company has refused this option and continues to insist that any transfer of collateral to its lenders occur within a chapter 11 case, regardless of the costs and increased risk of value destruction associated with that path.



Although the Ad Hoc Group appreciates the Company's advisors' efforts to design a chapter 11 process that seeks to expedite the closing of a 363 sale and reduce cost of the bankruptcy, the Ad Hoc Group does not have any confidence that the Company would be able to meet the aspirational timeline and budget. The Ad Hoc Group believes that such process will likely lead to a chapter 7 liquidation of the Company.

Moreover, after spending approximately $67 million in restructuring advisors' fees and expenses since January 2023, the Company has not been able to consummate a restructuring transaction. The Company estimates an additional $11.6 million in professional fees (which the Ad Hoc Group believes will likely be much more) to simply turn over its assets to its secured lenders in a chapter 11 proceeding, when a much less expensive option for accomplishing the same thing is readily available.

The Company's proposed chapter 11 cases would impose a heavy cost on the transfer of collateral to its lenders with no corresponding benefit to any of the Company's stakeholders. The Company has a relatively simple capital structure with its only secured funded debt being the obligations under the Revolving/Term Loan Credit Agreement and Bridge Loan Credit Agreement. The Company lacks assets to provide a recovery on unsecured liabilities. Moreover, given that much of the Company's value comes from its foreign subsidiaries, the operational benefits of chapter 11 do not solve most of the Company's issues with operational transition.

The strict foreclosure approach, on the other hand, would allow for the transfer of the lenders' collateral in the most cost-effective manner possible. The Ad Hoc Group's willingness to consider funding a post-foreclosure liquidating chapter 11 could also put all stakeholders in a substantially similar (or better) position than they would be in if the Company's chapter 11 path were to succeed as proposed. A pre-chapter 11 strict foreclosure would also substantially decrease the risk that the Company will default on a cash collateral order and be forced to liquidate in a disorganized chapter 7 proceeding.

Given that the Company's extended marketing process resulted in bids that offered consideration in amounts that would pay only a small fraction of the secured debt, and such bids ultimately went unconsummated, the Ad Hoc Group believes that the Company's decision to transfer collateral to the lenders through a partial strict foreclosure would be beyond reproach.



In light of all of the above, the Ad Hoc Group urges the Board to reconsider its current position and progress constructively with the Ad Hoc Group towards a value-maximizing transaction involving a partial strict foreclosure and a post-foreclosure chapter 11.

The Ad Hoc Group reserves all rights.

Sincerely,

Allan Brilliant

**Exhibit B**

**September 14, 2024**
**Tupperware Response to the Ad Hoc Group**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

333 West Wolf Point Plaza
Chicago, IL 60654
United States

Spencer A. Winters, P.C.
To Call Writer Directly:
+1 312 862 3800
spencer.winters@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

September 14, 2024

Ad Hoc Group
c/o Allan Brilliant
Dechert LLP
Three Bryant Park
New York, NY 10036

Re:    September 9, 2024 Ad Hoc Group Letter

Dear members of the Ad Hoc Group:

I write on behalf of Tupperware Brands Corporation (the "Company"), acting at the direction of its Board of Directors (the "Board"), in response to your letter dated September 9, 2024.

The Company and the Ad Hoc Group are in agreement on a number of matters, several of which are described in your letter. We agree that the Company, through its highly experienced investment banker, Moelis, has conducted a years-long marketing process that to date has resulted in no actionable proposal for a sale of the business. Although there was significant interest in the process from a number of parties, several of whom submitted bids, the incumbent lenders were not supportive of a sale at the values submitted.

Following that process, the Company agreed to waive provisions in its credit agreement and confidentiality agreements that restricted debt sales, and the Company was encouraged by the news, received approximately six weeks ago, that the Ad Hoc Group had bought a majority of the funded debt from the incumbent lenders. We understand that those transactions closed in the range of approximately three to six cents on the dollar. Since the Ad Hoc Group bought into the debt, the Company and its advisors have spent weeks with the Ad Hoc Group facilitating extensive due diligence regarding the Company, its operations, its financial condition, and its corporate structure. We appreciate the constructive approach that the Ad Hoc Group has taken in analyzing the Company's businesses and the funding that the Ad Hoc Group provided to facilitate those discussions.

Although the Company has yet to receive a written proposal from the Ad Hoc Group to purchase any assets of the Company, we understand the Ad Hoc Group is interested in a credit bid for a subset of the Company's assets as a going concern. The Company encourages the Ad Hoc Group to submit that bid in writing, as soon as possible, in the form of a marked draft of the asset purchase agreement that we sent to you on August 23, 2024. As we have repeatedly communicated

Austin  Bay Area  Beijing  Boston  Brussels  Chicago  Hong Kong  Houston  London  Los Angeles  Miami  Munich  New York  Paris  Riyadh  Salt Lake City  Shanghai  Washington, D.C.

# KIRKLAND & ELLIS LLP

September 14, 2024
Page 2

to you, the Company is prepared to execute and implement such transaction as quickly and efficiently as possible.

As your letter indicates, the disagreement between the Company and the Ad Hoc Group concerns the implementation mechanism for that sale. The Company and its advisors were surprised when, on August 30, 2024, the Ad Hoc Group proposed strict foreclosure as a means of implementing the transaction. Per the letter, the Ad Hoc Group would prefer to use this implementation mechanism because it "could close before being publicly disclosed" and would not provide "a forum for out-of-the-money creditors." In other words, the Tupperware brand name and the Company's most valuable assets could be transferred to the Ad Hoc Group without notice to the Company's unsecured creditors, shareholders, and other stakeholders and without an opportunity for those stakeholders to be heard.

As we have conveyed to you repeatedly through multiple channels, this is the same reason that the Company, acting at the direction of its Board, is not supportive of the strict foreclosure approach. The Company believes that any asset transfer to the lenders should be effectuated transparently in an open forum with an opportunity for all parties in interest to object and be heard. That forum is a chapter 11 proceeding before a U.S. bankruptcy court. As you know, this is the customary manner in which substantially all comparable transactions are implemented in the United States. Your proposed approach, involving a strict foreclosure on the core assets of an iconic, NYSE-listed operating company with funded-debt obligations in excess of $800 million, followed by a liquidating chapter 11 plan, is without precedent.[1]

The Company has many stakeholders other than the Ad Hoc Group, including the beneficiaries of an underfunded pension, the plaintiffs in multiple lawsuits, trade creditors, and public shareholders. The Company agrees with the Ad Hoc Group that there are almost certainly insufficient assets available to provide a recovery to general unsecured creditors or shareholders, as definitively demonstrated by the years-long marketing process. For that reason, the Company believes a highly expedited chapter 11 proceeding is appropriate and is reasonably likely to be approved by a U.S. bankruptcy court. The Company also believes, however, that those parties should be given a fair opportunity to object and be heard in that expedited proceeding prior to the transfer of assets to the Ad Hoc Group.

Contrary to your letter, the Board is not taking this position because of a "main concern" that the strict foreclosure would expose directors and officers to shareholders suits or that directors and officers could not otherwise obtain releases. It is true, however, that the Board is rightly concerned that the Ad Hoc Group's strict foreclosure approach could give rise to a host of lawsuits, by and against various parties, asserting that the assets were wrongfully transferred to the Ad Hoc Group.

---

[1] We have reviewed in detail the purported precedent transactions that you submitted. None is meaningfully comparable to the Company's situation or the proposed transaction.

# KIRKLAND & ELLIS LLP

September 14, 2024
Page 3

Any newly formed corporate entity that received the Company's assets following a strict foreclosure would likely find itself embroiled in litigation almost immediately, and its ability to operate successfully in the ordinary course of business would be severely undercut, with members of the management team routinely distracted from their core responsibilities and resources needlessly directed toward avoidable lawsuits. Again, that is among the reasons the Board believes that the transaction should be implemented in the customary manner that affords those parties an opportunity to object in an open forum prior to the transfer.

Your effort to cast these valid fiduciary concerns as a form of self-interest is not credible. Likewise, your criticisms of the Company's restructuring efforts to date, including the cost of advisors over a period of years, are unfounded and unconstructive.

At your request, the Chairperson and the Transformation Committee of the Board met Thursday with the Ad Hoc Group to hear directly from the Ad Hoc Group why it believes the strict foreclosure is the appropriate implementation mechanism. The Company, its advisors, the Transformation Committee, and the Board have extensively considered the Ad Hoc Group's proposed implementation mechanism. After Thursday's discussion, and after the numerous other discussions that preceded it, the position of the Company and the Board remains unchanged, for the reasons set forth in this letter.

Accordingly, subject to Board approval, the Company expects to commence chapter 11 proceedings in the coming days. To that end, the Company's advisors will send you a proposed consensual cash collateral order and bidding procedures order, each of which will contemplate an approximately 30-day period from filing to entry of a sale order. The Company hopes the Ad Hoc Group will consent to these pleadings and welcomes the Ad Hoc Group's comments.

The Company also urges the Ad Hoc Group to send a marked asset purchase agreement as soon as possible so that the Company can consider selecting your bid as the successful bid and proceeding with the sale transaction that both the Company and the Ad Hoc Group wish to consummate. As a component of that proposal, the Company requests that the Ad Hoc Group indicate the amount, timing, and form of any pre- and post-closing new-money commitment.

We look forward to further constructive discussions.

Sincerely

/s/ *Spencer A. Winters*

Spencer A. Winters, P.C.

**Exhibit C**

**September 16, 2024**
**Ad Hoc Group Response**



Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com


ALLAN BRILLIANT

Allan.Brilliant@Dechert.com
+1 212 698 3600  Direct
+1 212 698 0612  Fax

September 16, 2024

**VIA EMAIL**

The Board of Directors of Tupperware Brands Corporation (the "Board")
14901 South Orange Blossom Trail
Orlando, Fl 32837
c/o Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Attn: Spencer Winters

Dear members of the Board:

I write on behalf of the Ad Hoc Group[1] in response to the Board's letter of September 14, 2024 (the "Board Letter").

The Ad Hoc Group has proposed that the Company's secured lenders acquire portions of their collateral through a partial strict foreclosure process governed by the Uniform Commercial Code (the "UCC"), specifically sections 9-619, 9-620, 9-621, and 9-622.  This is a long-established statutory remedy available to secured lenders whose borrowers, like the Company, are in default on their secured debt.  The UCC clearly establishes what parties are entitled to notice, and the manner and timing of such notice, before collateral can be transferred in a partial strict foreclosure.  Those notice parties do not include unsecured creditors or shareholders, and there is nothing untoward about the secured creditors suggesting that the Company follow the statutory partial strict foreclosure procedures to transfer collateral.  This is particularly true given that, as the Board Letter states, the Company "agrees with the Ad Hoc Group that there are almost certainly insufficient assets available to provide a recovery to general unsecured creditors or shareholders, as definitively demonstrated by the years-long marketing process."

Moreover, as the Ad Hoc Group pointed out in its materials for its presentation to the Board on September 12, 2024, creditors and shareholders unhappy with a partial strict foreclosure transaction are not without remedies.  For example, if they believe warranted, unsecured creditors could commence avoidance actions such as fraudulent transfer actions.  The Ad Hoc Group

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Ad Hoc Group's letter to the Board dated September 9, 2024.



The Board of Directors of
Tupperware Brands Corporation
(the "Board")
September 9, 2024
Page 2

believes that any such actions would have no merit, and, as the Ad Hoc Group has communicated, it is willing to assume this risk.

The Board appears to acknowledge that it is highly likely that the transfer of collateral to the secured lenders will be the Company's ultimate outcome, but states that "the disagreement between the Company and the Ad Hoc Group concerns the implementation mechanism" for such transfer. The Board has chosen to attempt to implement the transfer of assets through chapter 11 cases, and has rejected the partial strict foreclosure option. The stated reason for commencing chapter 11 cases is the Board's perceived need for transparency and a forum for unsecured creditors and shareholders to object to the transfer. But—given the UCC's clear statutory framework and notice requirements, and the numerous examples of public companies that have agreed to strict foreclosure transactions that the Ad Hoc Group provided the Board—that perception is incorrect. Thus, the Board's choice to take the most administratively expensive, and therefore value-destructive, route possible to transferring the secured lenders' collateral can only be rooted in the idea that more "transparency" will reduce potential director and officer liability associated with the transfer.

The Ad Hoc Group is in receipt of the draft cash collateral and bidding procedures orders referred to in the Board Letter. At this time, the Ad Hoc Group does not consent to the use of cash collateral to fund a chapter 11 process that benefits no one but the Board and the Company's restructuring professionals. Accordingly, the Ad Hoc Group's current intention is to file a motion to dismiss the chapter 11 cases or convert them to cases under chapter 7 or, in the alternative, for relief from the automatic stay.

The Ad Hoc Group reserves all rights.

Sincerely,

Allan Brilliant

## **Exhibit D**

**Organizational Structure Chart**



**Tupperware**Brands