IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| TUPPERWARE BRANDS CORPORATION, *et al.*,[1] | ) Case No. 24-12156 (___) |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF
ADAM STEINBERG IN SUPPORT
OF MOTION OF DEBTORS FOR ENTRY OF
AN ORDER (I) APPROVING THE BIDDING PROCEDURES,
(II) AUTHORIZING THE DEBTORS TO ENTER INTO ONE
OR MORE STALKING HORSE AGREEMENTS AND PROVIDE BID
PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF
SALE NOTICE, (IV) SCHEDULING AN AUCTION AND SALE HEARING,
(V) APPROVING THE PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, (VI) APPROVING THE SALE OF THE
DEBTORS' ASSETS FREE AND CLEAR, AND (VII) GRANTING RELATED RELIEF**

I, Adam Steinberg, declare under penalty of perjury:

1. I am a Managing Director of Moelis & Company LLC ("Moelis"), a leading investment banking firm with principal offices located at 399 Park Avenue, New York, New York 10022. Moelis is the proposed investment banker and financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of an Order (I) Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and Provide Bid Protections, (III) Approving the Form and Manner of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving the Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Tupperware. The location of Debtors' service address in these chapter 11 cases is: 14901 S Orange Blossom Trail, Orlando, FL 32837.

*Debtors' Assets Free and Clear, and (VII) Granting Related Relief* (the "Bidding Procedures Motion"),[2] filed contemporaneously herewith.

3. Although Moelis is being compensated for its work as the investment banker proposed to be retained by the Debtors, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all statements set forth this Declaration are based on: (a) my experience as a restructuring professional; (b) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, (c) information I have learned from my review of relevant documents, including the Debtors' books and records; (d) information supplied to me by members of the Debtors' management and/or their other advisors; and (e) information I that I have received from employees of Moelis working directly with me or under my supervision or direction. Specifically, I have overseen the Moelis team, which has served as one of the Debtors' principal advisors since January 2023. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings. As such, I am familiar with the Debtors' operations, business affairs, financial performance, and restructuring efforts. I am over the age of 18 years, and if I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background

4. Moelis is a leading international investment banking and financial advisory firm (NYSE: MC) with approximately 1,100 employees in locations around the world. Moelis provides a broad range of investment banking and financial advisory services including (a) mergers and acquisitions, (b) recapitalization & restructuring, (c) capital markets advisory, and (d) private funds

---

[2] Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Bidding Procedures Motion or the *Declaration of Brian J. Fox, Chief Restructuring Officer of Tupperware Brands Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), as applicable.

2

advisory. Moelis has been, and is, involved in large and complex restructuring cases throughout the United States, including representing debtors, creditors, acquirers, and official committees in numerous chapter 11 cases in this and other districts. In addition, Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority.

5. Since joining Moelis in 2016, I have specialized in advising companies, lenders, creditors, and investors in a wide range of in-court and out-of-court recapitalization and restructuring transactions. My experience includes chapter 11 bankruptcies, distressed mergers, acquisitions and divestitures, exchange offers, consent solicitations, lender negotiations and distressed financings. Prior to joining Moelis, I was an Analyst at Lonestar Capital Management, where I invested in work-out and special situations, and a Vice President in the Recapitalization & Restructuring Group at Jefferies, where I advised clients on various recapitalization and restructuring transactions. I hold a Bachelor of Arts in Economics and Political Science from the University of Michigan.

6. On or around February 14, 2024, the Debtors retained Moelis to serve as their investment banker and financial advisor in connection with the Debtors' potential restructuring, in order to evaluate strategic alternatives to restructure the Debtors' debt obligations and execute the marketing and sale of all or substantially all of the Debtors' assets. Prior to its February 2024 engagement, the Debtors had previously engaged Moelis in November 2022 to provide financial advisory services in connection with a number of potential transactions, including, but not limited to the sale of all or substantially all of its assets and potential refinancing, restructuring and/or recapitalization transactions, which culminated with the consummation of a recapitalization transaction in August 2023. Prior to that, Moelis had been engaged by the Debtors in March 2020

in connection with a broad review of strategic alternatives including, but not limited to, potential refinancing, restructuring, recapitalization and/or sale transactions. Additionally, Moelis has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring, and has become well-acquainted with the Debtors' capital structure, liquidity needs, and global business operations.

7. Moreover, the Debtors selected Moelis for these roles because of our experience advising financially distressed companies on both in- and out-of-court restructurings across a wide array of industries. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others: *Sunpower Corporation*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 5, 2024); *In re Express, Inc*, No. 24-10831 (KBO) (Bankr. D. Del. May 22, 2024); *In re Invitae Corporation*, No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 13, 2024); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Jan. 12, 2024); *In re Impel Pharmaceuticals Inc.*, No. 23-80016 (SGJ) (Bankr. N.D. Tex. Jan. 12, 2024); *In re Proterra Inc.*, No. 23-11120 (BLS) (Bankr. D. Del. Sept. 21, 2023); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. July 27, 2023); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. July 10, 2023); *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (DRJ) (Bankr. S.D. Tex. May 22, 2023); *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. May 8, 2023); *In re Genesis Global Holdco, LLC.*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 21, 2023) *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Feb. 21, 2023); *In re Brazos Electric Power Cooperative, Inc.*, No. 21-30725 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2022); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 28, 2022); *In re Voyager Dig. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Aug. 16, 2022); *In re Talen Energy Supply, LLC.*, No. 22-90054 (MI) (Bankr. S.D. Tex. Jul. 26, 2022); *In re MD

*Helicopters, Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. May 6, 2022); *In re CBL & Assocs. Props., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Aug. 11, 2021); *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. June 29, 2021); *In re Energy Alloys Holdings, LLC*, No. 20-12088 (MFW) (Bankr. D. Del. June 28, 2021); *In re Alpha Media Holdings LLC*, No. 21-30209 (KRH) (Bankr. E.D. Va. Mar. 11, 2021); *In re EHT US1, Inc.*, No. 21-10036 (CSS) (Bankr. D. Del. Feb. 23, 2021); *In re Ferrellgas Partners, L.P. & Ferrellgas Partners Finance Corp.*, No. 21-10021 (MFW) (Bankr. D. Del. Feb. 3, 2021); *In re Mallinkrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Jan. 14, 2021); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. Sept. 22, 2020); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); *In re The Hertz Corp.*, No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. July 2, 2020); *In re The McClatchy Co.*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); *In re Whiting Petroleum Corp.*, No. 20-32021 (DRJ) (Bankr. S.D. Tex. May 6, 2020); *In re Internap Technology Solutions Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re RentPath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020).

**Overview**

8. Over the last seventeen months, the Debtors, with the assistance of Moelis, have engaged with over 150 different parties to evaluate market interest in one or more potential sales of all, substantially all, or any portion of the Debtors' assets (including certain equity interests in non-Debtor subsidiaries, the "Assets" and such process, the "Marketing Process"), including through a "free and clear" sale under section 363 of the Bankruptcy Code (any such sale, a "Sale Transaction"). The Marketing Process generated significant interest from numerous parties. At various stages, the Company has received indications of interest at valuations that, while well inside the principal amount of the nearly $800 million term loan, were significant.

9. Ultimately, however, the Marketing Process did not produce any offers that were sufficiently attractive to the ten commercial banks that were the incumbent term lenders at the time. As a condition of a further forbearance extension, the incumbent lenders insisted that the Company lift restrictions on the trading of the debt in the credit agreement and in confidentiality agreements, which the Company agreed to do. Thereafter, shortly before the Petition Date, in July 2024, a majority of the term loans traded to an ad hoc group of three lenders (the "Ad Hoc Group"), at three to six cents on the dollar. The implied value of this purchase is well below the value of various indications of interest the Company has received in the marketing process to date.

10. After these trades occurred, as I have witnessed, the Debtors worked with the Ad Hoc Group for weeks in the lead up to these chapter 11 cases regarding the terms of a going-concern credit bid transaction for a substantial portion of the Company's existing business. Approximately two weeks before the Petition Date, however, the Ad Hoc Group indicated to the Company that it wanted to take the Company's assets through a strict foreclosure and would not agree to a chapter 11 proceeding.

11. The Company considered the Ad Hoc Group's position, but determined they could not agree to transfer their storied business to new ownership without transparency and an orderly process. To resolve this tension, the Debtors propose an expedited thirty-day "last call" marketing process (funded through their current cash on hand and cash generated from operations), in accordance with the bidding procedures attached as Exhibit 1 to the proposed Bidding Procedures Order (the "Bidding Procedures").

12. The Bidding Procedures will facilitate a fourth and final market check. I believe that a thirty-day process is sufficient to conclude the Marketing Process in light of the extensive efforts undertaken to date. I understand that the Ad Hoc Group has been unwavering in its position,

and has indicated to the Debtors that it will soon be filing a motion to convert these chapter 11 cases to a chapter 7 liquidation, dismiss the cases, or otherwise lift the automatic stay, any of which the Debtors would oppose in favor of the value-maximizing process put forward in the Motion. I believe that the Bidding Procedures, combined with the Marketing Process conducted to date, will ensure that any decision regarding the path forward is made with a clear view of all available options.

### A. 2023 Marketing Process.

13. The Company engaged restructuring professionals to assist with its restructuring efforts and conducted multiple rounds of out-of-court marketing commencing in 2023 through 2024. The first marketing process, which began in April 2023, lasted approximately four months and generated significant interest from numerous parties. More specifically, the 2023 marketing process involved Moelis making contact initially with eighty-six parties (thirty-six of which signed confidentiality agreements). Eight parties subsequently submitted non-binding indications of interest ("IOI"). Discussions advanced with two parties but ultimately did not yield any offers that were sufficiently attractive to the term lenders.

14. As a result, the Debtors executed a Debt Restructuring Agreement with their prepetition lenders to reduce their obligations and extend maturities under the Prepetition Credit Agreement with the goal of allowing additional time to implement the Turnaround Plan. But the Debtors continued to face liquidity challenges, compounded by the overhang of publicity concerning their turnaround efforts and financial condition, which resulted in Sales Force deterioration and declining sales in certain foreign markets.

15. In February 2024, the Debtors missed an interest payment, and the Debtors and certain of their prepetition lenders entered into the Forbearance Agreement. Among other

requirements, the Forbearance Agreement contained milestones for the Company to reformulate the Turnaround Plan and launch a new marketing process.

### B. 2024 Marketing Process.

16. In February 2024, the Debtors, with the assistance of the Moelis, launched a second formal, third-party marketing process to solicit proposals for one or more potential sales or investments concerning all, substantially all, or any portion of the Debtors' assets. Again, the Marketing Process generated substantial interest.

17. In March 2024, the Company provided a detailed confidential information presentation containing an updated strategic business plan to potential investors. Moelis discussed potential transactions with approximately eighty-four potential financial or strategic investors with experience in investing in the consumer goods sector, operational turnarounds, and/or distressed situations. Approximately twenty-eight parties executed nondisclosure agreements ("NDAs"). Of the parties that executed NDAs, seven conducted further meetings and engaged in discussions related to a potential transaction.

18. On April 5, 2024, Moelis, on behalf of the Debtors, received five IOIs at significant valuations, three of which contemplated acquiring the entirety of the Company via an equity acquisition and two of which proposed a brand management solution. After evaluating each of the IOIs with the Debtors to determine which offered the best path forward, Moelis requested binding IOIs from four parties by May 15, 2024.

19. Only one party (the "Leading Bidder") met the deadline and presented an offer (the "Leading Bid") that encompassed a whole-company solution. The Leading Bidder had already conducted extensive diligence (substantially more than any other bidder), including numerous calls with Tupperware's management, diligence sessions at eight different Tupperware facilities, and one in-person management meeting. For nearly two months following receipt of the

Leading Bid, the Company and its advisors answered diligence requests and facilitated negotiations between their prepetition bank lenders and the Leading Bidder.

20. In late June 2024, however, the Leading Bidder unexpectedly (and severely) reduced the consideration offered under the Leading Bid and raised new concerns about pursuing the whole-company transaction it had championed for months. Ultimately, on July 3, 2024, after months of diligence and hard-fought negotiations, the Leading Bidder conveyed that it would not sponsor a whole-company transaction.

21. Facing a shortening liquidity runway, the Debtors quickly pivoted to re-engage with potentially interested parties for a third time. Moelis discussed potential transactions with approximately forty-seven potential financial or strategic investors. Approximately thirty-six parties executed NDAs, and four ultimately submitted IOIs, none of which were acceptable to the term lenders.

22. In parallel with the third-round marketing check, a majority of the Debtors' funded debt traded into the hands of the Ad Hoc Group, and the Ad Hoc Group formed and began conducting diligence. The Debtors and the Ad Hoc Group spent the weeks leading up to these chapter 11 cases negotiating a credit bid transaction for a going-concern business with a reduced footprint. Despite these productive negotiations, the Debtors were unable to negotiate terms of a private sale purchase agreement or a Stalking Horse Bid with the Ad Hoc Group.

23. Giving the Debtors the authority to select one or more Stalking Horse Bidders on an expedited sale timeline will afford the Debtors maximum flexibility to encourage robust bidding for the Assets. In the event of an Auction, the Debtors, pursuant to the Bidding Procedures, will select a winning Bid for the Assets or one or more winning Bids for a discrete portion of the Assets (such bid or each such bid, a "<u>Successful Bid</u>" and such bidder or each such bidder, a "<u>Successful

Bidder"), taking into account any factors the Debtors reasonably deem relevant to the value and certainty of the Bids to the Debtors' estates.

## The Bidding Procedures

24. I have reviewed the Bidding Procedures. Generally speaking, the Bidding Procedures establish, among other things:

- the availability of due diligence materials and access to conduct due diligence review by prospective Bidders;

- the deadlines and requirements regarding a Stalking Horse Bid, if any;

- the deadlines and requirements for submitting competing Bids and the method and criteria by which such competing Bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied (including, among others, the requirement for all cash Bids), and the deadline that must be met by any Bidder to be considered a "Qualified Bidder" and to participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors;

- the conditions for having the Auction and procedures for conducting the Auction, if any;

- various other matters relating to the sale process generally, including the Back-Up Bid, return of any Good Faith Deposits, and certain reservations of rights; and

- the following proposed key dates and deadlines:

| Event | Date |
|---|---|
| Bidding Procedures Hearing | October 1, 2024 |
| Stalking Horse Bidder Designation | October 1, 2024 |
| Stalking Horse Objection Deadline | Within three (3) Calendar Days of the Stalking Horse Bidder Designation (if any) |
| Bid Deadline | October 8, 2024 |
| Auction (if necessary) | October 10, 2024, at 10:00 a.m. Eastern Time |
| Successful Bidder and Contract Assignment Notice Deadline | October 15, 2024 |
| Sale Hearing | October 17, 2024 |
| Sale Closing | October 20, 2024 |

25. Based on my experience, I believe that the Bidding Procedures are designed to maximize the value received for the Assets by facilitating a fair and competitive bidding process

where potential bidders are encouraged to participate and submit competing Bids within the specified time frame. As described in the Bidding Procedures Motion, the proposed Bid Deadline requires binding Bids for the purchase of the Assets to be delivered no later than October 8, 2024. The Bid Deadline thus provides parties with approximately three weeks from the filing of the Bidding Procedures Motion and approximately seven months since the beginning of the 2024 marketing and sale process to obtain information, formulate, and submit a timely and informed bid to purchase any and all of the Debtors' Assets. The Bidding Procedures also require all Bids to be in cash. The cash bid requirement recognizes the chilling effect the possibility of a substantial credit bid may have on the competitive auction process and solicitation of viable third party Bids.

26. I believe continued pursuit of the marketing and sale process under the timeline contemplated by the Bidding Procedures is in the best interests of the Debtors' estates and their creditors under the circumstances, particularly in light of the extensive prepetition marketing conducted by the Debtors.

**Bid Protections**

27. To the extent the Debtors seek to appoint one or more Stalking Horse Bidders, in my view and based on my experience, it would be customary and reasonable to provide Bid Protections within the parameters outlined in the Bidding Procedures. In the event the Debtors seek to appoint one or more Stalking Horse Bidders, such appointment will be noticed to parties in interest in these chapter 11 cases and subject to their right to object to such bid protections. I believe that authority to provide the Bid Protections is in the best interest of the Debtors' estates and their creditors, and a Stalking Horse Bidder, if designated, would establish a floor for bidding that may ultimately increase the consideration received by the Debtors in exchange for some or all of the Assets. I believe the ability to appoint a Stalking Horse Bidder and provide such bidder

11

with Bid Protections provides the Debtors the necessary flexibility to pursue a value-maximizing transaction.

## Conclusion

28. Given the outreach process undertaken by the Company for the Assets, the publicity surrounding these chapter 11 cases, and the timeline proposed by the Debtors, it is my view, based on my experience and in light of the circumstances, that the proposed postpetition sale process set forth in the Bidding Procedures is reasonable and appropriate under the circumstances. At the Auction, as set forth in the proposed Bidding Procedures, the Debtors will have an opportunity to consider all competing offers, including offers for any and all of the Debtors' Assets, and select the offer or offers that they deem to be the highest or otherwise best offer(s) for the Assets.

Accordingly, for all the foregoing reasons, I believe that the Bidding Procedures and the timeline set forth therein: (a) will encourage bidding for the Debtors' assets; (b) are generally consistent with other bidding procedures previously approved in chapter 11 cases of similar size and complexity; and (c) are appropriate under the circumstances. Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, I believe that the Bidding Procedures are appropriate under the circumstances and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: September 18, 2024                     /s/*Adam Steinberg*
                                              Adam Steinberg
                                              Managing Director
                                              Moelis & Company