**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| TUPPERWARE BRANDS CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 24-12156 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 16, 65, 243, 256 & 381** |

**ORDER (I) APPROVING THE ASSET PURCHASE
AGREEMENT, (II) AUTHORIZING THE SALE OF
ACQUIRED ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(III) AUTHORIZING AND APPROVING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THERWITH, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") for entry of an order (this "Order" or "Sale Order"), (a) authorizing and approving the Bidding Procedures substantially in the form attached to the Motion, (b) approving the Debtors' ability to designate one or more Stalking Horse Bidders (as defined in the Motion) and offer Bid Protections (as defined in the Motion) relating thereto, (c) approving the form and manner of Sale Notice substantially in the form attached to the Motion, (d) establishing certain dates and deadlines, including an auction and sale hearing, (e) approving

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Tupperware Brands Corporation (2333); Dart Industries Inc. (5570); Deerfield Land Corporation (0323); Premiere Products Inc. (4064); Tupperware Brands Latin America Holdings, L.L.C. (0264); Tupperware Home Parties LLC (1671); Tupperware International Holdings Corporation (8983); Tupperware Products, Inc. (8796); and Tupperware U.S., Inc.  (2010).  The location of the Debtors' service address in these Chapter 11 cases is:  14901 S Orange Blossom Trail, Orlando, FL 32837.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the APA (as defined herein) or the Bidding Procedures Order (as defined herein), as applicable.

1

the procedures for the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") and related notices substantially in the form attached to the Motion, (f) approving the Successful Bidder Notice (as defined in the Motion) substantially in the formed attached to the Motion, and (g) granting related relief, all as more fully set forth in the Motion; and this Court, in furtherance of the Motion, having entered the *Order* (*I*) *Approving the Bidding Procedures, (II) Approving the Form and Manner of Sale Notice, (III) Scheduling a Sale Hearing, (IV) Approving the Procedures for the Assumption and Assignment of Contracts, (V) Approving the Sale of the Debtors' Assets Free and Clear, and (VI) Granting Related Relief* [Docket No. 243] (the "Bidding Procedures Order") on October 23, 2024 approving, among other things, the bidding procedures appended to the Bidding Procedures Order (the "Bidding Procedures"), the Debtors' cancellation of any auction, and the scheduling of the Sale Hearing regarding the proposed Sale Transaction to the Credit Agreement Lenders' designee, Party Products LLC ("NewCo" or "Buyer"), as set forth in the term sheet attached to the Bidding Procedures Order; and the Debtors having served the Sale Notice [Docket No. 247] in accordance with Bidding Procedures Order; and the Debtors having filed the proposed Asset Purchase Agreement among the Debtors, Wells Fargo Bank, National Association, as the Administrative Agent, and NewCo on October 28, 2024 [Docket No. 256], as further revised, amended and supplemented (including all schedules and exhibits thereto, the "APA") and the agreements for acquisition via credit bid of the collateral constituting 100% of the equity interests in Premiere Brands International Holdings BV (the "MX Equity Interests," which for the purposes of this Sale Order are Acquired Assets), from Dart Industries Inc. and Tupperware Home Parties, LLC, (the "Mexican Stock Purchase Agreements"), substantially in the forms attached hereto as **Exhibit B**, by any participating lenders under the Credit Agreement (the "MX SPA Purchasers");

and adequate and sufficient notice of the Bidding Procedures, the APA, and all transactions contemplated thereunder and in this Sale Order having been given in the manner directed by this Court in the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and this Court (i) having reviewed and considered (a) the Motion and all relief related thereto, and (b) any objections thereto, and (ii) having heard statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on October 17–18, 2024 and October 22, 2024 (collectively, the "Bidding Procedures Hearing"), and (iii) having heard statements of counsel and the evidence presented in support of the relief requested in this Order on October 29, 2024 (the "Sale Hearing"); and this Court having jurisdiction over this matter; and the legal and factual bases set forth in the Motion, at the Bidding Procedures Hearing, at the Sale Hearing, in the *Declaration of Brain J. Fox, Chief Restructuring Officer of Tupperware Brands Corporation, In Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2], and the *Declaration of Adam Steinberg In Support of Motion of Debtors for Entry of an Order (I) Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and Provide Bid Protections, (III) Approving the Form and Manner Of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving the Procedures for the Assumption And Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. 16] (the "Steinberg Declaration"), establishing just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

**Jurisdiction, Final Order and Statutory Predicates**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to hear and determine the Motion and approve the transactions contemplated by the APA and the Mexican Stock Purchase Agreements pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief provided herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Rules 2002-1 and 6004-1.

D.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). In light of the facts and circumstances of these chapter 11 cases, the Court finds that there is no just reason for delay in the implementation of this Sale Order, and the stay provided for in Bankruptcy Rules 6004(h) and 6006(d) and Local Rule 6004-1(b) is hereby waived.

**Notice of the Sale, Sale Hearing, and Assumption and Assignment of Assigned Contracts**

E.      On September 17–18, 2024 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and

manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

F.       The Debtors gave due and proper notice of the proposed Sale and Sale Hearing, as applicable, in the Sale Notice.  The Sale Notice constituted good, sufficient, and appropriate notice of the Sale under the particular circumstances and no further notice need be given with respect to the proposed Sale.  As provided by the Sale Notice, a reasonable and sufficient opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

G.       Pursuant to the Assumption and Assignment Procedures approved by the Bidding Procedures Order, the Debtors also gave or will give due and proper notice of the assumption and assignment of each Assigned Contract proposed to be assumed by the Debtors and assigned to the Buyer to each non-Debtor counterparty under each such Assigned Contract.  Such notice in accordance with the Assumption and Assignment Procedures is good, sufficient, and appropriate under the particular circumstances, and any counterparties to the Assigned Contracts treated in accordance with the Assumption and Assignment Procedures are hereby treated as consenting to the relief granted herein.

H.       As evidenced by the affidavits of service and certificates of publication previously filed with this Court, and under the urgent circumstances of these chapter 11 cases, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the APA, this Order, the Sale, and the transactions contemplated thereby, has been provided in accordance with the Bidding Procedures Order and sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008.  The notices described above were, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding

Procedures Order, the Sale Hearing, the Sale, the APA, or this Order is or shall be required.  Notice regarding the assumption and assignment of Assigned Contracts shall be sufficient and appropriate to the extent undertaken in compliance with the Bidding Procedures Order and the Assumption and Assignment Procedures.

I.    The Bidding Procedures were reasonable and fair to all persons and established in good faith.  The disclosures made by the Debtors concerning the Motion, the APA, the Sale, and the Sale Hearing were good, complete, and adequate.

J.    Based on the factual record established and representations of counsel made during these cases, time is of the essence for the Debtors, and these cases do not require a longer process than the one contemplated for the Sale Transaction.  *See* Steinberg Declaration at ¶¶ 23-26.  The sale timeline was appropriate under the circumstances in light of, among other things, the nature of the Debtors' assets, their liquidity constraints, and the extensive marketing process that the Debtors have conducted to date.

K.    A reasonable opportunity to object and be heard with respect to the Sale and the Motion and the relief requested therein (including the assumption and assignment of Assigned Contracts to the Buyer and any Cure Amounts related thereto), has been (or in the case of Assigned Contracts, will be upon compliance with the Assumption and Assignment Procedures) afforded to all interested persons and entities.

## Good Faith Purchaser

L.    The APA and the Mexican Stock Purchase Agreements were negotiated, proposed, and entered or will be entered into by, as applicable, the Debtors, the Administrative Agent, the MX SPA Purchasers, and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.

M.      Neither the Debtors, the Administrative Agent, the MX SPA Purchasers, nor the Buyer have engaged in any conduct that would cause or permit the APA or the Mexican Stock Purchase Agreements to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, neither the Administrative Agent, the Buyer, the MX SPA Purchasers, nor the Ad Hoc Group have acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among the bidders.

N.      The Buyer and the MX SPA Purchasers, as assignees of the Administrative Agent, are purchasing the Acquired Assets in good faith and are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code, and are therefore entitled to all of the protections afforded by that provision, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (b) the Administrative Agent, the Buyer, and the MX SPA Purchasers complied with the provisions in the Bidding Procedures Order; (c) the Acquired Assets were the subject of an extensive Prepetition Marketing Process (as defined below); and (d) all payments to be made by the Buyer and the MX SPA Purchasers in connection with the Sale have been disclosed.  None of the Debtors, Sellers, Buyer, or the MX SPA Purchasers have engaged in any conduct that would prevent the application of Bankruptcy Code section 363(m).  The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction, and the Buyer and the MX SPA Purchasers would not consummate the Sale Transaction without such protections.

**Highest and Best Offer, No Fraudulent Transfer or Successor Liability**

O.      The Debtors, with the assistance of their proposed investment banker, Moelis & Company, conducted an extensive prepetition marketing process to evaluate market interest in one

or more potential sales of all, substantially all, or any portion of the Debtors' assets (the "Prepetition Marketing Process"). *See* Steinberg Declaration. Through the Prepetition Marketing Process, the Debtors engaged with more than 150 different parties in three different stages over a seventeen month period, but were unable to close a sale transaction. *See* Steinberg Declaration at ¶¶ 8-9. The Debtors and their professionals have adequately and appropriately marketed the Acquired Assets in accordance with the Debtors' fiduciary duties.

P.      The Debtors conducted a sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order. The sale process, including the Prepetition Marketing Process, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. A potential auction was duly noticed through noticing of the Motion (but subsequently cancelled in accordance with the Bidding Procedures Order). The sale process, including the Prepetition Marketing Process, was conducted in a non-collusive, fair, and good faith manner.

Q.      The offer to purchase the Acquired Assets made by the Administrative Agent, the Buyer, and the MX SPA Purchasers under the terms and conditions set forth in the APA and the Mexican Stock Purchase Agreements, and the consideration provided by the Administrative Agent, the Buyer, and the MX SPA Purchasers thereunder: (i) was made in good faith and complied in all respects with the Bidding Procedures Order; (ii) is the highest or otherwise best offer obtained for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other alternative; (iii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration (under the Bankruptcy Code and under the laws of the

United States, any state, territory, possession or the District of Columbia) for the Acquired Assets being conveyed to the Buyer; (iv) is fair and reasonable; (v) is in the best interests of the Debtors' estates, the Debtors' creditors, and other parties in interest; and (vi) would not have been made or given by the Buyer or the MX SPA Purchasers absent the protections afforded to the Buyer and the MX SPA Purchasers by the Bidding Procedures Order, the APA, the Mexican Stock Purchase Agreements, the Bankruptcy Code, and this Sale Order.

R.     No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Administrative Agent, the Buyer, and the MX SPA Purchasers.

S.     The credit bid portion of the Purchase Price, together with the other consideration constituting the Purchase Price and the Carve-Out (as defined in the *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, entered contemporaneously herewith (the "Final Cash Collateral Order")), is valid and proper consideration pursuant to Sections 363(b) and 363(k) of the Bankruptcy Code, the Bidding Procedures Order, and the Final Cash Collateral Order.  No cause exists to limit the amount of the credit bid pursuant to Section 363(k) of the Bankruptcy Code or otherwise. Approval of the Motion, the APA, the Mexican Stock Purchase Agreements, and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their estates, creditors, and other parties in interest.

T.     The Debtors' determination that the Sale to the Buyer and the MX SPA Purchasers as assignees of the Administrative Agent, pursuant to the APA and the Mexican Stock Purchase Agreements, provides the highest or otherwise best offer for the Acquired Assets, and their related

decision to sell the Acquired Assets to the Buyer, each constitutes a reasonable exercise of the Debtors' business judgment, and each is in the best interests of the Debtors, their estates, and their creditors.  The facts and circumstances stated in the Motion, the declarations in support thereof [Docket Nos. 2, 16], and in the record at the Bidding Procedures Hearing and the Sale Hearing demonstrate the exigent nature of the Debtors' business situation, and the Debtors have articulated sound business reasons for consummating the APA, the Mexican Stock Purchase Agreements, and for selling the Acquired Assets outside of a chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver, and consummate the APA and the Mexican Stock Purchase Agreements and to consummate the transactions contemplated by the APA and the Mexican Stock Purchase Agreements, subject to this Sale Order.

U.      The Committee supports the Sale and entry of this Sale Order.

V.      Neither the Buyer, the MX SPA Purchasers, nor any of their affiliates, officers, directors, managers, shareholders, members, or any of their respective successors or assigns is an "insider" of any of the Debtors or Sellers, as that term is defined under Bankruptcy Code section 101(31).   No common identity of directors, managers, controlling shareholders, or members exists between the Debtors and either the Buyer or the MX SPA Purchasers.

W.      By virtue of the Sale, the APA, the Mexican Stock Purchase Agreements, the transactions contemplated herein, or the operations of the Acquired Assets, neither the Buyer nor the MX SPA Purchasers is a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between either the Buyer or the MX SPA Purchasers and the Debtors. Neither the Buyer nor the MX SPA Purchasers are holding themselves out to the public as a continuation of the Debtors.  The Buyer and the MX SPA Purchasers are not successors to the

Debtors or their estates, and the Sale does not amount to a consolidation, merger, or de facto merger of either the Buyer or the MX SPA Purchasers and the Debtors.

**Validity of Transfer**

X.      Upon entry of this Order, each Debtor (i) has full corporate power and authority to execute and deliver the APA, the Mexican Stock Purchase Agreements, and all other documents contemplated thereby, (ii) has all corporate authority necessary to consummate the transactions contemplated by the APA and the Mexican Stock Purchase Agreements, and (iii) has taken all corporate action necessary to authorize and approve the APA, the Mexican Stock Purchase Agreements, and the consummation of the transactions contemplated thereby.  The Debtors' sale of the Acquired Assets has been duly and validly authorized by all necessary corporate action. Upon entry of this Order, no consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate the Sale, the APA, the Mexican Stock Purchase Agreements, and the transactions contemplated thereby.

Y.      The APA and the Mexican Stock Purchase Agreements were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Debtors, the Sellers, the Buyer, nor the MX SPA Purchasers is entering into the transactions contemplated by the APA and the Mexican Stock Purchase Agreements fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Z.      The Sellers are the sole and lawful owners of and have clear and marketable title to the Acquired Assets.  Except as set forth herein or in the APA, subject to section 363(f) of the Bankruptcy Code, the transfer of each of the Acquired Assets to the Buyer or the MX SPA Purchasers, as applicable, will be, as of the applicable Closing Date, a legal, valid, and effective

transfer of the Acquired Assets, which transfer vests or will vest the Buyer or the MX SPA Purchasers, as applicable, with all right, title, and interest of the Debtors and Sellers and, with respect to the Acquired Assets sold by Debtors, such transfer shall be free and clear of (a) all liens (as defined in section 101(37) of the Bankruptcy Code), encumbrances, charges, mortgages, deeds of trust, options, pledges, security interests or similar interests, title defects, hypothecations, easements, rights of way, rights of use, encroachments, judgments, rights of setoff (except to the extent exercised prepetition), conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens") and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights (including, without limitation, rights of contribution or subrogation), contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, "Claims") including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Acquired Assets, or any similar rights, (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership, or (iii) in respect of the following: (A) any labor or employment agreements; (B) all mortgages, deeds of trust and security interests; (C) any pension, welfare,

compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (D) any other employee, workers' compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (1) the Employee Retirement Income Security Act of 1974, as amended, (2) the Fair Labor Standards Act, (3) Title VII of the Civil Rights Act of 1964, (4) the Federal Rehabilitation Act of 1973, (5) the National Labor Relations Act, (6) the Worker Adjustment and Retraining Act of 1988, (7) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (8) the Americans with Disabilities Act of 1990, (9) the Consolidated Omnibus Budget Reconciliation Act of 1985, (10) state discrimination laws, (11) state unemployment compensation laws or any other similar state laws, or (12) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors, including, without limitation, any and all claims under the California Private Attorneys General Act; (E) Liens or Claims arising under any Environmental Laws with respect to the Business, Excluded Liabilities, Acquired Assets, Excluded Assets (as defined below), or assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing Date; (F) any bulk sales or similar law; (G) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (H) any theory of fraudulent transfer under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, or otherwise; (I) the Carve-Out; and (J) any common law doctrine of de facto merger or successor-in-interest theory, or any other theory of or related to successor liability, relating to, accruing or arising any time prior to the Closing Date (all such Liens, Claims, and any other interests in the Acquired Assets of any kind or nature whatsoever, collectively, "Encumbrances"), with the exception of

Assumed Liabilities; *provided* that the Encumbrances attach to the proceeds of the Sale with the same validity, extent, and priority as had attached to the Acquired Assets immediately prior to such Sale. For the avoidance of doubt, any license granted to Tupperware Products A.G. ("TPAG") is terminable by its terms upon the commencement of insolvency proceedings by TPAG.[3] The Debtors have or are deemed to have provided sufficient notice to TPAG of termination of the license.[4]

## Section 363(f) Is Satisfied

AA.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Acquired Assets free and clear of any and all Encumbrances except for Assumed Liabilities.

BB.     The Buyer and the MX SPA Purchasers would not have entered into the APA and the Mexican Stock Purchase Agreements, and would not consummate the transactions contemplated therein, if the sale of the Acquired Assets to the Buyer and the MX SPA Purchasers and the assumption of any Assumed Liabilities by the Buyer and the MX SPA Purchasers were not free and clear of all Encumbrances, other than the Assumed Liabilities. Unless otherwise expressly provided in the APA or the Mexican Stock Purchase Agreements, neither the Buyer nor the MX SPA Purchasers are responsible for any Encumbrances against the Debtors or the Acquired Assets.

---

[3] Prior to entry of this Sale Order, the Court dismissed TPAG's chapter 11 case, thereby ending the protections of sections 362 and 365 of the Bankruptcy Code.

[4] In connection with the dismissal of TPAG's chapter 11 case, TPAG, Dart, and the Buyer entered into that certain Termination and Transitional License Agreement, dated November 5, 2024 (the "TPAG Termination TSA"). The TPAG Termination TSA reflects a mutual termination of Existing Agreements (as defined in the TPAG Termination TSA) and was approved by the competent court in Switzerland on November 12, 2024.

CC.    The Debtors may sell the Acquired Assets free and clear of all Encumbrances against the Debtors, their estates or any of the Acquired Assets (except the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances against the Debtors, their estates, or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Motion are treated as having consented pursuant to section 363(f)(2) of the Bankruptcy Code.

### Assumption and Assignment of Contracts and Leases

DD.    The assumption and assignment of the Assigned Contracts are integral to the APA, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.

EE.    In accordance with the APA, the Buyer shall: (i) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assigned Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assigned Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(B) and 365(f)(2)(A), in an aggregate amount not to exceed $2,404,000 (the "Cure Cap"); *provided* that, notwithstanding the Cure Cap, Buyer shall pay all Cure Amounts in connection with any contract first designated for assumption by Buyer post-Closing.  The Buyer's promise to perform under the Assigned Contracts after the Closing Date, subject to the terms set forth in this Sale Order, combined with the payment of any Cures in accordance with the Assumption and Assignment

Procedures, shall and hereby do constitute adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code

FF.      The Assumption and Assignment Procedures approved in the Bidding Procedures Order provide each counterparty to an Assigned Contract with a reasonable opportunity to object to the Cure Amounts and to the assumption and assignment to the Buyer of the applicable Assigned Contract.  To the extent that any counterparty fails to timely object to its Cure Amounts or the assumption and assignment of its respective Assigned Contract consistent with the Assumption and Assignment Procedures, such counterparty will be treated as having consented to such Cure Amounts and the assumption and assignment of its respective Assigned Contract to the Buyer.

**Compelling Circumstances for an Immediate Sale**

GG.      The Debtors have articulated good and sufficient reasons for approval of the APA, the Mexican Stock Purchase Agreements, and the Sale.  The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale to the Buyer and the MX SPA Purchasers is necessary and appropriate to maximize the value of the Debtors' estates.

HH.      To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.  The transactions contemplated by the APA and the Mexican Stock Purchase Agreements, including, without limitation, the Sale Transaction and the assumption and assignment of the

Assigned Contracts, neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a chapter 11 plan for the Debtors, and therefore do not constitute a *sub rosa* plan.

II.      Given all of the circumstances of the chapter 11 cases and the adequacy and fair value of the Purchase Price under the APA, the proposed Sale of the Acquired Assets to the Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

JJ.      The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**<u>General Provisions</u>**

1.      The relief requested is granted and approved to the extent set forth herein, and the Sale Transaction contemplated in the APA and the Mexican Stock Purchase Agreements is approved.

2.      All objections to the Motion or the relief requested therein or provided herein that have not been adjourned, continued, withdrawn, waived, or settled as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

**<u>Approval of the APA</u>**

3.      The Debtors' entry into the APA, attached hereto as **<u>Exhibit A</u>**, the Mexican Stock Purchase Agreements, and applicable ancillary agreements (the "<u>Definitive Agreements</u>") is

hereby approved and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved; *provided* that the Debtors' entry into any transition services agreement or any similar arrangement with the Buyer shall be at least cost neutral or better to the Debtors' estates.

4.    Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Acquired Assets to the Buyer and the MX SPA Purchasers pursuant to and in accordance with the terms and conditions of the APA and the Mexican Stock Purchase Agreements, (b) close the Sale as contemplated in the APA, the Mexican Stock Purchase Agreements, and this Sale Order, and (c) execute and deliver, perform under, consummate and implement the APA and the Mexican Stock Purchase Agreements, including the assumption and assignment to the Buyer of the Assigned Contracts pursuant to the Assumption and Assignment Procedures and the performance under the transition services agreement attached to the APA as Exhibit [●] (including, for the avoidance of doubt, the pass-through payment, on behalf of the Buyer, of any amounts to employees that may otherwise require separate approval of the Court), together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, the Mexican Stock Purchase Agreements, and the Sale, all without further order of the Court.

5.    This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor, any holders of Encumbrances in, against or on all or any portion of the Acquired Assets (whether known or unknown), the Buyer, the MX SPA Purchasers, and all successors and assigns of the Buyer, the Acquired Assets, and trustees, if any, subsequently appointed in any of the chapter 11 cases or upon a conversion to chapter 7 under

the Bankruptcy Code of any of the chapter 11 cases.  This Sale Order, the APA, and the Mexican

Stock Purchase Agreements shall inure to the benefit of the Debtors, their estates and creditors,

the Buyer and the respective successors and assigns of each of the foregoing.

### Transfer of the Acquired Assets

6.     Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors

are authorized to transfer the Acquired Assets to the Buyer and the MX SPA Purchasers on the

applicable Closing Date, and such transfer shall constitute a legal, valid, binding, and effective

transfer of such Acquired Assets and shall vest the Buyer and the MX SPA Purchasers with title

to the Acquired Assets and, upon the Debtors' receipt of the Purchase Price and the satisfaction or

waiver of all other conditions in the APA, other than Assumed Liabilities or as otherwise set forth

in this Sale Order, the APA, or the Mexican Stock Purchase Agreements, shall be free and clear

of all Encumbrances, including, without limitation, (i) the Carve-Out, and (ii) fraudulent transfer

liability and successor or successor-in-interest liability and Claims in respect of the Excluded

Liabilities; *provided* that the Encumbrances attach to the proceeds of the Sale with the same

validity, extent, and priority as had attached to the Acquired Assets immediately prior to such Sale;

*provided further* that notwithstanding anything set forth in the Final Cash Collateral Order, from

and after the Closing, the Carve-Out shall be on the Excluded Assets only, and no estate

professionals shall have any recourse to the Acquired Assets to satisfy to the Carve-Out.  Upon

the Closing, the Buyer shall take title to and possession of the Acquired Assets subject only to the

Assumed Liabilities.

7.     The Buyer and the MX SPA Purchasers shall acquire only the Acquired Assets as

specifically agreed to and set forth in the APA and the Mexican Stock Purchase Agreements, as

applicable. Sellers and their retained subsidiaries shall retain all assets that are Excluded Assets following the Closing as specifically agreed to and set forth in the APA.

8.      All persons and entities that are in possession of some or all of the Acquired Assets on the applicable Closing Date shall surrender possession of such Acquired Assets to the Buyer, the MX SPA Purchasers, or their assignee at the applicable Closing. On the applicable Closing Date, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

9.      On the Closing Date, this Sale Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtors' interests in the Acquired Assets. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and the Mexican Stock Purchase Agreements.

10.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other Encumbrances of record on the Acquired Assets except those assumed as Assumed Liabilities.

11.     If any person or entity which has filed statements or other documents or agreements evidencing any Encumbrances in or on, all or any portion of the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of

the Acquired Assets, the Debtors, the Buyer, and the MX SPA Purchasers are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets, including signing on behalf of the applicable Debtor any required localized assignment agreements, forms, or other documentation as may be necessary or desirable for recording any chain of title updates with respect to the Acquired Assets.

12.    This Sale Order is and shall be effective as a determination that, on the Closing Date, all Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyances described herein have been effected.  This Sale Order may be presented to any and all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, to facilitate the effectuation of the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and the Mexican Stock Purchase Agreements.

### Assumption and Assignment of Contracts

13.    The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing of the Sale or the effective date of the assignment of such Assigned Contracts (as set forth in the applicable

Assigned Contract Notice) and subject in all respects to the Assumption and Assignment Procedures approved in the Bidding Procedures Order, the Assigned Contracts free and clear of all Encumbrances of any kind or nature whatsoever (other than the Assumed Liabilities or as otherwise set forth in this Sale Order or the APA), and (b) execute and deliver to the Buyer such documents or other instruments as the Buyer deems necessary to assign and transfer the Assigned Contracts and the Assumed Liabilities to the Buyer.

14.    With respect to the Assigned Contracts: (a) each Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) subject to the Assumption and Assignment Procedures, the Debtors may assume each Assigned Contract in accordance with section 365 of the Bankruptcy Code; (c) subject to the Assumption and Assignment Procedures, the Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect with respect to the Sale approved hereby; (d) subject to the Assumption and Assignment Procedures, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied; (e) subject to the Assumption and Assignment Procedures, the Assigned Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after payment of the applicable Cure Amount and such assignment to and assumption by the Buyer; and (f) upon Closing and subject to the Assumption and Assignment Procedures, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract.

15.    All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing or the effective date of the assignment of any Assigned Contract (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer in accordance with the APA at the Closing, at the time of assignment of an Assigned Contract, or as soon thereafter as practicable by payment of the Cure Amounts.

16.    Upon the Debtors' assignment of the Assigned Contracts to the Buyer under the provisions of this Sale Order and any additional orders of this Court and the Debtors' or the Buyer's payment of any Cure Amounts, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted, except as otherwise provided by this Sale Order, (a) to declare a default by the Buyer under such Assigned Contract or (b) otherwise take action against the Buyer or its assets as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract. Subject to compliance with the Assumption and Assignment Procedures, each non-Debtor party to an Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or

existing immediately prior to Closing or the effective date of the assignment of an Assigned Contract (as applicable), including those constituting Excluded Liabilities, or, against the Buyer, any counterclaim, defense, setoff or any other Claim asserted or assertable against the Debtors; or (ii) imposing or charging against the Buyer or its Affiliates any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignments to the Buyer of the Assigned Contracts.

17.    Except as provided in the APA or this Sale Order, and subject to the Assumption and Assignment Procedures, after the Closing and payment of the applicable Cure Amount, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property or their assets or estates.

18.    The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

19.    At any time prior to Closing, the Buyer may notify the Debtors that it has elected not to accept assumption and assignment of executory contracts previously selected for assumption and assignment.  After the Closing, the Buyer may request that the Debtors assume and assign to Buyer any executory contracts or unexpired leases that have not previously been assumed and assigned or rejected.  In the event of such request, the Debtors shall, within two (2) business days of such request, serve the counterparties to such executory contracts and unexpired leases with a supplemental Assigned Contract Notice, which shall provide notice of a deadline to object to the assumption and assignment and/or the proposed Cure Amounts that is at least seven (7) days from the date of the Assigned Contract Notice; *provided* that no Assigned Contract Notice objection

deadline shall be on a U.S. federal holiday.  In the event that no objections are received and the Assigned Contract Notice has not been withdrawn prior to the proposed effective date of assignment set forth in the supplemental Assigned Contract Notice, the Buyer will be responsible for the Cure Amounts associated with such assumption and assignment, and any such Cure Amounts shall not be subject to the Cure Cap.  In the event of an objection, the Buyer shall not be required to take assignment of the relevant executory contract or unexpired lease, and the Debtors and the Buyer shall retain all rights under the Assumption and Assignment Procedures.

20.    Effective as of the Closing, Buyer shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably transfer, assign, convey, and deliver to Buyer, without duplication and only to the extent not paid prior to the Closing, liabilities consisting of the outstanding Global Tranche Revolving Loans under and as defined in the Credit Agreement in the aggregate principal amount of $7,000,000 and the obligations to reimburse the L/C Disbursements, if any, in respect of the Letters of Credit issued and outstanding under and as defined in the Credit Agreement in the aggregate face amount of $15,330,000 pursuant to the terms and conditions of a new first lien credit agreement to be entered into by and among, among others, Buyer and the Global Tranche Lenders under and as defined in the Credit Agreement at the Closing (the "Assumed Revolver Obligations") and each Global Tranche Lenders is deemed to be a lender under such first lien credit agreement.  Upon assumption of the Assumed Revolver Obligations, the Debtors' liabilities with respect to such obligations are deemed satisfied.  For the avoidance of doubt, the assumption of the Assumed Revolver Obligations by the Buyer shall not discharge any Global Tranche Lender's commitment and obligation under the Credit Agreement to fund its participation in any Letters of Credit (as defined in the Credit Agreement) issued by Issuing Bank

under (and as defined in) the Credit Agreement, which shall be continued as commitments and obligations under the above-mentioned first lien credit agreement with respect to such Letters of Credit which will be deemed issued and outstanding under such first lien credit agreement.

### Prohibition of Actions Against the Buyer

21.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Sale Order, the APA, or the Mexican Stock Purchase Agreements (or any definitive documents executed in connection with the foregoing), neither the Buyer, the MX SPA Purchasers, nor the Administrative Agent shall have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA or the Mexican Stock Purchase Agreements, neither the Buyer, the MX SPA Purchasers, nor the Administrative Agent shall be liable for any Claims against the Debtors or any of its predecessors or affiliates, and the Buyer and the MX SPA Purchasers shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, substantial continuity, or fraudulent transfer whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, Environmental Liabilities, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing.

22.     Except with respect to the Assumed Liabilities, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding

Encumbrances of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' Business prior to the Closing Date or the transfer of the Acquired Assets to the Buyer and the MX SPA Purchasers, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer and the MX SPA Purchasers, their Affiliates, successors, or assigns, their property or the Acquired Assets, the Prepetition Agents or the lenders under the Credit Agreement and the Bridge Credit Agreement, such persons' or entities' Encumbrances on, in, to, or against the Acquired Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer or the MX SPA Purchasers, their Affiliates, the Prepetition Agents or the lenders under the Credit Agreement and the Bridge Credit Agreement, and their successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer or the MX SPA Purchasers, their Affiliates, the Prepetition Agents or the lenders under the Credit Agreement and the Bridge Credit Agreement, and their successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Buyer or the MX SPA Purchasers, their Affiliates, the Prepetition Agents or the lenders under the Credit Agreement and the Bridge Credit Agreement, and their successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Buyer or the MX SPA Purchasers, their Affiliates, the Prepetition Agents or the lenders under the Credit Agreement and the Bridge Credit Agreement, or their successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the

provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.  On the Closing Date, each creditor holding Encumbrances or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate) is authorized and directed to execute such documents and take all other actions as may be necessary to release Encumbrances on, in, to, or against the Acquired Assets (except Assumed Liabilities), if any, as provided for herein, as such Encumbrances may have been recorded or may otherwise exist.  For the avoidance of doubt, upon Closing any licenses or rights granted to the Swiss Debtor, including without limitation, pursuant to the Amended and Restated License Agreement, dated January 1, 2011, by and between Dart Industries, Inc. ("Dart") and TPAG, as amended, modified and restated from time to time and superseding the Amended and Restated License Agreement, dated January 1, 1999, as amended, modified and restated from time to time; Agreement for Sharing Research and Development Costs, dated September 1, 1998, by and between Dart and TPAG, as amended, modified and restated from time to time and the Modified Agreement for Sharing Research and Development Costs, dated January 1, 1999, by and between Dart and TPAG, as amended, modified and restated from time to time, each as superseded by the Amended and Restated Agreement to Share Costs and Risks of Intangibles development, dated June 17, 2009, by and between Dart and TPAG, as amended, modified and restated from time to time; Royalty Prepayment Agreement, dated February 20, 2020, by and between Dart and TPAG, as amended, modified and restated from time to time; Cost Sharing Prepayment Agreement, dated June 28,

2017, by and between Dart and TPAG, as amended, modified and restated from time to time; Cost Sharing Prepayment Agreement, dated as of December 21, 2015, by and between Dart and TPAG, as amended, modified and restated from time to time; Cost Sharing Prepayment Agreement, dated as of December 17, 2012, by and between Dart and TPAG, as amended, modified and restated from time to time, have been and are deemed terminated by Dart and the Acquired Assets are being purchased and transferred free and clear of any rights thereunder.

### Releases

**23.     Effective as of the Closing Date, (I) (a) each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its and their respective past, present, and future predecessors, successors, heirs, subsidiaries, and assigns hereby, absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the Buyer, the MX SPA Purchasers, the Ad Hoc Group, the Prepetition Agents, each Credit Agreement Lender, each Bridge Credit Agreement Lender, and the Committee and each of its members (in their capacities as such), and, with respect to each of the foregoing, each of their successors and assigns and current and former directors, officers, managers, attorneys, advisors, and professionals from any and all obligations and liabilities to the Debtors and from any and all claims, counterclaims, defenses, offsets, demands, debts, accounts, contracts, liabilities, responsibilities, disputes, remedies, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorney's fees, costs, expenses, judgments of every type, and causes of action of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, fixed, contingent, pending or threatened, arising in law or equity, upon contract or tort or**

under any state or federal or common law or statute or regulation or otherwise, arising out of or relating to the Debtors or their affiliates, their businesses, their capital structures, these chapter 11 cases, the APA, the Mexican Stock Purchase Agreements, or the Sale Transaction and arising on or before the applicable Closing, and (b) the Buyer, the MX SPA Purchasers, the Ad Hoc Group, the Prepetition Agents, each Credit Agreement Lender, each Bridge Credit Agreement Lender, and the Committee and each of its members (in their capacities as such), each on its own behalf and on behalf of its respective past, present, and future predecessors, successors, heirs, subsidiaries, and assigns hereby, absolutely, unconditionally, and irrevocably releases and forever discharges and acquits each of the Debtors' current and former directors, officers, managers, attorneys, advisors, and professionals from any and all obligations, liabilities, claims, counterclaims, defenses, offsets, demands, debts, accounts, contracts, liabilities, responsibilities, disputes, remedies, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorney's fees, costs, expenses, judgments of every type, and causes of action of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, fixed, contingent, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal or common law or statute or regulation or otherwise, arising out of or relating to the Debtors or their affiliates, their businesses, their capital structures, these chapter 11 cases, the APA, the Mexican Stock Purchase Agreements,

or the Sale and arising on or before the applicable Closing, including the Purchased Claims,[5] and (II) the Buyer agrees to release the Acquired Avoidance Actions.[6]

24.     Each of the parties granting the releases set forth in the foregoing paragraph (including such parties' successors and assigns) covenants not to, and is hereby forever enjoined from, directly or indirectly bringing the released claims and causes of action.  For the avoidance of doubt, such releases shall not release the Debtors' obligations for the Remaining Credit Agreement Obligations (as defined herein), or any claims that are Acquired Assets, other than the Purchased Claims and the Acquired Avoidance Actions. Such releases (i) represent a sound exercise of the Debtors' business judgment; (ii) were negotiated in good faith and at arm's length; and (iii) are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise of the claims released thereby, (c) in the best interest of the Debtors and their estates, (d) fair, equitable, and reasonable under the circumstances of the Debtors chapter 11 cases, (e) are within the jurisdiction of the Bankruptcy Court; (f) are integral elements of the transactions incorporated into this Order and inextricably bound with the other provisions of this Order;

---

[5]     "Purchased Claims" means all claims, counterclaims, defenses, offsets, demands, debts, accounts, liabilities, disputes, remedies, indebtedness, obligations, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, judgments of every type, and causes of action of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, fixed, contingent, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal or common law or statute or regulation or otherwise, including any derivative claims or causes of action, held by the Debtors (other than TPAG) or their estates against each of their current and former directors, officers, managers, attorneys, advisors, and professionals.  Purchased Claims are Acquired Assets under the APA.

[6]     "Acquired Avoidance Actions" means all avoidance actions against counterparties to assumed contracts, Assumed Liabilities, other counterparties with which Buyer intends to continue doing business after Closing, any other trade vendors of the Debtors (other than TPAG), and any other General Unsecured Creditors of the Debtors (other than the Swiss Borrower).  Terms capitalized but not defined in this definition have the meanings ascribed to such terms in the Term Sheet.

**and (g) consistent with the Bankruptcy Code and are hereby approved in their entirety. For the avoidance of doubt, the foregoing releases do not release (i) any obligations under definitive documents documenting the Sale Transaction or (ii) direct claims held by any party not specified in the foregoing releases; *provided* that the Debtors reserve the right to seek such releases at a later time, subject to parties in interest's rights to oppose such releases.**

### Other Provisions

25.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Buyer and the MX SPA Purchasers in accordance with the terms of the APA, the Mexican Stock Purchase Agreements, and this Sale Order; *provided* that this paragraph shall not restrict any party in interest's rights to appeal any ruling with respect to this Order.

26.     The Debtors are authorized and directed to pay, on the Closing Date, the Bridge Payoff Amount from the cash portion of the Purchase Price and after payment of the Bridge Payoff Amount, fund in full the Carve-Out, pay $2,500,000 (the "PBGC Payment") to the Pension Benefit Guaranty Corporation (the "PBGC"), and pay such amounts required by the Cash Sellers as consideration for the purchase of the Cash Consideration Assets (other than the Bridge Payoff Amount) as provided for in the APA, allocate the remaining cash portion of the Purchase Price (i) to the Cash Sellers (as defined in the APA) and (ii) to remain in the Debtors' bankruptcy estates to pay other administrative claims and, to the extent sufficient, to fund the confirmation of a plan of liquidation and the orderly wind down of the Excluded Assets and the Debtors' retained subsidiaries; *provided* however, that, other than the Cash Consideration, neither the Buyer nor any member of the Ad Hoc Group shall be required to provide any funding for confirmation of a plan of liquidation or the winddown of the Debtors' estates.

27.     In consideration of the PBGC Payment and effective upon payment of the PBGC Payment, the PBGC releases, discharges, and acquits any and all claims and causes of action that it has against the Debtors, the Sellers, their Subsidiaries and Affiliates (including all Acquired Entities and including any entity treated as a member of a "controlled group" with the Debtors, the Sellers and their Subsidiaries and Affiliates under the Employee Retirement Income Security Act of 1974, as amended), the Administrative Agent, the Buyer, the MX SPA Purchasers, and their Subsidiaries and Affiliates, and the lenders under the Credit Agreement and the Bridge Credit Agreement in respect of all liabilities related to the Tupperware Brands Corporation Base Retirement Plan (the "Pension Plan"), including liability for any termination premiums, of the Seller, their Subsidiaries and Affiliates (including all Acquired Entities), *provided* however that nothing in this Order releases any person from liability for fiduciary breach with respect to the Pension Plan.

28.     The Administrative Agent is authorized under the Credit Agreement to follow the directions of the Required Lenders (as defined in the Credit Agreement) in submitting the Credit Bid, including, without limitation, in assigning the right to receive the Acquired Assets and to assume the Assumed Liabilities to the Buyer and the MX SPA Purchasers, and the Required Lenders are authorized to permit the individual lenders under the Credit Agreement to make the Credit Bid contemplated by the Mexican Stock Purchase Agreements.

29.     The Required Lenders acted validly and reasonably in structuring and directing the Administrative Agent to submit the Credit Bid with respect to transactions contemplated by the Mexican Stock Purchase Agreements, and each lender was given proper notice of these transactions as well as opportunity to participate therein.

30.     As of the Closing Date, the *Motion of the Ad Hoc Group of Secured Lenders for an Order (I) Dismissing These Chapter 11 Cases or Converting them to Chapter 7 or (II) for Relief from the Automatic Stay* [Docket No. 48] is automatically voluntarily withdrawn.

31.     The transactions contemplated by the APA and the Mexican Stock Purchase Agreements are undertaken by the Administrative Agent, the Buyer, and the MX SPA Purchasers without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Administrative Agent, the Buyer, and the MX SPA Purchasers are good faith buyers within the meaning of section 363(m) of the Bankruptcy Code and each, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

32.     Nothing contained in any chapter 11 plan, or order of any type or kind entered in (i) the Chapter 11 Cases, (ii) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (iii) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the APA, the Mexican Stock Purchase Agreements, or the terms of this Sale Order.

33.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Sale Order shall be effective immediately upon entry, and the Debtors, the Buyer, and the MX SPA Purchasers are authorized to close the Sale immediately upon entry of this Sale Order.

34.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

35.    The failure specifically to include any particular provision of the APA or the Mexican Stock Purchase Agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA and the Mexican Stock Purchase Agreements be authorized and approved in their entirety; *provided*, however, that this Sale Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) or the Mexican Stock Purchase Agreements and this Sale Order.  Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

36.    The APA, the Mexican Stock Purchase Agreements, and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or third parties.

37.    This Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order, the APA, the Mexican Stock Purchase Agreements, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which have been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, without limitation, retaining jurisdiction to: (a) compel delivery of the Acquired Assets to the Buyer or the MX SPA Purchasers; (b) interpret, implement and enforce the provisions of this Sale Order; (c) protect the Administrative Agent, the Buyer, and the MX SPA Purchasers against any Encumbrances on, in, to, or against the Acquired Assets of any

kind or nature whatsoever; and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

38.     Cigna Health and Life Insurance Company ("Cigna") and the Debtors are parties to an Administrative Services Only Agreement, a Stop Loss Policy, and an Agreement for Employee Assistance Program Services (collectively, the "Cigna Contracts") that facilitate the Debtors' self-insured employee medical and dental benefits plan.  Notwithstanding anything in this Order to the contrary, unless Cigna and the Debtors agree otherwise, the Cigna Contracts shall not be assumed and assigned to the Buyer as part of the Sale Transaction absent further order of the Court.

39.     For the avoidance of doubt, the Acquired Assets do not include the "Personal Property," as such term is defined in that certain Agreement for Purchase and Sale of Real Property, dated as of October 11, 2023 (the "Phoenix Purchase Agreement") between Tupperware U.S., Inc. and Dart, as sellers, and Phoenix Hemingway Industrial Investors, LLC ("Phoenix"). For further avoidance of doubt, Phoenix's Personal Property does not include the "Excluded Personal Property," as defined in the Phoenix Purchase Agreement.  Debtors and Buyer shall cooperate with Phoenix on or before the closing of the Sale Transaction (or such later date as the parties mutually agree) to identify Phoenix's Personal Property and to take such steps as are reasonably necessary to avoid any of Phoenix's Personal Property being removed from 248 Tupperware Road in Hemingway, South Carolina by Debtors or Buyer.

40.     Notwithstanding any other provision of this Order or the APA, Oracle consents to the Debtors' assumption and assignment to the Buyer of some or all agreements between the Debtors, on the one hand, and Oracle America, Inc. ("Oracle"), on the other hand (such assumed and assigned agreements, the "Oracle Agreements"), subject to (a) payment to Oracle of the cure

amount due under the Oracle Agreements, and (b) entry into a standard Oracle Assignment Agreement to be executed by the Debtors and the Buyer.  Said conditions may be satisfied after the Closing, but Buyer shall have the right to use Oracle's products and services under the Oracle Agreements on and after the Closing.  Buyer shall be responsible for continuing to pay all amounts due under the Oracle Agreements assigned to it as they come due for use of Oracle's products and services after the Closing.  In the event of a dispute as to the amount of the cure, either party may seek a determination from the Court, upon notice to the other parties.  Further, there shall not be any shared or concurrent use of Oracle's products and services by the Debtors on account of the Oracle Agreements, except as expressly permitted pursuant to the applicable agreement(s), absent further Court order or Oracle's prior written consent.

41.    Any amounts payable by the Debtors on account of the Expense Reimbursement shall be paid in the manner provided in the APA, and the Bidding Procedures Order, as applicable, without further order of this Court, shall be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified or otherwise affected by any chapter 11 plan of the Debtors, except by an express agreement with the Buyer, its successors, or assigns.

42.    Upon the Closing (a) the Credit Bid under the APA and the Mexican Stock Purchase Agreements shall be deemed to satisfy [$63.8] million in principal amount of "Obligations" under and as defined in the Credit Agreement ("Credit Agreement Obligations") and the remaining Credit Agreement Obligations following reduction for the Credit Bid (the "Remaining Credit Agreement Obligations") shall remain outstanding as claims against the Debtors secured by the Excluded Assets to the extent set forth in the Credit Agreement and related loan documents.

43.     The Buyer, the MX SPA Purchasers, and the Prepetition Agents and lenders under the Credit Agreement and the Bridge Loan Credit Agreement are each a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale, the assumption and assignment of the Assigned Contracts, and any issues related to or otherwise connected to the APA, the Mexican Stock Purchase Agreements, the Sale, or any other matter impacting their rights or alleged obligations.

44.     Each of the Debtors, the Buyer, the MX SPA Purchasers, and the Backstop Parties will use reasonable efforts to assist Sellers (as reasonably required) in effectuating the terms of this Order, and any other necessary orders in connection with the Definitive Agreements.

45.     The APA, the Mexican Stock Purchase Agreements, and their related documents may be amended or modified as provided therein without an Order of the Court, provided that any such amendment or modification is consistent with the Term Sheet in all material respects and does not have a material negative impact on the Debtors' general unsecured creditors.

46.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

47.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in the chapter 11 cases, the terms of this Sale Order shall govern.

**Dated: November 24th, 2024**
**Wilmington, Delaware**

**BRENDAN L. SHANNON**
**UNITED STATES BANKRUPTCY JUDGE**