# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TUPPERWARE BRANDS CORPORATION, *et al.*,[1] | ) ) ) | Case No. 24-12156 (BLS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## DISCLOSURE STATEMENT
## RELATING TO THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## TUPPERWARE BRANDS CORPORATION AND ITS DEBTOR SUBSIDIARIES

**COLE SCHOTZ P.C.**
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:    (302) 652-3131
Facsimile:    (302) 652-3117
Email:        preilley@coleschotz.com
              snewman@coleschotz.com
              mfitzpatrick@coleschotz.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (Admitted *pro hac vice*)
Spencer A. Winters, P.C. (Admitted *pro hac vice*)
Jeffrey T. Michalik (Admitted *pro hac vice*)
Gabriela Z. Hensley (Admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        anup.sathy@kirkland.com
              spencer.winters@kirkland.com
              jeff.michalik@kirkland.com
              gabriela.hensley@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated:  March 6, 2025

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tupperware Brands Corporation (2333); Dart Industries Inc. (5570); Deerfield Land Corporation (0323); Premiere Products, Inc. (4064); Tupperware Home Parties LLC (1671); Tupperware International Holdings Corporation (8983); Tupperware Products, Inc. (8796); Tupperware U.S., Inc. (2010); and Tupperware Brands Latin America Holdings, L.L.C. (0264).  The location of the Debtors' service address in these chapter 11 cases is: 14901 S Orange Blossom Trail, Orlando, FL 32837.

| IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT |

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THIS "DISCLOSURE STATEMENT") TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF LIQUIDATION OF TUPPERWARE BRANDS CORPORATION AND ITS DEBTOR SUBSIDIARIES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX OF THE DISCLOSURE STATEMENT.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE SALE TRANSACTION. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT

WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.    WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.    THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE. THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.    THE DEBTORS OR THE LIDUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER

THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE VIII OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR

HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE LIQUIDATING TRUST'S FUTURE PERFORMANCE.     THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE LIQUIDATING TRUST'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

I.     INTRODUCTION. ........................................................................................................1

II.    PRELIMINARY STATEMENT. ................................................................................1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND THE PLAN. ..............................................................................3

     A.     What is chapter 11?................................................................................3

     B.     Why are the Debtors sending me this Disclosure Statement? .................4

     C.     Am I entitled to vote on the Plan? .........................................................4

     D.     What will I receive from the Debtors if the Plan is consummated? ........5

     E.     What happens to my recovery if the Plan is not confirmed or does not go
effective?................................................................................................7

     F.     If the Plan provides that I get a distribution, do I get it upon Confirmation
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?" ................................................8

     G.     What is the Sale Transaction?................................................................8

     H.     What are the sources of Cash and other consideration required to fund the
Plan?......................................................................................................8

     I.     Is there potential litigation related to the Plan? .....................................8

     J.     Does the Plan preserve Causes of Action? .............................................9

     K.     Will there be releases, exculpation, and injunction granted to parties in
interest as part of the Plan? ...................................................................9

     L.     When is the deadline to vote on the Plan? ............................................10

     M.    How do I vote on the Plan?...................................................................10

     N.     Why is the Bankruptcy Court holding a hearing on Confirmation of the
Plan?....................................................................................................10

     O.     When is the Combined Hearing to consider Confirmation of the Plan and
approval of the Disclosure Statement set to occur?...............................11

     P.     What is the purpose of the Combined Hearing? ....................................11

     Q.     What is the effect of the Plan on the Debtors' ongoing business?.........11

## TABLE OF CONTENTS (CONT'D)

Page

R.    Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ......................................................................12

S.    Who Supports the Plan? ......................................................................12

T.    Could subsequent events potentially affect recoveries under the Plan? ...............12

U.    Do the Debtors recommend voting in favor of the Plan? ......................................12

IV.    SUMMARY OF THE PLAN. ........................................................................13

A.    Classification and Treatment of Claims and Interests. ...........................................13

1.    Classification of Claims and Interests. ..........................................................13

2.    Special Provision Governing Unimpaired Claims. ....................................14

3.    Elimination of Vacant Classes. ....................................................................14

4.    Controversy Concerning Impairment. .........................................................14

5.    Subordination of Claims. .............................................................................14

6.    Reservation of Rights Regarding Claims. ...................................................14

7.    Postpetition Interest on Claims. ...................................................................14

B.    Means for Implementation of the Plan. ......................................................................15

1.    Sources of Consideration for Plan Distributions. ......................................15

2.    Vesting of Assets. ..........................................................................................15

3.    Liquidating Trust. .........................................................................................15

i.    Establishment of the Liquidating Trust. .........................................15

ii.    Transfer of the Liquidating Trust Assets. .......................................15

iii.    Liquidating Trust Agreement. ........................................................15

iv.    Purpose of the Liquidating Trust. ...................................................16

v.    Liquidating Trustee. .......................................................................16

a)    Appointment of the Liquidating Trustee. ...........................16

## TABLE OF CONTENTS (CONT'D)

**Page**

b)  Liquidating Trustee as Representative of the Estates. ...... 16

c)  Responsibilities and Authority of the Liquidating Trustee. .............................................................................. 17

d)  Powers of the Liquidating Trustee. .................................. 17

e)  Compensation of the Liquidating Trustee. ....................... 18

f)  Retention and Payment of Professionals. .......................... 18

vi.  Termination of the Liquidating Trust. ............................................. 18

4.  U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust.  .................................................................................... 19

5.  Preservation of Causes of Action. ............................................................ 20

6.  Corporate Action. ..................................................................................... 20

i.  Transfer of Assets and Assumption of Liabilities. ........................ 20

ii.  Dissolution of the Debtors; Removal of Directors and Officers; Termination of Employees. ........................................................... 20

7.  Books and Records. .................................................................................. 21

8.  Transfer of Privilege/No Waiver. ............................................................. 21

9.  Plan Transactions. .................................................................................... 22

10.  Effectuating Documents and Further Transactions. ................................. 22

11.  Section 1146 Exemption from Certain Taxes and Fees. ........................... 22

12.  Sale Order ................................................................................................ 23

13.  Authority to Act ....................................................................................... 23

14.  No Revesting of Liquidating Trust Assets ............................................... 23

15.  Cancellation of Securities and Agreements. ............................................ 23

C.  Treatment of Executory Contracts and Unexpired Leases; and Insurance Policies. ............................................................................................................ 24

1.  General Treatment. ................................................................................... 24

## TABLE OF CONTENTS (CONT'D)

**Page**

2.    Rejection Damages Claims. ................................................................ 24

3.    Preexisting Obligations to Debtors Under Executory Contracts or Unexpired Leases. ...................................................................... 25

4.    Insurance Preservation ...................................................................... 25

D.    Release, Injunction, and Related Provisions ........................................... 25

1.    Releases by the Debtors ..................................................................... 25

2.    Releases by the Releasing Parties ....................................................... 26

3.    Exculpation ....................................................................................... 27

4.    Injunction .......................................................................................... 28

5.    No Discharge ..................................................................................... 29

6.    Release of Liens ................................................................................. 29

E.    Conditions Precedent to the Effective Date ............................................ 29

1.    Conditions Precedent ......................................................................... 29

2.    Waiver of Conditions ......................................................................... 30

3.    Effect of Vacatur of the Confirmation Order ...................................... 30

4.    Votes Solicited in Good Faith ............................................................ 30

V.    THE DEBTORS' CORPORATE HISTORY AND BUSINESS OVERVIEW. ............... 31

A.    Tupperware's Business and History. ...................................................... 31

1.    The Invention of Tupperware. ............................................................ 31

2.    The Start of the Tupperware Party. ..................................................... 31

3.    Mergers, Acquisitions, and Expansion. .............................................. 32

B.    Tupperware's Current Business Operations. ........................................... 33

1.    Operations Overview. ........................................................................ 33

2.    Sales Channels. ................................................................................. 33

**TABLE OF CONTENTS (CONT'D)**

**Page**

        3.     Products Offerings. ........................................................ 33

VI.    TUPPERWARE'S PREPETITION CAPITAL STRUCTURE. .......................................33

    A.     The Credit Agreement. ...........................................................34

    B.     The Bridge Facility. ...........................................................35

    C.     Common Stock. ...........................................................35

VII.   EVENTS LEADING TO THESE CHAPTER 11 FILINGS. ...........................................35

    A.     Operational Challenges. ...........................................................35

    B.     The Initial Turnaround Plan. ...........................................................35

    C.     Prior Restructuring Efforts & First, Second, and Third Amendments to the Credit Agreement. ...........................................................36

    D.     The 2023 Marketing Process. ...........................................................36

    E.     The Debt Restructuring Agreement. ...........................................................37

    F.     The Fifth and Sixth Amendments to the Credit Agreement. ...........................37

    G.     The Forbearance Agreement. ...........................................................37

    H.     The 2024 Marketing Process. ...........................................................38

    I.     The Forbearance Agreement Amendments. ...........................................................39

    J.     Arrival of the Ad Hoc Group: the Bridge Facility, the Third Forbearance Amendment, and the Seventh Credit Agreement Amendment. ...........................39

    K.     Commencement of the Chapter 11 Cases. ...........................................................39

VIII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES. ...........................................................40

    A.     First Day Relief. ...........................................................40

    B.     Appointment of the Official Committee of Unsecured Creditors. ...........................40

    C.     The Debtors' Professionals' Retention Applications. ...........................................................40

    D.     Approval of Cash Collateral. ...........................................................41

## TABLE OF CONTENTS (CONT'D)

**Page**

E.      Schedules and Statements. ........................................................41

F.      Bar Date Motion. ......................................................................41

G.      Bidding Procedures and Marketing Process. ............................41

H.      Litigation Matters.....................................................................42

I.      Appointment of the Official Committee of Retired Employees. ...........................42

J.      Environmental Remediation .....................................................42

IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.....................43

A.      Risks Related to Confirmation and Consummation of the Plan. ...........................43

      1.      Parties in Interest May Object to the Plan Classification of Claims and Interests. .................................... 43

      2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur. .................................... 43

      3.      The Debtors May Fail to Satisfy Vote Requirements. ............................. 44

      4.      The Debtors May Not Be Able to Secure Confirmation of the Plan. ....... 44

      5.      Nonconsensual Confirmation................................................... 44

      6.      The Debtors Could Lose Exclusivity...................................... 45

      7.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. .................................... 45

      8.      The Debtors May Object to the Amount or Classification of a Claim or Interest. .................................... 45

      9.      Risk of Non-Occurrence of the Effective Date......................................... 45

      10.     Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan. .................................... 46

      11.     The Plan's Release, Injunction, and Related Provisions May Not Be Approved. .................................... 46

# TABLE OF CONTENTS (CONT'D)

**Page**

12.    The Total Amount of Allowed Administrative Claims and/or General Unsecured Claims May Be Higher Than Anticipated by the Debtors. ............................................................................ 46

13.    Certain Tax Implications of the Plan. ....................................................... 46

B.    Disclosure Statement Disclaimer. ..........................................................46

1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited. ............................................................. 46

2.    Information Contained in this Disclosure Statement is for Soliciting Votes. ....................................................................... 47

3.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission. ....................................... 47

4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ....................................................................... 47

5.    This Disclosure Statement May Contain Forward Looking Statements. ....................................................................... 47

6.    No Admissions Made. ................................................................. 47

7.    Failure to Identify Litigation Claims or Projected Objections. ................. 47

8.    No Waiver of Right to Object Claims or Interests. .................................. 48

9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors. .......................................................... 48

10.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ....................................................................... 48

11.    No Representations Outside this Disclosure Statement Are Authorized. ....................................................................... 48

X.    SOLICITATION AND VOTING PROCEDURES. ..........................................................49

A.    Holders of Claims Entitled to Vote on the Plan. ....................................................49

B.    Voting Record Date. .........................................................................49

C.    Voting on the Plan. .........................................................................50

D.    Ballots Not Counted. .........................................................................50

## TABLE OF CONTENTS (CONT'D)

**Page**

XI.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................51

    A.  Combined Hearing. ................................................................................51

    B.  Confirmation Standards. ........................................................................51

        1.  Requirements of Section 1129(a) of the Bankruptcy Code. ....................51

        2.  Best Interests of Creditors—Liquidation Analysis. ................................51

        3.  Feasibility....................................................................................53

    C.  Acceptance by Impaired Classes. ..........................................................53

    D.  Confirmation Without Acceptance by All Impaired Classes................................53

        1.  No Unfair Discrimination. .............................................................54

        2.  Fair and Equitable Test. ................................................................54

XII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. ................................................................................54

    A.  Consequences to Liquidating Trust Beneficiaries. ...............................................55

    B.  Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein. .................................................................................56

        1.  General "Liquidating Trust" Tax Reporting by the Liquidating Trust and their Beneficiaries. ......................................................57

        2.  Tax Reporting for Assets Allocable to Disputed Claims..........................58

    C.  Withholding on Distributions and Information Reporting....................................58

XIII.  RECOMMENDATION. ................................................................................60

**EXHIBITS**[3]

Exhibit A        Chapter 11 Plan

Exhibit B        Liquidation Analysis

---
[3]    Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION.

Tupperware Brands Corporation and certain of its direct and indirect subsidiaries, as prospective debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Tupperware" or the "Company"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Liquidation of Tupperware Brands Corporation and Its Debtor Subsidiaries* (as may be amended, modified, or supplemented from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Epiq Corporate Restructuring, LLC, the Debtors' notice and claims agent (the "Claims and Noticing Agent"), no later than **[●] [●], 2025, at 4:00 p.m. (prevailing Eastern Time)**.  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

## II.    PRELIMINARY STATEMENT.

Tupperware is a leading global brand for food storage and other kitchen and beverage solutions and an iconic American company.  As of the Petition Date, Tupperware had approximately $811.8 million of funded debt obligations.  The Debtors (together with the Swiss Borrower, as defined and described below) are the obligors on the facility.  The Debtors also have dozens of non-debtor foreign operating subsidiaries, in countries all over the world, that are not obligors on the funded debt.  With the exception of an $8 million bridge loan entered into on August 12, 2024, the Debtors have no funded debt other than the first-lien debt borrowed under the Credit Agreement.

For decades, Tupperware's direct selling business model thrived, offering individuals across the globe—predominantly women—an opportunity to build their own businesses and develop valuable leadership and financial management skills, while also cementing the Tupperware brand in the hearts and homes of consumers.  In recent years, however, the historical strengths of a widespread direct selling model began to turn into weaknesses.  The Company's focus on its direct sales model ultimately came at the cost of developing an omnichannel strategy, or even modern e-commerce infrastructure to support its Sales Force.  These issues, and others described in greater detail herein, resulted in years of operational deterioration and stress on the Company's capital structure.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan or the *Declaration of Brian J. Fox, Chief Restructuring Officer of Tupperware Brands Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "First Day Declaration").  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

After over a year of marketing their business and working to find an alternate solution, on September 17 and 18, 2024, the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to utilize their approximately $7.4 million of cash on hand to fund a final 30-day sale process to preserve Tupperware as a going concern, to the benefit of all of the Debtors' stakeholders, including the thousands of employees, consumers, vendors, and others that depend on a value-maximizing outcome. Substantially concurrently with the filing of these Chapter 11 Cases, on September 18, 2024, the Debtors filed an emergency *Motion of Debtors for Entry of an Order (I) Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and Provide Bid Protections, (III) Approving the Form and Manner of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving the Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. 15] (the "Bidding Procedures Motion") seeking the Court's approval of that timeline. The Bidding Procedures Motion was accompanied by a declaration [Docket No. 16] (the "Steinberg Declaration") from Adam Steinberg, of Moelis, attesting to the 17 months of prepetition marketing.

On October 17-18 and October 22, 2024, the Bankruptcy Court held a contested hearing on the Bidding Procedures Motion (the "Bidding Procedures Hearing"). During the course of the Bidding Procedures Hearing, the Debtors, their secured lenders, and the official committee of unsecured creditors (the "Committee") reached agreement on a global resolution of all contested issues, and on October 23, 2024, the Court entered the *Order (I) Approving the Bidding Procedures, (II) Approving the Form and Manner of Sale Notice, (III) Scheduling a Sale Hearing, (IV) Approving the Procedures for the Assumption and Assignment of Contracts, (V) Approving the Sale of the Debtors' Assets Free and Clear, and (VI) Granting Related Relief* [Docket No. 243] (the "Bidding Procedures Order"). The Bidding Procedures Order approved, among other things, the Debtors' cancellation of an auction and scheduling the Sale Hearing (as defined below) regarding the proposed Sale Transaction to the Purchaser. The parties' agreement also provided, in part, for the creation of the Liquidating Trust and the Liquidation Proceeds Allocation reflected in the Plan.

On October 29, 2024, the Court held a hearing (the "Sale Hearing") regarding consideration of the proposed Sale Transaction, during which the Court approved the Sale Transaction on the record. Following the Sale Hearing, the Debtors revised the proposed sale order to address informal comments and objections received from various parties in interest.

On November 24, 2024, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing the Sale of Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 383] (as may be modified, amended, or supplemented by further Final Order) [Docket No. 383] (the "Sale Order") approving the proposed Sale Transaction to the Purchaser, and the agreement for the acquisition via credit bid of the collateral constituting 100% of the equity interests in Premiere Brands International Holdings BV from Dart Industries Inc. and Tupperware Home Parties, LLC. The Sale Transaction closed on November 27, 2024.

The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally distributes all property of the Debtors' Estates that is or becomes available for distribution according to the priorities established by the Bankruptcy Code and applicable law. The Plan provides the ability of the Debtors to satisfy administrative and priority claims in full.

The primary objective of the Plan is to maximize value for all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- provides the vesting of certain assets on the Effective Date in the Liquidating Trust for the purpose of distribution to the Liquidating Trust Beneficiaries;

- designates a Liquidating Trustee to administer the Liquidating Trust and to wind-down, liquidate, or otherwise dissolve the post-Effective Date Debtors;

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative would materially reduce recoveries to Holders of Claims. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that the Claims and Noticing Agent actually receives such ballots by **[●] [●], 2024, at 4:00 p.m. prevailing Eastern Time** (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

### A.    What is chapter 11?

Chapter 11 is the principal business chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

The Plan contemplates: (a) the Debtors paying Allowed Administrative Claims, Allowed Priority Claims, Allowed Other Secured Claims in full, or otherwise render such Claims Unimpaired; (b) appointing a Liquidating Trustee pursuant to the mechanics set forth in the Plan; (c) establishing a Liquidating Trust to distribute the remaining Cash of the Debtors and the proceeds of the Liquidating Trust Assets; and (iv) the orderly dissolution of the Debtors and the Debtors' Estates. This Disclosure Statement is being submitted to provide information about the actions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Credit Agreement Claims | Impaired | Entitled to Vote |

| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Presumed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Presumed to Reject) |
| Class 7 | Interests in Tupperware | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan. As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, as applicable, except to the extent different treatment is agreed to in writing by the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business).

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim/ Equity Interest | Treatment of Claim / Interest |
|---|---|---|
| Class 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Liquidating Trustee (as applicable), either: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired. |
| Class 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive: (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired. |
| Class 3 | Credit Agreement Claims | The Credit Agreement Claims are allowed in the amount of [$732,032,675]. Each Holder of an Allowed Credit Agreement Claim shall receive, in full and final satisfaction of such Allowed Credit Agreement Claim its Pro Rata share of the Distributable Proceeds, including proceeds of the Purchase Agreement Excluded Assets in accordance with the Liquidation Proceeds Allocation. |
| Class 4 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim Holder shall receive its Pro Rata share of the right to recovery from the Liquidating Trust in accordance with the Liquidation Proceeds Allocation. |

| Class | Claim/ Equity Interest | Treatment of Claim / Interest |
|-------|------------------------|-------------------------------|
| Class 5 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or the Liquidating Trustee (as applicable), either*: (i) Reinstated; or (ii) set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case. |
| Class 6 | Intercompany Interests | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor or the Liquidating Trustee (as applicable), either: (i) Reinstated; or (ii) set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case. |
| Class 7 | Interests in Tupperware | Holders of Interests in Tupperware shall not receive any distribution on account of such Interests in Tupperware, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. |
| Class 8 | Section 510(b) Claims | Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. |

**E.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed. Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Either alternative will bring additional risks and uncertainties.

**F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article IV.E of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

**G.    What is the Sale Transaction?**

The Sale Transaction includes the sale of Acquired Assets to, and assumption of Assumed Liabilities by, the Credit Agreement Lenders' designee, NewCo, and the agreement for the acquisition via credit bid of the collateral constituting 100% of the equity interests in Premiere Brands International Holdings BV from Dart Industries Inc. and Tupperware Home Parties, LLC.[2]

**H.    What are the sources of Cash and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) Cash on hand as of the Effective Date and (ii) all other Liquidating Trust Assets; *provided*, however, that Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve in the first instance.

**I.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

---

[2]    The asset purchase agreement for the Sale Transaction is attached to the Sale Order as <u>Exhibit A</u>.

**J.**     **Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.E of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Liquidating Trust. The Liquidating Trustee shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors will not pursue any and all available Causes of Action against it. The Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article IV.E of the Plan.**

**K.**     **Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, Article IX of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall chapter 11 efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the assets distributable by the Debtors or the Liquidating Trust (as applicable) for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Releasing Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) each Holder of Credit Agreement Claims and each Holder of Bridge Credit Agreement Claims; (c) the Prepetition Agents; (d) the Purchaser; (e) the Committee and members of the Committee in their capacity as members of the Committee; (f) the Liquidating Trustee; (g) each Holder of Claims who opt in to granting the releases set forth in the Plan; (h) each Holder of Interests who opt in to granting the releases set forth in the Plan; (i) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (j); and (i) each Related Party of each Entity in the foregoing clause (a) through this clause (j), only to the extent such Holder of Claims or Interests in the foregoing clause (g) and (i) is legally entitled to bind such Affiliate or Related Party.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) each Holder of Credit Agreement Claims and each Holder of Bridge Credit Agreement Claims; (c) the Prepetition Agents; (d) the Purchaser; (e) the Committee and members of the Committee in their capacity as members of the Committee; (f) the Liquidating Trustee; (g) each Holder of Claims who opt in to granting the releases set forth Plan; (h) each Holder of Interests who opt in to granting the releases set forth in the Plan; (i) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (j); and (j) each Related Party of each Entity in the foregoing clause (a) through this clause (j).

The Exculpated Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the directors, managers, and officers of the Debtors who served in such capacity between the Petition Date and the Effective Date; (c) the Committee and its members, in their capacity as members of the Committee and (d) the Professionals retained by the Debtors and the Committee in the Chapter 11 Cases.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.D of this Disclosure Statement, entitled "Settlement, Release, Injunction, and Related Provisions."

Further, notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (c) claims or Causes of Action on account of an act or omission that is determined in a Final Order to have constituted actual fraud.

**L.      When is the deadline to vote on the Plan?**

**The Voting Deadline is [●] [●], 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**M.      How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, you must submit your ballot in accordance with the instructions provided in Article X of this Disclosure Statement. **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

**N.      Why is the Bankruptcy Court holding a hearing on Confirmation of the Plan?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**O.     When is the Combined Hearing to consider Confirmation of the Plan and approval of the Disclosure Statement set to occur?**

The Bankruptcy Court has scheduled the Combined Hearing for **[●] [●], 2025, at [●]:[●]0 [●].m. (prevailing Eastern Time)**.  The Combined Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Combined Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Combined Hearing, in a nationally recognized publication to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Combined Hearing in such trade or other publications as the Debtors may choose.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **[●] [●], 2025, at 4:00 p.m., prevailing Eastern Time**, pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

**P.     What is the purpose of the Combined Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**Q.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article VIII.A of the Plan have been satisfied or waived.  On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, and Filed with the Bankruptcy Court as part of the Plan Supplement.  Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.  .

**R.**     **Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Epiq Corporate Restructuring, LLC:

*By regular mail, hand delivery or overnight mail at:*

Tupperware Brands Corporation c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005

*By electronic mail at:*

Tupperware@epiqglobal.com.  Please reference "Tupperware Brands Corporation – Solicitation Inquiry" in the subject line.

*By telephone at:*

(888) 994-6318 (Toll Free) or +1 (971) 314-6017 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at https://dm.epiq11.com/case/tupperware/dockets (free of charge) or the Bankruptcy Court's website at https://deb.uscourts.gov (for a fee).

**S.**     **Who Supports the Plan?**

The Plan, which remains subject to further negotiation, is supported by the Debtors, the Ad Hoc Group, and the Committee.  As of the date hereof, the Plan remains subject to further negotiation and finalization by the Debtors, the Ad Hoc Group, and the Committee.

**T.**     **Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

**U.**     **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan is in the best interests of all Holders of Claims and Interests, and that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe

that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or Events Leading To These Chapter 11 Filings.

### A.    Classification and Treatment of Claims and Interests.

### 1.    Classification of Claims and Interests.

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article II in the Plan (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors. Unless otherwise specified, the Plan consolidates Claims against all Debtors solely for purposes of voting, Confirmation, and distribution but not for any other purpose. The Debtors reserve the right to seek substantive consolidation of the Debtors in connection with Confirmation, but substantive consolidation shall not affect the legal and organizational structure of the post-Effective Date Debtors or their separate corporate existences and will not change the distributions to Holders of Allowed Claims compared to what is proposed in the Plan.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been otherwise paid, released, or satisfied at any time.

### 2. Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Liquidating Trustee's rights with respect to any Claims, including all legal and equitable defenses to or setoffs or recoupments against any Claims.

### 3. Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 4. Controversy Concerning Impairment.

If a controversy arises as to whether any Claim or any Class of Claims or Interests is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Combined Hearing.

### 5. Subordination of Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Liquidating Trustee (as applicable) reserves the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 6. Reservation of Rights Regarding Claims.

Except as otherwise provided in the Plan or in a Final Order of the Bankruptcy Court, nothing will affect the Debtors' or the Liquidating Trustee's respective rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### 7. Postpetition Interest on Claims.

Except as required by applicable bankruptcy law or otherwise expressly provided in the Plan, postpetition interest, penalties, or other fees will not accrue or be payable on account of any Claim.

B.      **Means for Implementation of the Plan.**

1.      **Sources of Consideration for Plan Distributions.**

Subject in all respects to the provisions of the Plan concerning the Professional Fee Reserve, the Debtors or the Liquidating Trustee (as applicable) shall fund distributions under the Plan with Cash on hand on the Effective Date and all other Liquidating Trust Assets.

2.      **Vesting of Assets.**

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests except as otherwise expressly provided in the Plan.

3.      **Liquidating Trust.**

i.      **Establishment of the Liquidating Trust.**

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement.  Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.

ii.      **Transfer of the Liquidating Trust Assets.**

Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as may be otherwise provided for in the Plan.  Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust.  For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.

iii.      **Liquidating Trust Agreement.**

On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement.  Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors or the Liquidating Trustee (as applicable) will be automatically ratified if made in accordance with the terms of the Liquidating Trust Agreement.  The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan.

### iv.    Purpose of the Liquidating Trust.

The Liquidating Trust shall be established for, among other purposes, the purpose of (a) receiving and holding the Liquidating Trust Assets; (b) administering, disputing, objecting to, compromising, or otherwise resolving all Claims and Interests; (c) making distributions in accordance with the Plan and the Liquidating Trust Agreement; (d) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries; (e) performing all actions reasonably requested by the Purchaser to complete all of the Debtors' outstanding obligations under the Purchase Agreement as successor to the Debtors; and (f) commencing and pursuing the Retained Causes of Action and managing and administering any proceeds thereof, with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d). The Liquidating Trust is intended to qualify as a "liquidating trust" under Treas. Reg. § 301.7701-4(d) and a grantor trust under section 671 of the Tax Code and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust.  To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

### v.    Liquidating Trustee.

#### a)    Appointment of the Liquidating Trustee.

The Liquidating Trustee will be disclosed in the Plan Supplement.  The Liquidating Trustee must be acceptable to the Debtors, the Committee, and the Ad Hoc Group.  Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee, subject to the terms and conditions of the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable.

#### b)    Liquidating Trustee as Representative of the Estates.

From and after the Effective Date, the Liquidating Trustee shall act as the exclusive representative of the Estates for all purposes and as the sole officer and director of each of the post-Effective Date Debtors.  Any successor Liquidating Trustee appointed pursuant to the Liquidating Trust Agreement shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

c)    **Responsibilities and Authority of the Liquidating Trustee.**

The responsibilities and authority of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following rights and responsibilities, which shall be the exclusive rights and responsibilities of the Liquidating Trustee: (i) preserving and liquidating the Liquidating Trust Assets; (ii) administering and paying taxes, including, among other things, (1) preparing and filing appropriate tax returns for the Debtors and Liquidating Trust and (2) representing the interest and account of the Debtors and Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Liquidating Trustee's performance of its duties under the Plan and the Liquidating Trust Agreement; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes; (v) preparing and filing all monthly operating reports due after the Effective Date and all post-confirmation reports as required by the U.S. Trustee; (vi) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; (vii) winding down and liquidating the Debtors' Estates; (viii) making distributions to Professionals for Allowed Professional Fee Claims, including from the Professional Fee Reserve; (ix) making distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Plan Supplement, the Liquidating Trust Agreement, or an order of the Bankruptcy Court (including, without limitation, the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan.

d)    **Powers of the Liquidating Trustee.**

The Liquidating Trustee shall have the power and authority to perform the acts described in the Liquidating Trust Agreement (subject to the approval of the Court, where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, *provided*, however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of the Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate or to take any act deemed appropriate by the Liquidating Trustee to discharge all obligations assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by the Plan.

Subject to the limitations set forth of the Liquidating Trust Agreement, the powers of the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement, and shall include, among others, the following:  (i) the power to invest funds of the Liquidating Trust, and withdraw, make distributions, and pay taxes and other obligations owed by the Liquidating Trust from such funds in accordance with the Plan and the Liquidating Trust Agreement; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals, reasonably acceptable to the Ad Hoc Group, to assist the Liquidating Trustee with respect to its responsibilities; (iii) the power to pursue, prosecute, resolve, compromise, and settle any Retained Causes of Action, without notice to or approval of the Bankruptcy Court; (iv) the power to object

17

to Claims, including, without limitation, the power to seek subordination or recharacterization of Claims by objection, motion, or adversary proceeding, as applicable; (v) the power and authority to wind-down, liquidate, or otherwise dissolve the post-Effective Date Debtors and their wholly-owned subsidiaries, without the necessity for any other or further actions to be taken by or on behalf of such dissolving Entity or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state or foreign law; and (vi) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Plan Supplement, the Liquidating Trust Agreement, or by an order of the Bankruptcy Court (including, without limitation, the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan.

### e) Compensation of the Liquidating Trustee.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement.  The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement.  The Liquidating Trustee (and any professionals retained by the Liquidating Trustee) shall not be required to File a fee application to receive compensation.

### f) Retention and Payment of Professionals.

The Liquidating Trustee shall have the right, without prior Bankruptcy Court order or approval, to retain attorneys, accountants, and other professionals and agents, reasonably acceptable to the Ad Hoc Group, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, the Liquidating Trustee can retain any professionals currently retained by the Committee.

### vi. Termination of the Liquidating Trust.

The Liquidating Trust shall be dissolved upon the earlier of (a) the distribution of all of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries; and (b) the fifth anniversary of the creation of the Liquidating Trust; *provided* that, if warranted by the facts and circumstances involved in resolving or monetizing any Liquidating Trust Assets, upon application to, and if approved by, the Bankruptcy Court after notice and an opportunity for hearing, and upon a finding that such extension is necessary or appropriate for purposes of resolving or monetizing such Liquidating Trust Assets and distributing the proceeds to Liquidating Trust Beneficiaries, the term of the Liquidating Trust may be extended by the Liquidating Trustee for a specified term in accordance with applicable tax laws and regulations. This application must be filed with the Bankruptcy Court no earlier than six (6) months before the termination date of the Liquidating Trust.

4. **U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust.**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust, as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an

19

opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust Beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust Beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, and if such treatment applies, any appropriate elections with respect to such treatment shall be made, and such treatment may also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

### 5.    Preservation of Causes of Action.

Except as otherwise provided in Article IX of the Plan or in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale Transaction, in accordance with section 1123(b) of the Bankruptcy Code, all Retained Causes of Action are preserved and transferred to the Liquidating Trust on the Effective Date. For the avoidance of doubt, the Purchased Claims and the Acquired Avoidance Actions are not Retained Causes of Action.

### 6.    Corporate Action.

#### i.    Transfer of Assets and Assumption of Liabilities.

On the Effective Date, (a) the Liquidating Trust Assets shall be automatically transferred to the Liquidating Trust; and (b) the Liquidating Trust shall assume all obligations of the Debtors under the Plan.

#### ii.    Dissolution of the Debtors; Removal of Directors and Officers; Termination of Employees.

On the Effective Date, and upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall be dissolved for all purposes unless the Liquidating Trustee

determines that dissolution can have any adverse impact on the Liquidating Trust Assets; *provided*, *however*, that neither the Debtors nor any party released pursuant to Article IX of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further*, *however*, that nothing in the Plan shall be construed as relieving the Debtors or the Liquidating Trustee (as applicable) of their duties to pay Statutory Fees to the U.S. Trustee as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Chapter 11 Cases or the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code. The Liquidating Trustee shall submit with the appropriate Governmental Units a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the applicable Secretary of State.

Without limiting the foregoing, on the Effective Date and upon the Debtors causing the Liquidating Trust Assets to be transferred to the Liquidating Trust, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors as of the Effective Date shall be deemed to have resigned and the employees of the Debtors as of the Effective Date shall be deemed to have been terminated. From and after the Effective Date, the Liquidating Trustee shall be authorized to act on behalf of the Estates, provided that the Liquidating Trustee shall have no duties other than as expressly set forth in the Plan and the Liquidating Trust Agreement (as applicable).

After the Effective Date, the Debtors will continue to exist solely with respect to (i) any applications for Professional Fee Claims or expense reimbursements for their Professionals, including preparing, objecting to, defending, and attending any hearing with respect to the same; (ii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or Confirmation Order; and (iii) any appeal pending as of the Effective Date or filed thereafter, the outcome of which could reasonably be expected to affect in any material way any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. Following the Effective Date, the Debtors' Professionals shall be entitled to reasonable compensation for services rendered in connection with the matters identified in clauses (i) through (iii). Any such payments made in connection therewith shall be made without any further notice to or action, order, or approval of the Bankruptcy Court.

## 7.    Books and Records.

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with the Sale Transaction and that relate to the operation and business of the Liquidating Trust; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or beneficial.

## 8.    Transfer of Privilege/No Waiver.

On the Effective Date, the Debtors' evidentiary privileges relating to (i) the amount, validity, or allowability of any Disputed Claim; and (ii) assets transferred into the trust, shall be deemed transferred to the Liquidating Trustee and the Liquidating Trust. Notwithstanding

anything to the contrary herein, evidentiary privileges, including but not limited to the attorney/client privilege, relating to (i) the Acquired Assets and (ii) any claims released pursuant to the Debtor Release (including any materials relating to the preparation, filing, or prosecution of these Chapter 11 Cases) shall not be transferred to the Liquidating Trustee and the Liquidating Trust hereunder.  The Plan shall be considered a motion pursuant to sections 363 and 365 of the Bankruptcy Code for the purposes of granting such relief.  Nothing herein nor any actions taken by the Debtors or the Liquidating Trustee pursuant hereto shall be deemed a waiver of any privilege or immunity of the Debtors or the Liquidating Trustee, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

## 9.    Plan Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, subject to the terms of the Plan, the Debtors and the Liquidating Trustee (as applicable) may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including, but not limited to, (1) the execution and delivery of appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of any appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, duty, or obligation on terms consistent with the Plan; (3) the filing of appropriate documents with the appropriate governmental authorities pursuant to applicable law; and (4) any and all other actions that the Debtors or the Liquidating Trustee (as applicable) determine are necessary or appropriate to effectuate the Plan.

## 10.    Effectuating Documents and Further Transactions.

Upon entry of the Confirmation Order, subject to the terms of the Plan, the Debtors and the Liquidating Trustee (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  Subject to the terms of the Plan, the Debtors, the Liquidating Trustee, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## 11.    Section 1146 Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation all such instruments or other

documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment. Such exemption specifically applies, without limitation, to the transfer of the Liquidating Trust Assets to the Liquidating Trust.

## 12.    Sale Order

Notwithstanding anything to the contrary herein, nothing in the Plan, the Plan Supplement, the Liquidating Trust Agreement or the Confirmation Order, shall affect, impair, or supersede the Sale Order, which remains in full force and effect and governs in the event of any contradiction with the Plan, the Plan Supplement, the Liquidating Trust Agreement or the Confirmation Order.

## 13.    Authority to Act

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtors or notice to, order of, or hearing before, the Bankruptcy Court.

## 14.    No Revesting of Liquidating Trust Assets

No Liquidating Trust Asset will revest in the Debtors on or after the date such asset is transferred to the Liquidating Trust, but will vest upon such transfer in the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

## 15.    Cancellation of Securities and Agreements.

Except for the purpose of enabling Holders of Allowed Claims to receive a distribution under the Plan as provided herein and except as otherwise set forth in the Plan, the Plan Supplement, or the Confirmation Order, on the Effective Date: (1) the obligations of the Debtors under the Prepetition Secured Debt Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Liquidating Trustee shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interests in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no

Executory Contract or Unexpired Lease that (i) has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

**C.      Treatment of Executory Contracts and Unexpired Leases; and Insurance Policies.**

**1.      General Treatment.**

On the Effective Date, except as otherwise provided herein (which exclusion includes the Insurance Policies), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Effective Date or identified on the Schedule of Assumed Executory Contracts and Unexpired Leases.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon the Cure of all defaults under such Executory Contract or Unexpired Lease to the extent required under the Bankruptcy Code.

**2.      Rejection Damages Claims.**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable.  Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with Article III.B.4 of the Plan.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be automatically disallowed, forever barred from assertion, and shall not

be enforceable against, as applicable, the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or any of their respective assets and properties.

### 3. Preexisting Obligations to Debtors Under Executory Contracts or Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or Liquidating Trustee (as applicable) under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Liquidating Trustee (as applicable) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.

### 4. Insurance Preservation

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Liquidating Trust.

### D. Release, Injunction, and Related Provisions

### 1. Releases by the Debtors

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed forever released and discharged and acquitted by the Debtors and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, that the Debtors or their Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors, their businesses, the Debtors' in- or out-of-court restructuring efforts, their capital structures, the purchase, sale, or recission of any security of the Debtors, any Avoidance Actions, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Confirmation Order, the Sale Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Purchase Agreement, the Mexican Stock Purchase Agreements (as defined in the Sale Order (prior to closing thereof)), the Plan,**

the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of the Sale Order, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (c) any matters retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for a hearing; and (f) a bar to any of the Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.     Releases by the Releasing Parties

As of the Effective Date, each Releasing Party is deemed to have forever released and discharged and acquitted each Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, their capital structures, the purchase, sale, or recission of any security of the Debtors, any Avoidance Actions, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Confirmation Order, the Sale Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Purchase Agreement, the Mexican Stock Purchase Agreements (as defined in the Sale Order (prior to closing thereof)), the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of the Sale Order, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the

Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan, (c) any obligations incurred by any Seller (as defined in the Purchase Agreement) in the Sale Transaction, (d) any claims that are Remaining Credit Agreement Obligations (as defined in the Sale Order), or (e) any claims against any of the Debtors' non-debtor subsidiaries, including, without limitation, Tupperware Product A.G.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for a hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

3.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is and shall be released and exculpated from any Cause of Action related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of any prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release or other agreement or document created or entered into in connection with any prepetition transactions, the Disclosure Statement, the Sale Transaction, the Purchase Agreement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of the Sale Order, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud. For the avoidance of doubt, the Debtors themselves shall not be so released or exculpated from liability for the Remaining Prepetition Debt (as defined in the Sale Order), any claims included in the Acquired Assets (other than the Purchased Claims and the Acquired Avoidance Actions), or any other claims entitled to receive distribution under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation

of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  Further, the exculpation set forth above does not alter the obligations incurred by any Seller (as defined in the Purchase Agreement) in the Sale Transaction as set forth in the Purchase Agreement.

4.    **Injunction**

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation under the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the Liquidating Trust (but solely to the extent such action is brought against the Debtors or the Liquidating Trust to directly or indirectly recover upon any property of the Estates, upon the Effective Date), the Exculpated Parties, or the Released Parties (including the Debtors), and any successors, assigns or representatives of such Persons or Entities:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim, interest, Cause of Action, or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests, or Causes of Action released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For avoidance of doubt, obligations incurred by the Sellers (as defined in the Purchase Agreement) in the Sale Transaction are not subject to the foregoing injunction.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this section D hereof.**

### 5.    No Discharge

Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims.

### 6.    Release of Liens

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of a Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Liquidating Trustee that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidating Trustee shall be entitled to make any such filings or recordings on such Holder's behalf.

### E.    Conditions Precedent to the Effective Date

### 1.    Conditions Precedent

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent.

i.    The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

ii.    The Confirmation Order shall have been entered and shall be in full force and effect.

iii.    There shall have been no modification or stay of the Confirmation Order or entry of any other order prohibiting the transactions contemplated by the Plan from being consummated.

iv.        All TSA Service Periods, as defined in the Transition Services Agreement attached to the Purchase Agreement, have expired or terminated.

v.        The Debtors shall have paid all Allowed Professional Fee Claims in full in Cash and transferred Cash in an amount equal to the Professional Fee Reserve Amount with respect to any unpaid Professional Fee Claims, whether Allowed or otherwise, to the Professional Fee Reserve Account pending approval of such Professional Fee Claims by the Bankruptcy Court.

vi.        The Administrative / Priority Claims Reserve shall have been funded in accordance with the Plan.

vii.        All actions, documents and agreements necessary to implement the Plan shall have been effected, executed, and/or tendered for delivery.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date).

viii.        The Liquidating Trust Agreement shall have been executed.

ix.        The Liquidating Trustee shall have been appointed and assumed its rights and responsibilities under the Plan and the Liquidating Trust Agreement, as applicable.

x.        The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement the Plan and any transaction contemplated hereby that are required by law, regulation, or order.

## 2.      Waiver of Conditions

Unless otherwise specifically provided for in the Plan, the conditions set forth in Article VIII.A of the Plan may be waived in whole or in part by the Debtors, in consultation with the Committee and the Ad Hoc Group, without notice to any parties in interest or the Bankruptcy Court and without a hearing.

## 3.      Effect of Vacatur of the Confirmation Order

If the Confirmation Order is vacated: (1) the Plan will be null and void in all respects, including with respect to the release of Claims and distributions for Allowed Claims; and (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights, including any claims or defenses, of any party in interest.

## 4.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code.

## V.     THE DEBTORS' CORPORATE HISTORY AND BUSINESS OVERVIEW.

### A.     Tupperware's Business and History.

#### 1.     The Invention of Tupperware.

In 1938, Earl Tupper started a plastics company, the Earl S. Tupper Company (also known as Tupper Plastics). Tupper Plastics found its legs during World War II, producing gas masks and other wartime supplies. The post-war transition period marked a pivotal juncture for Tupper Plastics and the entire plastics industry. At the time, plastics were not widely used in consumer goods, so plastic manufacturers had significant surplus production capacity once hostilities ceased. Plastics were made of polyethylene, which was black, brittle, slimy, and smelled bad, making it difficult to work with and even more difficult to market to consumers who, unlike soldiers, had a choice in what they used. Tupper tinkered until he created a durable, clean, and translucent plastic.

This new plastic, while a major innovation, was only half of the equation—the other half was the "Tupper seal." Inspired by the airtight seal commonly found on paint cans at that time (which could keep paint from drying out for years), Tupper created an air-tight, leak-proof lid that could be sealed by pressing it to "burp" out the air (leading to the moniker "burping" seal). Tupper utilized this seal in a bowl—the Wonder Bowl—which became the cornerstone of Tupperware (and is still sold worldwide, now called the Wonderlier® Bowl). In 1946, Tupper debuted the Wonder Bowl and thirteen other companion products.

Tupper's food storage products were an invention made for the moment. Consumerism was on the rise, and Americans were particularly looking for practical purchases that would improve their day-to-day lives (refrigerators being one of the most-purchased items of the time). Tupperware offered an attractive, affordable product—soon available in bright colors named after fruits and gemstones—that was highly functional for reducing food waste, which was a major financial drain for growing families in the post-war era.

Tupper's products were available in hardware and department stores, and he even opened a store front on 5th Avenue. While unimaginable now, the Wonder Bowl was too high tech for consumers, who were used to using tin foil, glass jars, or ceramic containers. Tupper marketed his plastic alternatives heavily, including distributing catalogues and giving products away with cigarettes, with little success until a single mother from Detroit changed everything.

#### 2.     The Start of the Tupperware Party.

Brownie Wise was a divorcée and single mother living in Detroit when a friend who had come across Tupperware in a hardware store introduced her to the product in 1947. It took her three days to figure out how to use the Tupper seal, but once she got the hang of it, she immediately saw the potential.

At the time, Wise worked for Stanley Home Products, which had recently launched a new sales model that involved home-based sales demonstrations. Wise, who had previously worked at an advertising agency, had a knack for marketing. Putting her own spin on things, Wise envisioned a new business model based around parties ("Polly-T" parties, after the new plastic utilized in

31

Tupperware products).  Wise received Tupper's permission to sell Tupperware, recruited a few friends to work with her, and embarked on her new business venture.

At a Polly-T party (now known as a "Tupperware Party") a host would pair with a well-dressed Tupperware dealer, who would give a product demonstration and sell products to any interested guests.  The parties were fun and interactive events.  Famously, Wise would fill a Wonder Bowl with water (or even grape juice), show the group how to "burp" the lid, and then toss the bowl to an attendee.  The women, who were used to containers that would shatter and spill, marveled that not a single drop escaped through the Tupper seal.  Wise and her team quickly outsold retail stores and Tupper's other independent distributors.  In 1951, Tupper pulled his products from stores and hired Wise to serve as his head of marketing and vice president of the Company, a position unheard of for a woman at the time.

Wise's approach—like Tupper's product—was perfect for the moment.  Women, who had held jobs during the war, were back at home and, in many cases, longing for more.  Wise encouraged these women to believe in themselves and dream big, and to represent both themselves and the Company's products with confidence.  At the same time, consumers were looking to spend, but not opulently, and homemaking was a priority as the post-war baby boom began.  Tupperware Parties offered the perfect opportunity to socialize and earn supplemental income, all from the comfort of one's home, without threatening the established family order.

Famous for saying, "If we build the people, they'll build the business," Wise not only empowered women; she also incentivized them.  Wise introduced the concept of "Jubilees," which were lavish annual celebrations designed to reward top sellers with recognition, entertainment, and prizes.  These events were unprecedented at the time and fostered a strong sense of community and loyalty among the sales force.  Wise's approach turned the Company into an empire, and in 1954, she became the first woman to be featured on the cover of *Business Week*.

### 3.    Mergers, Acquisitions, and Expansion.

Between 1958 and 1996, the Company was the subject of several major transactions, including (a) a 1958 sale to Rexall Drug Company (later renamed to Dart Industries, Inc., "Dart"); (b) a 1980 merger with Kraft, Inc. ("Kraft") (one of the largest U.S. mergers in history at that time), forming Dart & Kraft, Inc ("Dart & Kraft"); (c) a 1986 de-merging from Kraft; and (d) a 1996 spin off from its post-Dart & Kraft parent company (Premark International, Inc.), resulting in the Tupperware Corporation.  In this period, the Company also significantly expanded its operational footprint, establishing a presence in dozens of new countries on multiple continents.

Moving into the 2000s, the Company diversified into beauty and personal care brands by acquiring companies like BeautiControl (a beauty company specializing in spa treatments) and direct-selling brands like Avroy Shlain, Fuller Cosmetics, NaturCare, Nutrimetics, and Nuvo from the Sara Lee Corporation.  The brand continued to accumulate accolades, including being named one of Fortune Magazine's "World's Most Admired Companies" in 2008.  By 2015, Tupperware brands were sold in over 80 countries, the Sales Force consisted of approximately 3.1 million Independent Consultants, an estimated 90% of American homes owned at least one Tupperware product, and the Company held over 10,000 product patents.

Gradually, however, Tupperware began finding itself "late to the party" when it came to modern consumers. Consumers primarily purchase homewares either in stores (approximately 76%) or online (approximately 20%), where Tupperware's products were historically not available. While Tupperware maintains a website, even today that website only includes 13% of Tupperware's products, and the 87% that are missing include some of Tupperware's most beloved products. The Company has also struggled to make its products consistently available online and for the Sales Force, and the technology supporting the Sales Force is a step behind that of the Company's competitors, resulting in further frustrations and Sales Force deterioration.

As described in greater detail herein, the Company developed a revitalization plan for the business in the face of these challenges—including a focus on sales channel modernization—but started from behind, particularly stressed under the weight of the Company's existing capital structure.

### B.    Tupperware's Current Business Operations.

#### 1.    Operations Overview.

Tupperware is a leading global brand for food storage and other kitchen and beverage solutions and an iconic American company. The Company designs, manufactures, and distributes its own products in addition to offering branding opportunities to third parties.

#### 2.    Sales Channels.

The Company currently executes sales through a variety of different channels. The Company primarily utilizes its direct-selling business model through the Sales Force to distribute and market its products. Additionally, due to recent headwinds, the Company has utilized other sales channels and expanded its online and retail presence through Amazon, Macys, Target, international store fronts, and pop-up stores in recent years. These efforts have been a critical component of the Company's turnaround efforts.

#### 3.    Products Offerings.

Tupperware products blend of form and function. Recognized the world over for both functionality and style, Tupperware products satisfy the practical demands of the customer as well as the design standards of some of the world's most important design centers and art museums. Tupperware's current product lines include kitchen tools, cookware & bakeware, serveware, food storage, on-the go solutions, and kids and toys.

## VI.    TUPPERWARE'S PREPETITION CAPITAL STRUCTURE.

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $811.8 million (inclusive of approximately €196 million in borrowings denominated in Euros):

| Debt Instrument | Maturity | Outstanding Amount as of the Petition Date[3] |
|---|---|---|
| Revolving Credit Facility | July 31, 2025 | $7.0 million ($15.3 million letters of credit) |
| USD Term A Loan Facility | July 31, 2025 | $399.9 million |
| USD Term C Loan Facility | July 31, 2027 | $177.5 million |
| EUR Term D Loan Facility | July 31, 2027 | €196 million |
| Bridge Facility | September 30, 2024 | $8 million |
| **Total Funded Debt:** | **$811.8 million (inclusive of €196 million)** | |

### A.    The Credit Agreement.

On November 23, 2021, Tupperware Brands Corporation (the "Parent Borrower"), Tupperware Products A.G. ("TPAG" or the "Swiss Borrower" and together with the Parent Borrower, the "Borrowers")[4] and the lenders from time to time as parties thereto, and Wells Fargo, as administrative agent (the "Credit Agreement Agent") entered into a credit agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") which provided four credit facilities: (a) a global tranche revolving credit facility; (b) term A loans denominated in U.S. dollars; (c) term C loans denominated in U.S. dollars; and (d) term D loans denominated in euros.

The obligations of the Debtors under the Credit Agreement are secured by first priority liens (subject to (a) the Bridge Facility Liens (as defined below) on the Bridge Collateral (as defined below) and (b) certain other permitted liens) on substantially all of the assets of the Debtors (other than TPAG, which has only provided limited cash collateral in connection with, and as collateral security for certain obligations outstanding under, the Credit Agreement), subject to exclusions for, among other things, certain Excluded Assets (as defined in the Credit Agreement) (the "Credit Agreement Collateral"). The Credit Agreement Collateral is pledged pursuant to, among other things: (1) a master collateral agreement dated November 23, 2021, among the Parent Borrower, Dart, certain other subsidiary grantors, and the Credit Agreement Agent; (2) a security agreement dated November 23, 2021 by and between Dart and the Credit Agreement

---

[3]  The $811.8 million in funded debt obligations was reduced, in part, as part of a credit bid relating to the Sale Transaction.

[4]  TPAG commenced a chapter 11 case on the Petition Date. Case No. 24-12165 (BLS). On November 24, 2024, TPAG's case was voluntarily dismissed pursuant to the *Order (I) Approving the Dismissal of the Chapter 11 Case of the Swiss Debtor and (II) Granting Related Relief*. [Docket No. 382]

Administrative Agent; and (3) certain intellectual property security agreements by and among the Debtors and the Credit Agreement Agent.

### B.        The Bridge Facility.

On August 12, 2024, the Company and the guarantors under the Credit Agreement, as guarantors, entered into the Bridge Loan Credit Agreement with the Ad Hoc Group, pursuant to which the Ad Hoc Group provided $8 million principal amount in emergency funding (half of which came in the form of a delayed draw term loan funded on August 26, 2024, following the Company's borrowing request) (the "Bridge Facility") to bridge the Debtors to the commencement of these Chapter 11 Cases.  The Bridge Facility principal amount was funded with a 25.00% original issue discount, netting approximately $6 million of proceeds.  The Bridge Facility currently accrued interest at a per annum rate equal to 14.00% and matured on September 30, 2024. As of the date Petition Date, the Company owed an aggregate principal amount of approximately $8 million on account of the Bridge Facility.  Obligations of the Company under the Bridge Facility are secured by first priority liens (the "Bridge Facility Liens"), subject to certain permitted liens, on certain inventory owned by Debtor Tupperware U.S., Inc. and any books and records or proceeds related thereto (the "Bridge Collateral").  Amounts owed under the Bridge Facility were paid with proceeds from the Sale Transaction.

### C.        Common Stock.

Shares of Tupperware Brands Corporation's Common Stock, $0.01 par value (the "Common Stock"), trade on the New York Stock Exchange under the symbol "TUP."  As of the date hereof, 46,572,276 shares of Common Stock were issued and outstanding.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 FILINGS.

### A.        Operational Challenges.

Tupperware enjoyed decades of growth propelled by pioneering product development and its direct selling business model, which was innovative for the time.  Over the years, however, this growth slowed as fewer new market opportunities presented.  Particularly in the last few years, the Company has faced several key challenges that put pressure on the business, causing revenue to decline more than 16% year over year in two consecutive years in 2022 and 2023.

Since 2020, the Company has actively worked to identify these challenges, which include shifts in consumer behavior, anti-plastic sentiment, marketing deficiencies, underdeveloped infrastructure, and take steps to overcome them, but liquidity constraints—exacerbated by rising interest rates—have limited the Company's ability to respond as comprehensively as the circumstances warrant.

### B.        The Initial Turnaround Plan.

In early 2020, the Company retained a new executive leadership team and developed whole-business initiatives to put Tupperware back on the right track (as modified, the "Turnaround Plan").  The initial Turnaround Plan consisted of three driving focal points, including operational rightsizing for improved profitability, accelerated non-core business divestitures, and business

model re-evaluation. The Turnaround Plan also contemplated a general shift from a distributor-push model to a consumer-pull model to address the needs of modern consumers, an omnichannel evolution, and expansion into new product categories to bring more innovative solutions to the market. Liquidity constraints and the disruption of the COVID-19 pandemic, however, interrupted implementation of the Turnaround Plan and also skewed perception of its progress.

The initial Turnaround Plan at first appeared very successful, and the Company enjoyed multiple quarters of double-digit EBITDA growth over the course of 2020 and 2021. In November 2021, the Company was able to enter into the Credit Agreement, refinancing its then-existing capital structure though a $480 million revolving credit facility and a $400 million term loan facility provided by certain prepetition bank lenders under the Credit Agreement (the "Prepetition Bank Lenders"). The effect of the refinancing was to provide the Company with access to $100 million of incremental liquidity in the aggregate to further pursue the Turnaround Plan.

### C.      Prior Restructuring Efforts & First, Second, and Third Amendments to the Credit Agreement.

Entry into the Credit Agreement was intended to put the Company on a path towards sustainable future growth, but early gains turned out to be temporary and were replaced with longer-term challenges. The initial pandemic sales bump slowed, and macroeconomic cost drivers flared, including inflation, the strengthening of the dollar relative to most other currencies, and sustained global supply chain disruptions. Additionally, the Company made several changes to Sales Force compensation models that unintentionally made remaining with the Company less attractive for high performers and resulted in Sales Force attrition, compounding challenges with the direct selling model. As a consequence of these and other factors, sales and profitability metrics declined rapidly—leading to a revenue drop of over 16% year over year—in 2022 and 2023. While execution on the initial Turnaround Plan stalled, the Company began to buckle under what had become an unsustainable capital structure.

On August 1, 2022, December 21, 2022, and February 22, 2023, the Debtors entered into the first, second, and third amendments, respectively, to the Credit Agreement and included covenant waivers or modifications at the cost of further restrictions. Even with the additional covenant relief provided through these amendments, the Company continued to struggle to implement the Turnaround Plan, mitigate its "going concern" condition, and achieve targeted results. On May 5, 2023, the Debtors entered into a fourth amendment to the Credit Agreement which permitted incremental borrowing to pay past-due interest, added increased reporting and information sharing requirements, and requiring that the Company appoint Brian J. Fox of A&M as Chief Restructuring Officer.

### D.      The 2023 Marketing Process.

As discussed in the Steinberg Declaration, Moelis commenced a formal marketing process in April 2023 on behalf of the Debtors to locate a third-party investment to fund the Company's turnaround. This marketing process ran in parallel to negotiations with the Prepetition Bank Lenders regarding a standalone restructuring or other strategic alternatives.

This process involved Moelis making contact with eighty-six potential financial or strategic investors, either through outbound solicitations or inbound inquiries. The Company subsequently executed NDAs with thirty-six parties, who were then granted access to the Debtors' virtual data room. Of the parties that executed NDAs, eight submitted indications of interest (each, an "IOI").

The marketing process generated significant interest from numerous parties, but the Prepetition Bank Lenders ultimately determined that none of the proposals received through the process were sufficiently attractive, and the Company refocused its efforts on effectuating a standalone restructuring with the Prepetition Bank Lenders.

### E. The Debt Restructuring Agreement.

As a result, on August 2, 2023, following extensive negotiations with the Prepetition Bank Lenders, the Debtors entered into a debt restructuring agreement with Wells Fargo, as administrative agent, and the Lenders (as amended, restated, supplemented, or otherwise modified from time to time, the "Debt Restructuring Agreement"), which effected additional amendments to the Credit Agreement and waived certain events of default thereunder. As a condition to providing the Company with this significant additional flexibility and relief, the Debt Restructuring Agreement required that the Company implement a new governance framework to enhance execution and redevelopment of the Turnaround Plan.

The Debt Restructuring Agreement required that the Company place a director on the Board with experience in restructuring and turnaround matters. On August 24, 2023, the Board appointed Mr. Paul Aronzon as an independent director. Simultaneously with the appointment of Mr. Aronzon, the Company also established a special committee with delegated authority to investigate, analyze, evaluate, negotiate, and, if appropriate, approve and execute strategic transactions available to the Company, including with respect to the Turnaround Plan. The original members of the Transformation Committee were Mr. Aronzon and Mr. Richard Riley.

On October 17, 2023, the Company announced the appointment of Ms. Laurie Ann Goldman as President, Chief Executive Officer, and a director of the Board, and the appointment of three additional directors, Ms. Lori Bush, Mr. Paul Keglevic, and Mr. William Transier. Upon their appointment to the Board, Mr. Keglevic and Mr. Transier were also appointed to the Transformation Committee.

### F. The Fifth and Sixth Amendments to the Credit Agreement.

While the Debt Restructuring Agreement helped the Debtors manage their liabilities and offered an opportunity to develop and implement the Turnaround Plan, the Debtors' substantial obligations under the Credit Agreement continued to pressure liquidity and operational flexibility. On October 5, 2023 and December 22, 2023, the Debtors entered into the fifth and sixth amendments to the Credit Agreement, respectively, to obtain relief from certain financial reporting requirements and from milestones related to the Turnaround Plan.

### G. The Forbearance Agreement.

In early February 2024, while engaged in discussions with the Prepetition Bank Lenders, the Debtors missed an interest payment due under the Credit Agreement. Consequently, on

February 13, 2024, the Debtors entered into the initial Forbearance Agreement with certain of the Prepetition Bank Lenders and the Credit Agreement Administrative Agent, who agreed to forbear from exercising rights and remedies on account of the defaults specified therein until June 30, 2024, subject to the Debtors' compliance with the terms of the Forbearance Agreement, including milestones for a second marketing process and, as a contingency, chapter 11 preparations.

### H.    The 2024 Marketing Process.

Substantially concurrently with entry into the Forbearance Agreement, the Company, with the assistance of Moelis, launched a second formal, third-party marketing process in February 2024 to reevaluate market interest and solicit any and all proposals from potentially interested parties, ranging from out-of-court recapitalization structures, to asset sales, to whole-company transactions.  In March 2024, Moelis also circulated a detailed confidential information presentation containing an updated strategic business plan to potential investors.

Moelis discussed various potential transactions with approximately 84 potential financial or strategic investors—with experience in the consumer goods sector, operational turnarounds, and/or distressed situations.  Approximately 28 of those parties executed NDAs.  Of the parties that executed NDAs, seven (the "Interested Parties") engaged in additional discussions regarding potential transactions.  Moelis requested that each Interested Party submit a non-binding IOI by April 5, 2024.

On April 5, 2024, Moelis, acting on behalf of Tupperware, received five non-binding IOIs, (i) three of which proposed acquiring the entirety of the Company via an equity acquisition and (ii) two of which contemplated a "brand management" solution.  After thoroughly evaluating each non-binding IOI, the Company and its advisors requested binding IOIs from four of the Interested Parties by May 15, 2024.

Only one party (the "Leading Bidder") met the deadline and presented an offer (the "Leading Bid") that encompassed a whole-company solution.  The Leading Bidder had already conducted extensive diligence (substantially more than any other bidder), including numerous calls with Tupperware's management, diligence sessions at eight different Tupperware facilities, and one in-person management meeting.  After the May deadline passed, one "whole-company bidder" expressed its willingness to acquire only certain regions of the business, and one "brand-management bidder" reiterated its interest in a brand-centered transaction yet declined the Company's request to present a comprehensive solution.  Under the circumstances, the Company and its advisors concluded that the Leading Bid was the best available option to right-size Tupperware's overlevered balance sheet and position it for long-term, sustainable growth.

Through the Spring of 2024, the Company and its advisors carefully evaluated proposals and negotiated with interested counterparties to identify a comprehensive solution for the Company.  This second process resulted in a transaction proposal from the Leading Bidder that—after extensive development and negotiation—fell through on the eve of execution going into the July 4, 2024, holiday weekend.

### I.      The Forbearance Agreement Amendments.

On June 3, 2024, the Debtors, the Credit Agreement Administrative Agent and certain of the Prepetition Bank Lenders entered into the first Amendment to Forbearance Agreement (the "First Forbearance Amendment") to, among other things, extend the milestone for entry into a definitive agreement.  After entry into the First Forbearance Amendment, the Credit Agreement Administrative Agent approved several additional extensions of certain of milestones and the termination date, ultimately postponing them until July 14, 2024.  On July 12, 2024, the Debtors, the Credit Agreement Administrative Agent and certain of the Prepetition Bank Lenders entered into the Second Amendment to Forbearance Agreement (the "Second Forbearance Amendment"), which extended the Forbearance Agreement until August 15, 2024.  In connection with entry into the Second Forbearance Agreement, the Debtors lifted certain restrictions on trading the term loans, which were contained in the Credit Agreement and certain confidentiality agreements.

### J.      Arrival of the Ad Hoc Group: the Bridge Facility, the Third Forbearance Amendment, and the Seventh Credit Agreement Amendment.

By mid-July 2024, a majority by principal amount of the Debtors' prepetition debt traded to the Ad Hoc Group in a series of transactions.  On August 12, 2024, the Ad Hoc Group provided an $8 million bridge loan (half of which came in the form of a delayed draw term loan that was funded on August 26, 2024), netting approximately $6 million of proceeds taking into account a 25% OID.  The Bridge Facility was secured by certain of the Debtors' inventory which was previously secured under the existing facilities under the Credit Agreement.  In connection with entry into the Bridge Facility, the forbearance termination Date was extended to September 30, 2024 to coincide with the maturity date of the Bridge Facility.

In parallel with negotiation of the Bridge Facility, the Debtors entered into discussions with the Ad Hoc Group regarding a going-concern transaction in which the Ad Hoc Group would acquire the Tupperware brand name, select assets in the US, and select foreign subsidiaries.  Weeks of in-depth diligence meetings occurred among principals and advisors regarding the Company's business and structure and the proposed go-forward business model.

### K.      Commencement of the Chapter 11 Cases.

The Debtors and their advisors worked with various stakeholders, including the Ad Hoc Group, to forge a clear path forward for the Debtors' storied business and to maximize value for all stakeholders.  Following weeks of discussions regarding a potential chapter 11 filing to implement a transaction, on August 30, 2024, the Ad Hoc Group informed the Debtors that it was considering implementing its proposed acquisition through an out-of-court strict foreclosure on a subset of the Debtors' assets, including the Tupperware brand name.  After significant deliberation, the board of directors determined it could not support a strict foreclosure.  Accordingly, the Debtors commenced these Chapter 11 Cases to utilize their limited cash on hand to fund an approximately 30-day bidding process to preserve their business as a going concern and foster a competitive bidding environment for their assets.

## VIII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A.    First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Debtors' Chapter 11 Cases following the commencement of the Chapter 11 Cases.  A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the First Day Declaration.

The First Day Motions were heard and approved on an interim or final (as applicable) basis at the September 19, 2024, and September 25, 2024, hearings, and all First Day Motions and orders for interim and final relief granted in the Chapter 11 Cases can be viewed free of charge at https://dm.epiq11.com/case/tupperware/dockets.

### B.    Appointment of the Official Committee of Unsecured Creditors.

On September 30, 2024, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 106], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases.  The Committee is currently comprised of: (a) All Blue Solutions Inc.; (b) Pension Benefit Guaranty Corporation; and (c) Cesco Linguistic Services, Inc.

On October 2, 2024, the Committee Filed the *Notice of Appearance and Request for Service of Papers* [Docket No. 118], identifying their proposed counsel as Brown Rudnick LLP and Morris James LLP.  The Committee subsequently retained Berkeley Research Group, LLC its financial advisor. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on October 23, 2024.

### C.    The Debtors' Professionals' Retention Applications.

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

    i.    ***Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession*** [Docket No. 206];

    ii.    ***Cole Schotz P.C. as Delaware Co-Counsel for the Debtors and Debtors in Possession*** [Docket No. 207];

    iii.    ***Alvarez & Marsal North America, LLC as Financial Advisor to the Debtors and Debtors in Possession*** [Docket No. 208];

iv.    ***Moelis & Company LLC as Investment Banker and Capital Markets Placement Agent to the Debtors and Debtors in Possession*** [Docket No. 209]; and

v.     ***Epiq Corporate Restructuring, LLC as Administrative Advisor to the Debtors and Debtors in Possession*** [Docket No. 215].

### D.    Approval of Cash Collateral.

On September 18, 2024, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 6] (the "Cash Collateral Motion") and on November 24, 2024, the Bankruptcy Court entered a final order approving the Cash Collateral Motion [Docket No. 384] (the "Cash Collateral Order"). The Cash Collateral Order was the culmination of rigorous, arm's-length negotiations between the Debtors and the Ad Hoc Group to permit the Debtors to continue to use the Ad Hoc Group's cash collateral.

### E.    Schedules and Statements.

The Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") on November 5, 2024.

### F.    Bar Date Motion.

On October 29, 2024, the Debtors filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Claims, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 277] (the "Bar Date Motion"). On November 12, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 333] (the "Bar Date Order"), which established procedures and deadlines for filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was December 13, 2024, at 11:59 p.m. Eastern Time (the "General Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is March 17, 2025, at 11:59 p.m. Eastern Time. On November 19, 2024, the Bar Date Notice was published in The Wall Street Journal.

### G.    Bidding Procedures and Marketing Process.

As described above, the Debtors conducted a marketing process for all or substantially all of their assets prior to the Petition Date. The marketing process was an extensive, far reaching, seventeen-month long process in which the Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction. Moelis, with the assistance of the Debtors, identified more than 150 parties, including strategic and financial partners, as potential

bidders for the Debtors' assets.  In the period leading up to the Petition Date, Moelis worked to prepare for a robust postpetition marketing process on an expedited basis.

On September 18, 2024, the Debtors filed the Bidding Procedures Motion with the Bankruptcy Court.  On October 17-18 and October 22, 2024, the Bidding Procedures Hearing was held by the Court.  On October 23, 2024, the Court entered the Bidding Procedures Order, which approved, among other things, the Debtors' cancellation of an auction and scheduled the Sale Hearing regarding the proposed Sale Transaction to the Credit Agreement Lenders' designee, Party Products Holdings LLC (such designee, "NewCo"), as set forth in the term sheet attached to the Bidding Procedures Order.

On October 29, 2024, the Sale Hearing was held regarding consideration of the proposed Sale Transaction, during which the Court approved the Sale Transaction on the record.  On November 24, 2024, the Bankruptcy Court entered the Sale Order approving the proposed Sale Transaction to the Credit Agreement Lenders' designee, NewCo, and the agreement for the acquisition via credit bid of the collateral constituting 100% of the equity interests in Premiere Brands International Holdings BV from Dart Industries Inc. and Tupperware Home Parties, LLC. The Sale Transaction closed on November 27, 2024.

### H.    Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.

### I.    Appointment of the Official Committee of Retired Employees.

On January 14, 2025, the *Motion of Debtors for the Entry of an Order (I) Directing the United States Trustee to Appoint a Committee of Retired Employees of Tupperware Brands Corporation and (II) Granting Relating Relief* [Docket No. 473] (the "Retiree Motion") was filed by the Debtors.   The Retiree Motion seeks entry of an order, to the extent required, directing the U.S. Trustee to appoint an official committee of retired employees of Debtor Tupperware Brands Corporation.  The Debtors' retiree programs are described in the Retiree Motion.

[The Bankruptcy Court held a hearing regarding the Retiree Motion on March 7, 2025.][5]

### J.    Environmental Remediation.

The Debtors are responsible for the cleanup, monitoring and testing of soil and groundwater impacts at their former manufacturing facility in Neshanic Station, New Jersey

---

[5]    [**NTD**:  Disclosure will be updated prior to solicitation to describe the outcome of the hearing.]

(the "Neshanic Station Property").  The Neshanic Station Property has been subject to remedial investigations and remediation since the late 1980s pursuant to the New Jersey Industrial Site Recovery Act, a program overseen by the New Jersey Department of Environmental Protection Agency ("NJ DEPA").  The Neshanic Station Property is currently undergoing confirmatory monitoring for completion of groundwater remediation.

The NJ DEPA notified the Debtors that in order to remain in compliance with N.J.A.C. 7:26C-5 et seq., the Debtors are required to establish an alternative remediation funding source. The Debtors are indemnified by Mondelēz (as successor to Kraft Foods, Inc.) for 50% of the costs associated with the Neshanic Station Property.   In addition, there are six other unrelated sites the Debtors have been named as potentially responsible for remediation.  The Debtors are indemnified by Mondelēz (as successor to Kraft Foods, Inc.) for 100% of costs associated with these additional sites.

The Neshanic Station Property will be transferred to the Liquidating Trust for the Liquidating Trustee to market and sell the property.

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims and Interests entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Risks Related to Confirmation and Consummation of the Plan.

#### 1.    Parties in Interest May Object to the Plan Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article VI.A of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down, liquidate, or otherwise dissolve the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the

plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.      The Debtors Could Lose Exclusivity.

In addition, at the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors obtained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

### 7.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

### 8.      The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.      Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.    **Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.    **The Plan's Release, Injunction, and Related Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

12.    **The Total Amount of Allowed Administrative Claims and/or General Unsecured Claims May Be Higher Than Anticipated by the Debtors.**

With respect to Holders of Allowed Administrative Claims and/or General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

13.    **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the post-Effective Date Debtors, Liquidating Trust, and Holders of Claims.

B.    **Disclosure Statement Disclaimer.**

1.    **The Financial Information Contained in this Disclosure Statement Has Not Been Audited.**

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

46

2. **Information Contained in this Disclosure Statement is for Soliciting Votes.**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.**

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement does not constitute legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5. **This Disclosure Statement May Contain Forward Looking Statements.**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

6. **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7. **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The

Debtors or the Liquidating Trustee may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8.    No Waiver of Right to Object Claims or Interests.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11.    No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## X.    SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims and Interests in Class 3 and Class 4 (the "Voting Classes").  The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are not soliciting votes from Holders of Claims and Interests in Classes 1, 2, 5, 6, 7, or 8.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date.

**The Voting Record Date is [●], 2025**. The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      **Voting on the Plan.**

**The Voting Deadline is [●], 2025, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are actually received by the Debtors' Claims and Noticing Agent on or before the Voting Deadline:

---

**DELIVERY OF BALLOTS**

**Tupperware Brands Corporation**
**c/o Epiq Corporate Restructuring, LLC**
**10300 SW Allen Blvd. Beaverton, OR 97005**

**and/or**

**To submit your ballot to the Claims and Noticing Agent via electronic mail:**
**Tupperware@epiqglobal.com**

---

D.      **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY**
**QUESTIONS ABOUT THE SOLICITATION OR VOTING**
**PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT**

(888) 994-6318 (Toll Free) or +1 (971) 314-6017 (International)

**ANY BALLOT RECEIVED AFTER THE**
**VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE**
**WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.    Combined Hearing.

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the Combined Hearing for **[●], 2025, at [●]:[●]0 [●].m., (prevailing Eastern Time)**.  The Combined Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Combined Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties no later than the Confirmation Objection Deadline.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

### B.    Confirmation Standards.

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

#### 2.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' Advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide the same or a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business have been liquidated through the Sale Transaction and the Plan effects a transfer of the Liquidating Trust Assets to the Liquidating Trust and the wind-down, liquidation, or otherwise dissolution of the Debtors. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan and the Liquidating Trust (as applicable) likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee.  Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.  Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recover for Holders. See, e.g., 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date.  See Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced recoveries, increased expenses, delayed distributions, and the prospect of additional

claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

### 3.        Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the distribution of the Debtors' Cash on hand on the Effective Date and all other Liquidating Trust Assets to the Liquidating Trust.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### C.        Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

### D.        Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may

request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.  The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

The confirmation and execution of the Plan may have tax consequences to the Liquidating Trust Beneficiaries.  The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Liquidating Trust Beneficiaries as a result of the confirmation of the Plan.  All Liquidating Trust Beneficiaries are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan.  The Plan is not intended, and should not be construed, as legal or tax advice to any Liquidating Trust Beneficiary or other party in interest.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to (i) creditors whose Claims are Unimpaired

or otherwise entitled to payment in full in cash under the Plan or (ii) Holders who are deemed to reject the Plan, such as Holders of Class 7 Interests in Tupperware.

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended from time to time (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  No assurance can be given that the IRS will not take a position contrary to the description of U.S. federal income tax consequences of the Plan described below.  This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their

The following discussion of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, provincial, local and other tax consequences applicable under the Plan.

### A.    Consequences to Liquidating Trust Beneficiaries.

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim and the Term Loan Lenders will receive a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the Liquidating Trust Assets consistent with its Pro Rata interest in the Liquidating Trust, and subject to any portion(s) of the Liquidating Trust being treated as a "disputed ownership fund" for U.S. federal income tax purposes.

In general, each Liquidating Trust Beneficiary will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the fair market value of its undivided interest in the Liquidating Trust Assets and treated as received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  The Liquidating Trustee will in good faith value the Liquidating Trust Assets as of the Effective Date, and all parties to the Liquidating Trust must consistently use such valuation for all U.S. federal income tax purposes.  As discussed below, the amount of cash or other property received in respect of an Allowed Claim for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting.

After the date of transfer of Liquidating Trust Assets to the Liquidating Trust, a Holder's share of any collections received on the Liquidating Trust Assets (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the Liquidating Trust Assets.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder. The character of any gain or loss depends on, among other things, the origin of the Holder's Allowed Claim, when the Holder receives payment (or is deemed to receive payment) in respect of such Allowed Claim, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Allowed Claim at a discount, whether the Holder has taken a bad debt deduction with respect to such Allowed Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets (subject to any portion(s) of the Liquidating Trust being treated as a "disputed ownership fund" for U.S. federal income tax purposes) will equal the fair market value of such interest increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and a holder's holding period generally will begin on the day following the date of transfer of Liquidating Trust Assets to the Liquidating Trust.

### B.    Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein.

The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the assets transferred to the Liquidating Trust that are part of a Disputed Claims Reserve (*i.e.*, assets allocable to Disputed Claims, including assets retained on account of Disputed Claims), as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee and beneficiaries of the Liquidating Trust) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of such Liquidating Trust Assets (subject to any obligations relating to those assets) directly to recipients of beneficial interests in the Liquidating Trust (other than any Disputed Claims Reserve), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of such Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust. Accordingly, except in the event of contrary definitive guidance, holders of beneficial interests in the Liquidating Trust shall be treated for U.S. federal income tax purposes

as the grantors and owners of their respective share of the assets transferred by the Debtors to the Liquidating Trust (other than any Disputed Claims Reserve).

No ruling is currently being requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein. Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 are also discussed below.

### 1.    General "Liquidating Trust" Tax Reporting by the Liquidating Trust and their Beneficiaries.

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the holders of beneficial interests in the Liquidating Trust are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the Liquidating Assets transferred to the Liquidating Trust (other than any Disputed Claims Reserve), consistent with their Pro Rata interests therein. The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Liquidating Trustee also shall annually send to each holder of a beneficial interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, the holders of beneficial interests in the Liquidating Trust with respect to such holder's interest in the assets of the Liquidating Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any Disputed Claims Reserve. The character of any income and the character and ability to use any loss would depend on the particular situation of the holder. The U.S. federal income tax consequences to U.S. beneficiaries of U.S. grantor trusts with foreign corporate subsidiaries is not entirely clear. Holders of Liquidating Trust beneficial interests may be taxed on certain income of foreign corporate subsidiaries of the Liquidating Trust, but the amount of such income, if any, is not expected to be material.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the fair market value of such Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, holders of Allowed Claims, and the beneficiaries of the Liquidating Trust) must consistently use such valuation for all U.S. federal income tax purposes.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any cash or other proceeds, subject to any Disputed Claims Reserve. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust do not make a concurrent distribution to the holder. In general, other than in

57

respect of cash retained as part of a Disputed Claims Reserve (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Liquidating Trust will not be separately taxable to a beneficiary of the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying Liquidating Trust Assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust as part of a Disputed Claims Reserve. The Liquidating Trust will comply with all applicable governmental withholding requirements.

### 2.    Tax Reporting for Assets Allocable to Disputed Claims.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by section 1.468B-9(b)(2) of the Treasury Regulations, if applicable.

Accordingly, if a "disputed ownership fund" election is made with respect to any Disputed Claims Reserves, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets allocable thereto (including any gain recognized upon the disposition of such Liquidating Trust Assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the beneficiaries of the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

A reserve will be responsible for payment, out of the assets of the reserve, of any taxes imposed on the reserve or its assets. In the event, and to the extent, any cash in the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

### C.    Withholding on Distributions and Information Reporting.

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding." Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from

backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

The foregoing summary has been provided for informational purposes only. All Holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.

## XIII.   RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives, and provides for the best recovery to the Debtors' stakeholders.  Accordingly, the Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  March 6, 2025                              TUPPERWARE  BRANDS  CORPORATION
                                                   on behalf of itself and all other Debtors


                                                   _/s/ Brian J. Fox_
                                                   Name:  Brian J. Fox
                                                   Title:  Chief Restructuring Officer

## **Exhibit A**

**Chapter 11 Plan**

[Filed Separately]

## **Exhibit B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HEREIN.

### 1.    Introduction

Tupperware Brands Corporation, Dart Industries Inc., Deerfield Land Corporation, Premiere Products, Inc., Tupperware Home Parties, LLC, Tupperware International Holdings Corporation, Tupperware Products, Inc., , Tupperware U.S., Inc., Tupperware Brands Latin America Holdings, L.L.C., (each, a "Debtor," and collectively, the "Debtors"), with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the *Joint Chapter 11 Plan of Liquidation of Tupperware Brands Corporation and Its Debtor Subsidiaries* [Docket No. [●]] (as amended, supplemented, or modified from time to time, the "Plan")[1] and *Disclosure Statement Related to the Joint Chapter 11 Plan of Liquidation of Tupperware Brands Corporation and Its Debtor Subsidiaries* [Docket No. [●]] (as amended, supplemented, or modified from time to time, the "Disclosure Statement"). This Liquidation Analysis indicates the estimated recoveries that may be obtained by Holders of Allowed Claims and Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code as an alternative to the Plan.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each Holder of an Allowed Claim or Interest in each Impaired Class: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, this Liquidation Analysis: (1) estimates the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each of the Chapter 11 Cases were converted to a chapter 7 case on the Effective Date of the Plan and the assets of each Debtor's Estate were liquidated; (2) determines the distribution (the "Liquidation Distribution") that each Holder of an Allowed Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code; and (3) compares each Holder's Liquidation Distribution to the distribution that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. This Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or Disclosure Statement (as defined below), as applicable.

2.      **Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors would convert their cases from chapter 11 cases to chapter 7 cases on March 31, 2025 (the "Conversion Date") and would be liquidated thereafter pursuant to chapter 7 of the Bankruptcy Code.  The Debtors believe that the Conversion Date is a reasonable proxy for the Effective Date of the Plan.  This Liquidation Analysis was prepared on an individual legal entity basis for each Debtor and summarized into a consolidated report.  This Liquidation Analysis reflects consummation of the Sale Transaction. Accordingly, the only substantial assets available for recovery by the Debtors are PP&E, intercompany claims and equity interests, as well as estimated residual cash at the Debtors upon conversion to a chapter 7 case.  The Liquidation Analysis also assumes that any entity not transferred or acquired by Purchaser (each, a "RemainCo Entity") is liquidated upon conversion to a chapter 7 case resulting in potential proceeds available for distribution to equity or intercompany claims.

The pro forma values referenced herein are based upon the balances as of October 31, 2024, and adjusted for estimated balances as of the Conversion Date where applicable.  The Debtors' management ("Management") and advisors believe that this represents a reasonable proxy for the balances as of the Conversion Date.  This Liquidation Analysis is summarized in the table contained herein.

This Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors.  It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint a trustee who would attempt to sell the assets (if applicable) and/or recover value from the Debtors' equity interests in subsidiaries over a period of three months following the Conversion Date and distribute the cash proceeds, net of liquidation-related costs, to Holders of Allowed Claims and Interests in accordance with the priority scheme set forth in chapter 7 of the Bankruptcy Code.  There can be no assurance that the liquidation would be completed in such a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  It is assumed that the Trustee will retain counsel and other necessary advisors to assist in the liquidation and wind-down of the Estates and that no additional foreign proceedings are necessary to wind-down the Estates.

The estimation of proceeds from a hypothetical liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by Management and advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and Management.

The conversion to a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the Plan.  The amount of additional Claims could be significant, and some may be entitled to treatment as Administrative Claims, while others may be entitled to priority in payment over General Unsecured Claims.  The Liquidation Analysis does not include estimates for such additional Claims, including, but not limited to additional Claims that may be entitled to priority under the Bankruptcy Code, including Administrative Claims under sections 503(b) and 507(b) of the Bankruptcy Code.  More specific assumptions are detailed in the notes below. Additionally, certain factors, such as a seizure of collateral by secured creditors and/or delays in

the liquidation process may limit the amount of proceeds generated by the liquidation of the assets. These factors could materially reduce the value of the liquidation proceeds and yield significantly lower recoveries than those estimated in the Liquidation Analysis.

The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR SHALL BE CONSTRUED AS A CONCESSION OR ADMISSION BY THE DEBTORS.

No recovery or related litigation costs have been attributed to any potential Avoidance Actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the fact that many of such claims were purchased and released by the Purchaser as part of the Sale Transaction, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

Professional fees, Trustee fees, Administrative Claims, Priority Claims, and other such Claims that may arise in a liquidation scenario would have to be paid in full from the Liquidation Proceeds before any proceeds are made available to Holders of General Unsecured Claims and other Claims. Under the priority scheme dictated under chapter 7 of the Bankruptcy Code, no junior creditor of a Debtor would receive any distributions until all senior creditors of such Debtor are paid in full, and no equity holder of a Debtor would receive any distribution until all creditors of such Debtor are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated under chapter 7 of the Bankruptcy Code.

**3.      Liquidation Process**

For purposes of this Liquidation Analysis, the Debtors' hypothetical liquidation would be conducted pursuant to chapter 7 of the bankruptcy code, with the Trustee managing the bankruptcy estate of each Debtor to maximize recoveries in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets (if applicable) and/or recover value of the Debtors for distribution to creditors. The three major components of the liquidation are as follows:

- generation of cash proceeds from remaining assets (if applicable) and/or recovery of value on account of the Debtors' equity interests in subsidiaries;

- costs related to the liquidation process, such as estate wind-down costs and Trustee, professional, broker, and other administrative fees; and

- distribution of net proceeds generated from asset sales (if applicable) and/or recovered value to the Holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

4.      **Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to the applicable Holders of Allowed Claims and Interests in strict accordance with the priority scheme set forth in section 726 of the Bankruptcy Code.  The waterfall of Liquidation Proceeds is summarized below:

- Chapter 7 Liquidation Adjustments:  includes wind-down costs, estimated fees paid to the Trustee, and certain professional and/or broker fees;

- Secured Claims:  includes secured portions of all Secured Claims from the respective collateral;

- Administrative Claims, Priority Claims and Other Priority Claims:  includes preliminary estimate for administrative claims along with certain estimated unsecured Claims entitled to priority under section 507 of the Bankruptcy Code; and

- General Unsecured Claims:  includes General Unsecured Claims of each Debtor.

5.      **Conclusion**

The Debtors have determined, as summarized in the following analysis (the "Projected Liquidation Recovery"), that upon the Effective Date, the Plan will provide all Holders of Allowed Claims and Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code. [2]

---

[2]    Although the chart presents the results of the analysis on a consolidated basis for the Debtors, the Liquidation Analysis was prepared on a legal entity basis for each Debtor and the Projected Liquidation Recovery assumes that the Debtors would be liquidated in jointly administered chapter 7 cases, but on a nonconsolidated basis.

## DETAILED LIQUIDATION ANALYSIS

The following table summarizes this Liquidation Analysis for the aggregated Debtor entities.  This Liquidation Analysis should be reviewed with the accompanying notes.

| Liquidation Proceeds ($ in 000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debtors | Notes | Pro Forma ($) | | Estimated Liquidation Value ($) | | Estimated Recovery (%) | |
| | | Adj. Book Value | | Low | High | Low | High |
| **Liquidated Balance Sheet** | | | | | | | |
| | | | | | | | |
| **Asset Recoveries** | | | | | | | |
| Cash & Cash Equivalents | [A] | $644 | | $644 | $644 | 100.0% | 100.0% |
| Net Accounts Receivable | | - - | | - - | - - | - - | - - |
| Net Inventory | | - - | | - - | - - | - - | - - |
| Prepaid Expenses | | - - | | - - | - - | - - | - - |
| PP&E | [B] | 2,373 | | 237 | 475 | 10.0% | 20.0% |
| Intercompany Receivables | [C] | 636,002 | | 93 | 2,249 | 0.0% | 0.4% |
| Investment in Subsidiaries | [D] | 3,289,254 | | 488 | 1,356 | 0.0% | 0.0% |
| Other Current and Non-Current Assets | | - - | | - - | - - | - - | - - |
| **Total Assets Recovery / Gross Liquidation Proceeds** | | **$3,928,273** | | **$1,462** | **$4,723** | **0.0%** | **0.1%** |
| **Chapter 7 Fees and Costs** | | | | | | | |
| Chapter 7 Trustee Fees | [E] | | | (67) | (165) | | |
| Chapter 7 Other Fees | [F] | | | (575) | (650) | | |
| **Total Chapter 7 Fees and Costs** | | | | **($642)** | **($815)** | | |
| **Net Liquidation Proceeds** | | | | **$820** | **$3,908** | | |

| Claims and Recoveries ($ in 000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Professional Fee Carve-Out** | | | | | | | |
| Professional Fee Carve-Out | [G] | 5,415 | | 820 | 3,908 | 15.1% | 72.2% |
| **Total Professional Fee Carve-Out** | | **$5,415** | | **$820** | **$3,908** | **15.1%** | **72.2%** |
| **Secured Claims** | | | | | | | |
| Secured Claims | [H] | 732,280 | | - - | - - | - - | - - |
| **Total Secured Claims Recovery** | | **$732,280** | | **- -** | **- -** | **- -** | **- -** |
| **Administrative & Priority Claims** | | | | | | | |
| Administrative & Priority Claims - Pre-Petition | [I] | 964 | | - - | - - | - - | - - |
| Administrative & Priority Claims - Post-Petition | [I] | 868 | | - - | - - | - - | - - |
| Pre Chapter 7 Conversion Professional Fees (excl. Prof Fee Carve-Out) | [J] | 615 | | - - | - - | - - | - - |
| **Total Administrative & Priority Claims** | | **$2,447** | | **- -** | **- -** | **- -** | **- -** |
| **General Unsecured Claims** | | | | | | | |
| Unsecured Claims - Pre-Petition | [K] | 14,871 | | - - | - - | - - | - - |
| Other 3rd Party Liabilities and Accruals | [L] | 296,115 | | - - | - - | - - | - - |
| **Total General Unsecured Claims** | | **$310,986** | | **- -** | **- -** | **- -** | **- -** |
| **General Unsecured Intercompany Claims** | | | | | | | |
| General Unsecured Claims - Net Intercompany Liabilities | [M] | 4,073,790 | | - - | - - | - - | - - |
| **Total General Unsecured Intercompany Claims** | | **$4,073,790** | | **- -** | **- -** | **- -** | **- -** |
| **Total Claims and Recoveries** | | **$5,124,918** | | **$820** | **$3,908** | | |

**Notes to Specified Line Items of Liquidation Analysis**

*Gross Liquidation Proceeds*

[A] <u>Cash and Cash Equivalents</u>:  This consists of unrestricted cash held in bank accounts.  The cash and cash equivalents reflect an estimate of $0.6 million as of the Conversion Date.

[B] <u>Property, Plant and Equipment ("PP&E")</u>: This represents the Debtors' estimated recoveries on PP&E. The net book value of PP&E as of the Conversion Date is estimated at $2.4 million. The liquidation proceeds of net PP&E for all Debtor entities are estimated to be between 10% - 20% of the net book value.

[C] <u>Intercompany Receivables</u>:  This represents the Debtors' estimated recoveries on intercompany obligations from non-Debtor, RemainCo Entities.  The Debtors' collection depends on, among other things, the available proceeds from non-Debtor RemainCo Entities' liquidations and is assumed to be recovered after the non-Debtors RemainCo Entities have satisfied all secured claims, administrative claims, and other unsecured claims.  As part of this analysis, it is assumed that the Debtor entities will not receive any recovery on intercompany obligations owed to them from Purchaser.

[D] <u>Investment in Subsidiaries</u>:  This represents the Debtors' estimated recoveries on equity distributions from non-Debtor, RemainCo Entities.  The Debtors' collection depends on, among other things, the available proceeds from non-Debtor RemainCo Entities' liquidations and is assumed to be recovered after the non-Debtors RemainCo Entities have satisfied all secured claims, administrative claims, and other unsecured claims (including intercompany obligations).

*Chapter 7 Liquidation Adjustments*

[E] <u>Chapter 7 Trustee Fees</u>:  Upon converting to a chapter 7 liquidation, it is assumed that a Trustee would manage the bankruptcy estate of each Debtor to maximize recoveries in an expedited manner.  Fees would be limited to the fee guidelines in Section 326(a) of the Bankruptcy code. This Liquidation Analysis assumes that fees to the Trustee are estimated between $0.1 million and $0.2 million.

[F] <u>Chapter 7 Other Fees</u>:  This reflects any other costs associated with the wind down of Debtors' operations.  Costs include, among other things, personnel costs for Trustee's counsel, consultants kept on to wind down the business and other fees including, but not limited to, final tax returns, IT costs, and other administrative fees.  Total other fees are estimated to be between $0.6 million and $0.7 million.

*Claims & Recoveries*

[G] <u>Professional Fee Carve-Out</u>: This represents a preliminary estimate for trustee fees and expenses and allowed Debtor Professional fees. This Liquidation Analysis estimates a recovery between 15% - 72% on account of the Professional Fee Carve-Out.

[H] <u>Secured Claims</u>:  This represents a preliminary estimate for pre-petition secured claims and includes Credit Agreement Claims of $732 million.  This Liquidation Analysis estimates no recovery on account of the pre-petition Secured Claims.

[I] <u>Administrative & Priority Claims</u>:  This represents a preliminary estimate for pre-petition and post-petition administrative and priority claims.  Estimates associated with incremental post-petition accounts payable or administrative claims that may be triggered upon converting to a chapter 7 liquidation are not contemplated.  This Liquidation Analysis estimates no recovery on account of the pre-petition and post-petition Administrative & Priority Claims.

[J] <u>Pre-Chapter 7 Conversion Professional Fees</u>:  This represents a preliminary estimate for Debtor Professional fees and Committee Professional fees not entitled to Professional Fee Carve-Out treatment. This Liquidation Analysis estimates no recovery on account of Pre-Chapter 7 Conversion Professional fee claims.

[K] <u>Unsecured Claims – Pre-Petition</u>:  This represents estimated pre-petition unsecured claims at the Debtor entities.  This Liquidation Analysis estimates no recovery on account of the pre-petition Unsecured Claims.

[L] <u>Other 3rd Party Liabilities and Accruals</u>:  This represents estimated 3rd party accounts payable, taxes payable, accrued liabilities, pension & other postemployment benefit liabilities, and lease liabilities.  It is likely that other unsecured claims including product warranty claims, litigation claims, and other such claims would arise in the event of a liquidation.  This Liquidation Analysis estimates no recovery on account of the other 3rd party liabilities and accruals.

[M] <u>General Unsecured Intercompany Claims</u>:  This represents estimated net intercompany liabilities.  This Liquidation Analysis assumes that the intercompany liabilities are subordinate to general unsecured claims and estimates no recovery on account of Intercompany Claims.